1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - - - -

Adam P. Hall,                    :

      Plaintiff,        :

      vs.               :

                  Case No. 2:08CV518

OhioHealth              : Judge Watson

Corporation, Doctors

Hospital, et al.,       :

      Defendants.       :


- - - - -

DEPOSITION OF ADAM P. HALL, D.O.

- - - - -


Taken at Littler Mendelson

21 East State Street, Ste. 1600

Columbus, OH 43215

May 18, 2009, 10:14 a.m.


- - - - -


Spectrum Reporting LLC

333 Stewart Avenue, Columbus, Ohio 43206

614-444-1000 or 800-635-9071

www.spectrumreporting.com


- - - - -

Adam P. Hall, D.O.                                    May 18, 2009

2

1          A P P E A R A N C E S

2

   ON BEHALF OF PLAINTIFF:

3

   The Law Office of Marc Mezibov, Inc.

4  401 East Court Street, Ste 600

   Cincinnati, OH 45202

5  By Marc D. Mezibov, Esq.

6

   ON BEHALF OF DEFENDANTS:

7

   Littler Mendelson

8  21 East State Street, Ste. 1600

   Columbus, OH 43215

9  By Alison M. Day, Esq.

10

   ALSO PRESENT:

11

   Deborah Blackwell, D.O.

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                        Monday Morning Session

2                       May 18, 2009, 10:14 a.m.

3                          - - - - -

4              S T I P U L A T I O N S

5                          - - - - -

6          It is stipulated by counsel in attendance that

7     the deposition of Adam P. Hall, D.O., the

8     Plaintiff herein, called by the Defendants for

9     cross-examination, may be taken at this time by

10    the notary pursuant to notice and subsequent

11    agreement of counsel that said deposition may be

12    reduced to writing in stenotypy by the notary,

13    whose notes may thereafter be transcribed out of

14    the presence of the witness; that proof of the

15    official character and qualification of the notary

16    is waived.

17                          - - - - -

18

19

20

21

22

23

24

Adam P. Hall, D.O.                                          May 18, 2009

4

I N D E X

| Examination By | Page |
|---|---|
| Ms. Day - Cross | 6 |
| Mr. Mezibov - Direct | 206 |
| Ms. Day - Recross | 210 |

| Exhibits | Page |
|---|---|
| 1 - Resume of Hall | 23 |
| 2 - Letter from Hall, 12-14-03 | 36 |
| 3 - Report and Recommendation in the Matter of Adam P. Hall, D.O. | 85 |
| 4 - Entry of Order | 87 |
| 5 - Letter to Hilliard from Hall, 3-1-06 | 90 |
| 6 - Resident Contract | 91 |
| 7 - Application for Internship/Residency Training | 100 |
| 8 - Resident Quarterly Evaluation | 101 |
| 9 - Resident Quarterly Evaluation | 103 |
| 10 - Resident Contract | 104 |
| 11 - Evaluation of Resident Performance | 120 |
| 12 - Evaluation of Resident Performance | 122 |
| 13 - Quarterly Evaluation of Resident Performance | 123 |

Adam P. Hall, D.O.                                          May 18, 2009

5

1                    INDEX (CONT'D)

2    Exhibits                                           Page

3    14 - Employment Agreement for Graduate Medical    125
            Education
4

     15 - Physician Orders                              136
5

     16 - Standard Policies & Procedures for House      143
6            Staff

7    17 - Letter to Hall from Hilliard, 4-20-06         147

8    18 - Evaluation of Resident Performance            149

9    19 - Letter to Smith from Meldrum, 3-6-07          150

10   20 - Letter to Hall from Hilliard, 5-3-06          151

11   21 - Step I Consent Agreement                      155

12   22 - Resident Quarterly Evaluation                 157

13   23 - Step II Consent Agreement                     162

14   24 - letter to Jacobs from Goldberg, 10-16-06      171

15   25 - Letter to Bickers from Sanelli, 12-19-06      172

16   26 - Multidisciplinary Assessment Program          174
            Summary
17

     27 - Charge of Discrimination                      176
18

     28 - OCRC Charge of Discrimination                 177
19

     29 - Charge of Discrimination                      181
20

     30 - Interrogatories                               181
21

     31 - Amended Complaint and Jury Demand             192
22

23   (Exhibits attached to original transcript.)

Adam P. Hall, D.O.                                        May 18, 2009

6

1                  ADAM P. HALL, D.O.

2      being first duly sworn, testifies and says as

3      follows:

4                    CROSS-EXAMINATION

5      BY MS. DAY:

6      Q.          Hi, Dr. Hall.  My name is Alison Day.

7      We met a moment ago.  I'm an attorney.  I

8      represent your former employer, OhioHealth, in

9      connection with the lawsuit that you've brought.

10     I'm going to be taking your deposition today.

11                You've had your deposition taken

12     before, correct?

13     A.          Yes.

14     Q.          Okay.  So you're familiar with what

15     we're doing, but I'll still go over a few ground

16     rules to help things go a little bit more

17     smoothly.

18     A.          Sure.

19     Q.          Tracy is a court reporter.  She's going

20     to be taking down my questions and your answers

21     verbatim.  Keeping that in mind, it's important

22     that we don't talk over each other.  Try to let me

23     finish asking my question before you answer even

24     if you can already tell what I'm asking.  And I'll

7

1    try to let you finish your answer as well.

2             It's important that you answer verbally

3    yes, no, or whatever your answer may be rather

4    than nodding your head or saying uh-huh or huh-uh.

5    I'll probably understand you, but it's difficult

6    to tell on the transcript of what you meant by

7    your answer.  And it's difficult for Tracy to take

8    down.  Does that sound good?

9    A.        Sure.

10   Q.        If you need to take a break at any

11   time, just let me know.  I'm happy to take a

12   break.  I'll just ask that you answer the question

13   that's on the table.

14   A.        Okay.

15   Q.        And if you ever don't understand one of

16   my questions or you don't hear it or you just want

17   me to repeat it or rephrase it in a different way,

18   please let me know.  Again, I'm happy to do that,

19   but you have to let me know.  Otherwise I'm going

20   to assume that you heard my answer and believe

21   that you understood it.

22             Does that sound fair?

23   A.        Uh-huh.

24   Q.        Yes?

8

1    A.          Yes.

2    Q.          See, you're already doing it.

3    A.          Could we -- we had spoken earlier,

4    maybe about every hour just take a break?

5    Q.          Sure.  You just let me know when you

6    want to take a break.

7    A.          Okay.

8    Q.          I'm not real good at watching the time.

9    And I have a tendency to go on.  So don't feel

10   like -- I'll try to watch it, but if we've been

11   going a long time --

12              MR. MEZIBOV:  I'll be the timekeeper.

13   Q.          Just let me know.  I'll just ask that

14   you answer the question that we've got out there.

15   A.          Okay.

16   Q.          And Dr. Blackwell is going to be

17   getting here at some point here this morning.

18   A.          Okay.

19   Q.          So we'll probably take a break when she

20   gets here as well.

21              Are you currently under the influence

22   of alcohol or any drug that would affect your

23   ability to answer my questions truthfully?

24   A.          No.

9

1   Q.          Are you aware of any other reason that

2   would affect your ability to answer my questions

3   truthfully?

4   A.          No.

5   Q.          Can you state and spell your full legal

6   name for the record?

7   A.          My full legal name is Adam Patrick

8   Hall, spelled A-D-A-M, P-A-T-R-I-C-K, H-A-L-L.

9   Q.          What is your current residence?

10  A.          My current residence is 4142 Charter

11  Oak Way, Columbus 43219.

12  Q.          Do you own or rent that residence?

13  A.          I rent.

14  Q.          How long have you lived there?

15  A.          Since April of 2008.

16  Q.          Who do you live with there?

17  A.          I live by myself.

18  Q.          Are you currently employed?

19  A.          Yes.

20  Q.          And where is that?

21  A.          I work for Adam P. Hall, D.O.,

22  Incorporated.  It's my own business.

23  Q.          Do you have an office?

24  A.          Yes.

Adam P. Hall, D.O.                                      May 18, 2009

10

1    Q.        And where is that?

2    A.        It's down in Ironton, Ohio.  The

3    address is 407 South Third Street, Ironton 45638.

4    Q.        Do you have an office in Columbus as

5    well or just Ironton?

6    A.        No, I have an office in Columbus as

7    well that I just opened recently.  And it is 7400

8    Huntington Park Drive, Suite 50, Columbus 43230 I

9    believe is the zip code there.

10   Q.        And when did you start your own

11   practice?

12   A.        January of 2008.

13   Q.        At that point, did you open both the

14   Ironton and Columbus office?

15   A.        No.  I only had the one in Ironton.

16   And then this year, opened the other one in

17   Columbus.

18   Q.        Okay.  So how much time are you

19   spending in Ironton versus Columbus?

20   A.        Two days out of town.  And then the

21   rest of the time in Columbus.

22   Q.        And what's the nature of your practice?

23   A.        I do general practice with some pain

24   management.

11

1    Q.          Prior to starting your own practice,

2    were you employed?  I guess strike that.

3                After leaving Doctors, which I believe

4    was April of 2006?

5    A.          Yes.

6    Q.          When was the first time you were

7    employed after that?

8    A.          May of 2006.

9    Q.          What did you do in May?

10   A.          I worked at an ER in Missouri for a

11   little bit.  And then I also, when I was back in

12   Columbus, I would work between Dayton and here.  I

13   don't think I had many times when I was in

14   Columbus.  But most of it was in Dayton at the

15   urgent care facility there.

16   Q.          How long were you at the ER in

17   Missouri?

18   A.          Till November of 2006.

19   Q.          So from May '06 to November '06, were

20   you only working at the ER in Missouri, or were

21   you also back in Columbus at times?

22   A.          I was back in Columbus at times.

23   Q.          So what was the nature of your

24   employment in Missouri?

12

1   A.          I did emergency room work.

2   Q.          And for who?

3   A.          The facility that I worked at was

4   called Twin Rivers Regional.

5   Q.          And was that full-time employment or

6   part-time?

7   A.          Part-time.

8   Q.          When you were in Ohio during this May

9   to November '06 period, you said you also did some

10  work in Ohio?

11  A.          Until August.  From May to August.

12  Q.          What happened in August?

13  A.          That's when I entered into rehab.  And

14  so the month of August I didn't work at all at

15  either place because I was in a 28-day inpatient

16  rehabilitation facility.

17  Q.          Was that at The Woods?

18  A.          Yes, that's correct.

19  Q.          Other than August of '06 when you were

20  in rehab, has there been any other time since

21  April of '06 that you've been unable to work for

22  any reason?

23  A.          Could you rephrase that a little bit?

24  Q.          Sure.  From the time since you left

Adam P. Hall, D.O.                                      May 18, 2009

13

1    Doctors in April of '06 until the present, has

2    there been any time that you've been unable to

3    work for any reason?

4    A.          In Ohio my license was suspended

5    between August and February.  August of '06 to

6    February of '07.  I was not able to work and I was

7    able to get my license back.  The State of

8    Missouri as a reciprocal move asked me to be

9    evaluated.  And in Missouri I had been unable to

10   work because of the restriction on my license.

11   They have not lifted the suspension.  So in

12   Missouri, I've been unable to work.

13   Q.          When did Missouri restrict your

14   license?

15   A.          In February of 2007.

16   Q.          Which was the -- around the same time

17   that Ohio reinstated your license?

18   A.          Correct, yes.

19   Q.          So you've had a license in either Ohio

20   or Missouri at all times?

21   A.          Yes.

22   Q.          Since April of '06?

23   A.          Yes.

24   Q.          Okay.  So any other reason why you have

Adam P. Hall, D.O.                                      May 18, 2009

14

1    been unable to work since April of '06?

2    A.          Yes.

3    Q.          And what was that?

4    A.          Not being Board certified restricts the

5    facilities that I can work at.

6    Q.          Okay.  Has there been any reason other

7    than issues with your medical license why you've

8    been unable to work since April of '06?

9    A.          No.

10   Q.          And the fact that you were in

11   inpatient rehab.  Was that inpatient rehab?

12   A.          Yes.

13   Q.          Okay.  So when you got out of the

14   inpatient rehab -- and was that beginning of

15   September or end of August?

16   A.          It was the end of August.

17   Q.          Of '06, then did you go back to the ER

18   in Missouri?

19   A.          Yes.

20   Q.          And were you working in Ohio as well?

21   A.          No.

22   Q.          When you did work in Ohio in that May

23   to August time frame, where did you work?

24   A.          The urgent cares in Dayton.

15

1    Q.        Was that part of a particular company?

2    A.        Yes.  I'm trying to think of the name.

3    I don't recall the name.

4    Q.        There was more than one?

5    A.        Yes.

6    Q.        And then did you also work at urgent

7    care in Columbus?

8    A.        I don't believe I did, no.

9    Q.        So after you got out of rehab, you

10   moved back to Missouri, correct?

11   A.        Could you rephrase that?

12   Q.        After you got out of rehab at the end

13   of August of '06, did you move back to Missouri?

14   A.        No.

15   Q.        What did you do?

16   A.        I commuted between Missouri and Ohio.

17   Q.        And you worked at the ER at Twin Rivers

18   until November of '06?

19   A.        Yes.

20   Q.        Did you work anywhere else from

21   September to November of '06?

22   A.        No.

23   Q.        And then what did you do in November of

24   '06?

Adam P. Hall, D.O.                                          May 18, 2009

16

1    A.          I separated from my wife for a month

2    and I moved down to Florida.

3    Q.          So you lived in Florida from when to

4    when?

5    A.          For the month of November.

6    Q.          Did you work at all then?

7    A.          No.

8    Q.          And then you moved back for December --

9    A.          Yes.

10   Q.          -- of '06?  Did you work anywhere then?

11   A.          No.

12   Q.          When was the next time you were

13   employed?

14   A.          January of '07.

15   Q.          Where did you go to work in January of

16   '07?

17   A.          I went to two different ERs in

18   Missouri.

19   Q.          And where was that?

20   A.          One was Cedar County Memorial Hospital.

21   And the other was Nevada Regional.

22   Q.          How long did you work there for Cedar

23   County and Nevada Regional?

24   A.          For less than a month.

Adam P. Hall, D.O.                                    May 18, 2009

17

1    Q.        Because then you lost your license in

2    Missouri?

3    A.        Yes.

4    Q.        Was there a period then when you were

5    unemployed?

6    A.        Yes.

7    Q.        For how long?

8    A.        Between February of '07 to

9    approximately May of '07.

10   Q.        And by May of '07, you had your Ohio

11   license?

12   A.        Yes.

13   Q.        And what did you do in May of '07?

14   A.        I started working at an office down in

15   Ironton, Ohio.

16   Q.        What was the name of that?

17   A.        County Wide Health.

18   Q.        Who owns County Wide Health?

19   A.        I believe his name is Rick Billiter.

20   Q.        Is he a physician?

21   A.        No.

22   Q.        Were there other offices of County Wide

23   Health or just the one?

24   A.        Just the one.

Adam P. Hall, D.O.                                    May 18, 2009

18

1    Q.        In Ironton?

2    A.        Yes.

3    Q.        Were there other physicians working

4    there at the time you were there?

5    A.        For a period of a few months when I

6    first started, there was a gentleman, another

7    physician there, but he left after a few months.

8    Q.        Who was there when you started?

9    A.        The other physician?

10   Q.        Yes.

11   A.        I don't recall his name.

12   Q.        Was this a general family practice?

13   A.        It was a similar practice concept to

14   what I do now.  It was a general practice with

15   pain management.

16   Q.        In May of '07, were you under

17   restrictions as far as your ability to administer

18   controlled substances?

19   A.        Yes.

20   Q.        And what were those?

21   A.        The restrictions in May of '07 that I

22   had on my license for controlled substances was

23   that I could not personally furnish, administer or

24   dispense narcotics.

Adam P. Hall, D.O.                                        May 18, 2009

                                                                    19

1   Q.         And how long -- is that limitation

2   still in place?

3   A.         Yes.

4   Q.         Has it been in place continually since

5   February or March of '07?

6   A.         Yes.  Yes, I believe it was March.

7   Q.         March of '07.  Okay.  And were you able

8   to comply with that restriction while you were at

9   County Wide Health?

10  A.         Yes.

11  Q.         How did you do that?  How did that

12  work?

13  A.         There were no narcotics at the

14  practice, just prescribing.

15  Q.         And how long were you with County Wide?

16  A.         From May until January.  May of '07

17  till January of '08.

18  Q.         And what did you do in January of '08?

19  A.         I started my own practice.

20  Q.         Is that the practice that you have now?

21  A.         Yes.

22  Q.         What was the name of that again?  I

23  know you told me.

24  A.         Adam P. Hall, D.O., Incorporated.  It's

Adam P. Hall, D.O.                                          May 18, 2009

20

1    a dba Pinnacle Wellness & Longevity.

2    Q.        And there was some litigation from

3    County Wide after you left there --

4    A.        Yes.

5    Q.        -- correct?  And what was the nature of

6    that lawsuit?

7             THE WITNESS:  Do I have to answer that

8    question?

9             MR. MEZIBOV:  You can answer.

10            THE WITNESS:  Okay.

11   A.        The nature of the lawsuit was the

12   gentleman who owned the practice sued me for

13   leaving the practice without notice.  I believe it

14   was more like a noncompete.  He was trying to say

15   that I was competing with his practice.  But I

16   didn't have a noncompete.  And that case has since

17   been settled with prejudice.  We had a motion for

18   summary judgment and it's been since settled.

19   Q.        Okay.  Do you know when that case was

20   dismissed?

21   A.        Just last week.

22   Q.        And is it your understanding that it

23   was dismissed based on your motion for summary

24   judgment?

Adam P. Hall, D.O.                                                May 18, 2009

21

1   A.        Yes.

2   Q.        At one point was there a temporary

3   restraining order in place?  Do you know what I'm

4   talking about?

5   A.        A temporary injunction?

6   Q.        Yes.

7   A.        Yes.

8   Q.        What were you prevented from doing

9   under that injunction?

10  A.        Well, the owner of the previous

11  business had his lawyers file a motion for a

12  temporary injunction.  And I was just restricted

13  from seeing those patients that had been County

14  Wide patients for, I believe, about a two-day

15  period of time when the injunction was lifted.

16  Q.        Are you currently -- so that case is

17  dismissed --

18  A.        Yes.

19  Q.        -- as far as you know?

20  A.        Yes.

21  Q.        Okay.  Are you currently involved in

22  litigation, additional litigation with some of the

23  other folks that you worked with at County Wide?

24  A.        Yes.

22

1    Q.         And what's the status of that

2    litigation?

3    A.         It's still currently pending.  Do you

4    mind if I get some water real quick?

5    Q.         Sure.  Why don't we take a quick break.

6               (Dr. Blackburn joins the deposition.)

7               (A short recess is taken.)

8    Q.         You understand you're still under oath?

9    A.         Yes.

10   Q.         We were talking earlier about your

11   current practice now?

12   A.         Yes.

13   Q.         And you said that that was some general

14   practice and then some pain management --

15   A.         Correct.

16   Q.         -- correct?  Now, as part of your pain

17   management, are you furnishing, administering or

18   dispensing any sort of controlled substance?

19   A.         No.

20   Q.         How does that work?

21   A.         Well, I prescribe medications, I just

22   don't have any controlled substances that I

23   personally furnish, administer or dispense in the

24   office.

Adam P. Hall, D.O.                                      May 18, 2009

23

1    Q.        So you really don't have at this point

2    access to controlled substances beyond issuing a

3    prescription?

4    A.        Correct.

5    Q.        Dr. Hall, from time to time during your

6    deposition we're going to be handing you some

7    documents I'll be asking you questions about.

8    We'll be marking them as exhibits.  You need to

9    make sure that you leave the original for the

10   court reporter.  Your attorney will have a copy as

11   well.

12                    - - - - -

13        Thereupon, Defendants' Exhibit 1 is marked

14   for purposes of identification.

15                    - - - - -

16   Q.        There may be an extra here or there

17   but --

18             MR. MEZIBOV:  I was going to ask, but I

19   guess it's too late.  I've found it to be useful

20   for everybody if we just use a running 1, 2, 3, 4.

21             MS. DAY:  Well, you know what, it may

22   not be a bad idea to use numbers anyway because I

23   don't know how many I've got.

24             MR. MEZIBOV:  We'll use the same

Adam P. Hall, D.O.                                          May 18, 2009

24

1    numbers.

2              MS. DAY:  You can turn that into 1.

3    Q.        Dr. Hall, we've handed you what we've

4    marked as Exhibit 1.  Do you recognize this

5    document?

6    A.        Yes.

7    Q.        And I believe this was a copy of your

8    resume that was produced in discovery.  Is this a

9    current resume?

10   A.        No.

11   Q.        In what way is it not current?

12   A.        On the third page where it says

13   available upon request where I have listed Ohio,

14   Florida, Kentucky, I don't have a Kentucky

15   license.  I believe I was going to get one, but I

16   did not receive one.

17   Q.        Do you have a Florida license?

18   A.        Yes.

19   Q.        So you have since revised your resume

20   to take out the part about Kentucky?

21   A.        I haven't.  No, I have not revised it.

22   I just looking at this --

23   Q.        Okay.  That's just something that's not

24   accurate?

Adam P. Hall, D.O.                                    May 18, 2009

25

1    A.          Right.

2    Q.          And then you also on the second page

3    list the Ironton, dba Pinnacle Wellness.  That's

4    your practice, correct?

5    A.          Yes.  And I don't have the --

6    Q.          Columbus?

7    A.          -- Columbus office listed either.

8    Q.          Do you know when you prepared this

9    resume?

10   A.          It would have preceded 2009 I believe.

11   It would have been in the year of 2008.

12   Q.          I'd like to talk a little bit about

13   your educational background.  And just have your

14   resume there to the extent that it helps refresh

15   you.

16               Did you graduate from high school?

17   A.          Yes.

18   Q.          And where did you go?

19   A.          Lee's Summit Senior High School.

20   L-E-E-'-S Summit Senior High School.

21   Q.          And where is that?

22   A.          That's in Lee's Summit, Missouri.

23   Q.          And after high school, did you go

24   directly to the Air Force?

Adam P. Hall, D.O.                                              May 18, 2009

26

1    A.        Yes.

2    Q.        So you graduated from high school in

3    1991?

4    A.        Correct.

5    Q.        And why did you leave the Air Force

6    Academy?

7    A.        I left the Air Force Academy because I

8    lost my pilot slot due to a vision change.

9    Q.        Any other reason?

10   A.        No.

11   Q.        And your resume states that you left or

12   that you were there from 6-91 to 2-92 --

13   A.        Correct.

14   Q.        -- is that correct?  And then you ended

15   up at the University of Missouri in August of '92,

16   correct?

17   A.        Correct.

18   Q.        What did you do in between?

19   A.        I took some courses at a community

20   college.  I may not have listed it on there, but I

21   took some courses at a -- it's called Longview

22   Community College.

23   Q.        And where is that?

24   A.        It's in Lee's Summit, Missouri.

27

1   Q.        And your resume states you graduated

2   from the University of Missouri in December 1994;

3   is that correct?

4   A.        Correct.

5   Q.        With a B.A. in chemistry?

6   A.        Yes.

7   Q.        And what did you do after you graduated

8   from the University of Missouri?

9   A.        Well, I had applied to do some work as

10   a chemist, but I decided not to pursue that route.

11   And I worked some odd jobs as a waiter until I

12   went back to school in '95 for a couple months.

13   Q.        Okay.  So between December of '94 and

14   August of '95, just odd jobs?

15   A.        Correct.

16   Q.        Where were you living then?

17   A.        I was still living in the college town

18   of Columbia.

19   Q.        Did you start at then Creighton in

20   Omaha in August of 1995?

21   A.        Correct.

22   Q.        And what type of program were you in at

23   Creighton?

24   A.        I was going to a healthcare program for

Adam P. Hall, D.O.                                May 18, 2009

28

1    nursing.

2    Q.        Was that a master's program?

3    A.        It was an accelerated program.  If you

4    already had a bachelor's, you could get it in a

5    year.

6    Q.        And so did you obtain some sort of

7    degree or certification from Creighton?

8    A.        No.

9    Q.        Did you complete that program?

10   A.        No.

11   Q.        And then did you leave Creighton in

12   February of 1996?

13   A.        Correct.

14   Q.        And why was that?

15   A.        I just didn't finish the program.  I

16   had some -- just had some personality issues with

17   the staff there.  And it just wasn't really a

18   program that I wanted to continue pursuing.

19   Q.        Did you leave Creighton voluntarily?

20   A.        I was put on leave and I had the option

21   of coming back, but I didn't go back so --

22   Q.        When did they put you on leave?

23   A.        About the same time that I listed on

24   there for the resume.

Adam P. Hall, D.O.                                    May 18, 2009

29

1    Q.          February of '96?

2    A.          Uh-huh.  Correct.

3    Q.          So were you on some sort of -- do you

4    know what exactly your status was as of February

5    of '96?

6    A.          I really couldn't say.  I really don't

7    recall.

8    Q.          What was the reason that Creighton gave

9    you for putting you on leave or asking you to

10   leave or whatever it was?

11   A.          Again, I think there was some issues

12   with personality.  I really honestly could not

13   recall as to the exact detail of it to the exact

14   extent.

15   Q.          What were the issues with personality?

16   A.          I just believe that they were -- to the

17   best of my recollection, I believe that some of

18   the staff and I did not get along.

19   Q.          Was there any particular incident that

20   led to Creighton putting you on leave?

21   A.          I don't recall.  There may or may not

22   have been.

23   Q.          Do you recall any discussion with any

24   of the administrators at Creighton about going on

Adam P. Hall, D.O.                                    May 18, 2009

30

1    leave or the reasons for being put on leave?

2    A.          I'm sure I had some discussions with

3    them, but I don't recall what they were.

4    Q.          So what did you do then in February of

5    1996?

6    A.          I sought application for medical school

7    because that was my desire end goal to be a

8    physician.  And so I started applying for programs

9    to do medicine.  And I worked for a few months

10   prior to going back to medical school.

11   Q.          And where did you work in between

12   February and August 1996?

13   A.          I believe I may have spent some time in

14   Kansas City near my folks.  And I may have also

15   gone back to Columbia.  But, again, that's hard to

16   recall the exact sequence of events.

17   Q.          And then you started medical school at

18   Des Moines University in August of 1996?

19   A.          Correct.

20   Q.          And were you a full-time student there

21   until June of 2000?

22   A.          Yes.

23   Q.          Were you subject to any discipline

24   while you were at Des Moines University?

Adam P. Hall, D.O.                                        May 18, 2009

                                                                    31

1    A.          To the best of my knowledge, no.

2    Q.          Were there any occasions while you were

3    at Des Moines University when you were placed on

4    any sort of probationary status?

5    A.          There was a rotation towards the end of

6    my fourth year that I received unsatisfactory

7    marks and had to repeat.

8    Q.          What rotation was that?

9    A.          Internal medicine.

10   Q.          Any other occasions where you can

11   recall either being disciplined or placed on any

12   sort of probationary status?

13   A.          No.

14   Q.          After you graduated in June of 2006,

15   did you then complete an internship?

16   A.          Yes.

17   Q.          And was that at Peninsula Hospital?

18   A.          Yes.

19   Q.          In Far Rockaway, New York?

20   A.          Yes.

21   Q.          And did you complete that internship?

22   A.          Yes.

23   Q.          Were you placed on probationary status

24   at all with Peninsula Hospital?

Adam P. Hall, D.O.                                    May 18, 2009

32

1    A.        To the best of my recollection, no.

2    Q.        Were you disciplined at all during your

3    internship with Peninsula Hospital?

4    A.        To the best of my recollection, no.

5    Q.        What type of internship was that?

6    A.        It would be considered a traditional

7    rotating internship.

8    Q.        And after you completed the

9    internship -- and that was in about June of 2001;

10   is that correct?

11   A.        Yes.

12   Q.        What did you do after that?

13   A.        I moved to California to start an

14   anesthesia residency.

15   Q.        And that was with Riverside County

16   Regional Medical Center?

17   A.        Correct.

18   Q.        And you were only there until August of

19   2002, correct?

20   A.        Yes.

21   Q.        So did you get credit for the first

22   year of that residency?

23   A.        I sent my documentation to the American

24   Osteopathic College of Anesthesia, but I don't

33

1    know if I received credit from them, so I don't

2    know.

3    Q.          You redid a first year anesthesia

4    residency at Doctors --

5    A.          Correct.

6    Q.          -- in any event?  And why did you not

7    complete your full residency with Riverside County

8    Regional Medical Center?

9    A.          Prior to your 25th month of training,

10   which would be a PGY3, it required you to have a

11   permanent medical license, and I did not pass my

12   step-three boards in time to get the license.

13   Q.          Did you ultimately pass it?

14   A.          Yes.

15   Q.          And when did you pass that?  Feel free

16   to look at that.

17   A.          During the period of 8-2002 to 12-02 I

18   took a sabbatical.  That's when I did the Board

19   prep.  And I took the test in December.  I believe

20   it was '02.  I believe that's when it was given.

21   And I passed it at that time.

22   Q.          Any other reason why you did not

23   complete the residency at Riverside County

24   Regional Medical other than you not passing the

Adam P. Hall, D.O.                                    May 18, 2009

34

1    Step III Boards in time?

2    A.          No, not that I know of.

3    Q.          Other than in connection with not

4    passing the Step III Boards in time, were you

5    subject to any discipline or probation at

6    Riverside County?

7    A.          Not that I recall, no.

8    Q.          So then I think you've already said

9    from August to December '02, you took off to study

10   for your Boards?

11   A.          Yes, that's correct.

12   Q.          And then you took them in about

13   December of '02?

14   A.          Yes.

15   Q.          And when did you find out that you

16   passed?

17   A.          About eight weeks later.

18   Q.          And what did you do after that?

19   A.          Well, after December, January of '03, I

20   started a family practice program.  So while I was

21   waiting to get my results back, I had already

22   started another program.

23   Q.          Did you apply for other anesthesia

24   residences before you went to -- back to Missouri

35

1    in January?

2    A.         I had called.

3    Q.         I'm sorry?

4    A.         I had called numerous programs around

5    the country and there were not any available

6    slots.

7    Q.         And then you were only at the Medical

8    Center of Independence -- that's where the family

9    practice residency was, correct?

10   A.         Yes.

11   Q.         You were only there from January of

12   2003 to June of 2003; is that right?

13   A.         Yes.

14   Q.         And why did your residency there end?

15   A.         Because I missed a call shift and was

16   subsequently terminated.

17   Q.         And that was an issue that came up when

18   you had applied for your Ohio license, correct?

19   A.         Yes.

20   Q.         What did you do then between June of

21   2003 and February of 2004 when you started at

22   Doctors?

23   A.         During that period that I wasn't

24   working or in a residency, I had received my

Adam P. Hall, D.O.                                    May 18, 2009

36

1   Missouri medical license during that time and I

2   was moonlighting, doing some ER work in small

3   facilities outside the metropolitan area.

4   Q.       And if you go ahead and look at the

5   second page of your resume, this entry starting

6   with ER physician, Cameron Regional Medical

7   Center, do you see where I'm referring?

8   A.       Yes.

9   Q.       And then it looks like there are about

10  four of them, I guess, during that time period.

11  Were those the places where you worked?

12  A.       Yes.

13                  - - - - -

14       Thereupon, Defendants' Exhibit 2 is marked

15  for purposes of identification.

16                  - - - - -

17  Q.       I'm handing you what we've marked as

18  Exhibit 2.  Go ahead and take a look at this.  Do

19  you recognize this document?

20  A.       Yes.

21  Q.       And is the first page of Exhibit 2 the

22  cover letter that you submitted when applying for

23  an anesthesia residency at Doctors?

24  A.       I believe so.

37

1    Q.          And this letter is dated December 14,

2    2003.  Do you believe that that's around the time

3    that you applied?

4    A.          Yes.

5    Q.          And then the second, third and fourth

6    pages are a version of your -- a previous version

7    of your resume, correct?

8    A.          Yes.

9    Q.          And was this the resume that you

10   submitted to Doctors in December of 2003 when you

11   applied for residency?

12   A.          I'm not sure.  It may or may not be.

13   Q.          Do you have any reason to believe that

14   it's not?

15   A.          Again, it may or may not be the one

16   that I submitted.

17   Q.          Right.  No, I understand that.  But do

18   you have any reason to believe that it's not?

19   A.          Again, I don't know if it is or it

20   isn't.  I really --

21   Q.          No, I understand that you're saying

22   you're not sure if this is it.

23   A.          Right.

24   Q.          But what I'm asking you is a different

Adam P. Hall, D.O.                                    May 18, 2009

38

1    question.  I understand you're not sure whether or

2    not it is.  But do you have any reason to believe

3    that it's not?

4    A.          No.

5    Q.          Okay.  Looking at the third page under

6    employment, do you see where the first entry is

7    family medicine resident?

8    A.          Uh-huh.  Yes.

9    Q.          Where it says January '03 to current,

10   did I read that correctly?

11   A.          It looks like it, yes.

12   Q.          At the time that you applied for your

13   residency at Doctors, you weren't still doing your

14   family practice residency?

15   A.          Correct.

16   Q.          When you applied for your residency

17   with Doctors, did you interview with anyone?

18   A.          I believe I did, yes.

19   Q.          Do you remember who?

20   A.          I believe I talked with the program

21   director and a few of the residents when I came in

22   to interview.

23   Q.          And who was the program director then?

24   A.          At the time it was Dr. Tony Zucco.

Adam P. Hall, D.O.                                    May 18, 2009

39

1   Q.        And you believe that you talked to

2   Dr. Zucco before Doctors offered you the

3   residency?

4   A.        Yes.

5   Q.        And you think you also talked to some

6   residents?

7   A.        Yes.

8   Q.        Do you remember who those people were?

9   A.        I believe the residents I talked to

10  were Nate Hanflink and Dan Blake.

11  Q.        On Exhibit 2 on the first page, back to

12  the cover letter, in the first sentence you say

13  that you're interested or applying for the

14  anesthesiology residency at Doctors.  And then the

15  second sentence says, "I am familiar with Doctor's

16  Hospital and Columbus as I spent approximately

17  eight months of my third year of medical school

18  there and I enjoyed the hospital and staff very

19  much."

20           Did I read that correctly?

21  A.        Yes.

22  Q.        What were you doing at Doctors during

23  your third year of medical school?

24  A.        I would have been in my third year

Adam P. Hall, D.O.                                          May 18, 2009

40

1    doing general medicine training for the

2    osteopathic medical practice, so I would assume to

3    the best of my recollection a wide variety of

4    things.  But I don't remember specifically what I

5    did.

6    Q.        Is there any reason why you don't

7    remember what you did during that time period?

8    A.        No, nothing particular.  I mean, I'm

9    sure I did general surgery and medicine and

10   pediatrics and family practice.  It's pretty much

11   a core training program.  So at the time, it was

12   whatever the requirements of the medical school

13   were.

14   Q.        Do you have any condition that you're

15   aware of that affects your memory or ability to

16   recall things?

17   A.        Well, I had -- for a long period of

18   time during medical school and until 2006, I had

19   major depressive disorder.  So that would

20   definitely affect my ability to recall events.

21   Q.        From that time period?

22   A.        Yes.

23   Q.        Do you do better recalling events since

24   2006?

Adam P. Hall, D.O.                                    May 18, 2009

41

1    A.         Yes.

2    Q.         Any other reason other than the

3    depressive disorder that you're aware of that

4    affects your ability to recall?

5    A.         Well, I have a dependence issue, and

6    some memory loss might have been associated with

7    it.

8    Q.         You're talking about the chemical

9    dependency?

10   A.         Yes.

11   Q.         Have any of your healthcare providers

12   ever told you that you may have memory loss

13   associated with that, with the chemical

14   dependency?

15   A.         I have not specifically been told that.

16   Q.         You just suspect that that may be the

17   case?

18   A.         Yes.

19   Q.         Prior to being offered the residency

20   with Doctors, did you discuss with anyone there

21   the circumstances surrounding your family practice

22   residency being terminated?

23   A.         Can you rephrase that question?

24   Q.         Sure.  Prior to being offered the

42

1    residency by Doctors, did you tell anybody there

2    about why your residency in Missouri had been

3    terminated?

4    A.         Yes.

5    Q.         Who did you talk to about that?

6    A.         I talked with Dr. Zucco about it.

7    Q.         And what did you tell him?

8    A.         I had told him that I had been

9    terminated for missing a call shift.

10   Q.         And what did Dr. Zucco say?

11   A.         He asked basically what had happened.

12   And I told him that I missed a call shift and I

13   was subsequently terminated.  I was looking to

14   continue with my training.  And I believe that

15   answered the question to his satisfaction and

16   there was not -- no further questions were asked

17   about it.

18   Q.         Did you tell him why you missed the

19   call shift?

20   A.         No.

21   Q.         So he didn't ask you about why you had

22   missed it?

23   A.         No.

24   Q.         And you didn't tell him that you had

43

1    initially lied about missing the call shift to the

2    folks in the residency in Missouri?

3    A.          Correct.

4    Q.          Correct, you didn't tell Dr. Zucco

5    that?

6    A.          No, I did not.

7    Q.          Did you at any subsequent point tell

8    anyone from Doctors that you had initially lied

9    about the reasons for missing the call shift?

10   A.          Yes.

11   Q.          Who did you discuss that with later?

12   A.          When I applied for my Ohio medical

13   license, I needed letters of reference.  So I

14   talked with Dr. Zucco, Dr. Reddy and Dr. Furbee,

15   and they were aware of the circumstances.  And I

16   had expressed remorse for the situation.  And they

17   felt that I was deserving a recommendation.

18   Q.          So you explained to Dr. Zucco,

19   Dr. Reddy and Dr. Furbee that you needed a letter

20   of recommendation in connection with your

21   application --

22   A.          Yes.

23   Q.          -- for an Ohio license?

24   A.          Yes.

44

1    Q.          And did you explain to them why there

2    was an issue with your Ohio license?

3    A.          Yes.

4    Q.          And did you explain to each of them

5    that you had initially lied when asked about it,

6    about why you missed the call shift?

7    A.          I'm not sure exactly what I related to

8    them in discussing the situation, but I believe I

9    did tell them the full circumstances.  But I'm not

10   sure exactly what they would recall.

11   Q.          Oh, no, I'm not asking you what they

12   would recall.  I'm asking you what you recall.

13   A.          I believe I was fully honest with them.

14   Q.          At that point?

15   A.          Yes.

16   Q.          And that was when?

17   A.          I would have to look at the file to see

18   what the dates were that they dated their letters

19   of reference.  But I believe that it was somewhere

20   between September and November of '05.

21   Q.          There was a hearing before the Ohio

22   Medical Board?

23   A.          Yes.

24   Q.          So would it have been sometime around

Adam P. Hall, D.O.                                    May 18, 2009

45

1    that hearing, the date of that hearing?

2    A.          I believe it would have preceded that

3    by a little bit.  But, yes, it would have been

4    close to that time period.

5    Q.          Okay.  What were the circumstances

6    surrounding you missing the call shift?

7    A.          The circumstances were I had previously

8    worked that day at the children's clinic.  I was

9    starting to feel sick.  And so I went home and I

10   took some cold medicine prior to the call shift, a

11   few hours.  And I was going to sit -- take a nap

12   and then go into work.  I had been

13   self-prescribing antidepressants for not only what

14   I knew was a major depressive order that was not

15   getting treated accurately, but also for chronic

16   pain as that medicine had dual properties to it.

17           Unfortunately the combination thereof

18   caused me to be sedated to the point that I didn't

19   show up for work and subsequently missed a shift.

20   And then the consequences occurred after that.

21   Q.          And what explanation did you provide

22   when you were initially confronted with the fact

23   that you had missed a call shift?

24   A.          I lied and said that I was available.

Adam P. Hall, D.O.                                          May 18, 2009

46

1   Q.         What do you mean that you were

2   available?

3   A.         That I had been available to do the

4   work.

5   Q.         And you just didn't hear the calls

6   or --

7   A.         Yes.

8   Q.         Did you say where you were?

9   A.         I did.  I said I was in the hospital in

10  the computer library.

11  Q.         And then did somebody check and --

12  A.         Yes.

13  Q.         -- see that you weren't on the

14  computer?

15  A.         Yes.

16  Q.         Did they come back to you then and say,

17  we checked, you weren't on the computer, words to

18  that effect?

19  A.         Yes.

20  Q.         And then what happened?

21  A.         I basically a day later I went back and

22  revised my story to the medical staff and asked

23  for forgiveness for the lie and to try and salvage

24  the position.

47

1   Q.          Did you -- when you went back and told

2   them that, no, you were actually asleep, did you

3   tell them that you had taken cold medicine?

4   A.          Yes, I did.

5   Q.          But you didn't tell them about the

6   other medications that you were taking?

7   A.          No.  There was some shame and

8   embarrassment.  And, again, the long-standing

9   depression, I guess there was maybe a stigma in my

10  mind about the diagnosis of depression.  So I

11  wasn't forthcoming with that.

12  Q.          What were you taking -- you said you

13  were self-medicating for depression.  What were

14  you taking at that time?

15  A.          I was taking Elavil.

16  Q.          And then you said you also had chronic

17  pain.  Were you self-medicating for that as well

18  at that time period?

19  A.          Yes.

20  Q.          And what were you taking?  What else

21  were you taking?

22  A.          Well, I was hoping that the Elavil

23  would be enough, as I had read it had

24  pain-modifying effects.  But as it was not doing

Adam P. Hall, D.O.                                        May 18, 2009

48

1    the job, weekends, things like that, I would take

2    a lot of over-the-counter ibuprofen, aspirin,

3    whatever I could get my hands on, and I would mix

4    it with alcohol.

5    Q.           What were you on the particular night

6    when you missed the call shift?  The cold

7    medicine, do you remember what kind of cold

8    medicine it was?

9    A.           I believe it was NyQuil.  It was the

10   DayQuil version.  It was supposed to be

11   nonsedating but --

12   Q.           So DayQuil?

13   A.           Yes.

14   Q.           And then you were on Elavil?

15   A.           Yes.

16   Q.           And anything else?

17   A.           To the best of my recollection, no.

18   Q.           Now, when the issue came up with the

19   Ohio Medical Board, you admitted to them that you

20   had lied initially when asked about why you missed

21   the on-call shift, correct?

22   A.           Yes.

23   Q.           And you told them that you had taken

24   cold medicine and you were sleeping at the time at

49

1    home?

2    A.          Yes.

3    Q.          But you didn't tell the Medical Board

4    about also being on Elavil or anything else?

5    A.          No, I didn't.

6    Q.          And when you talked to Dr. Zucco or

7    Dr. Reddy or Dr. Furbee, did you tell any of them

8    that you were on anything in addition to the cold

9    medicine at the time?

10   A.          I don't know if those issues came up or

11   if they had asked about what was the sequence of

12   events or what medications.  I honestly can't

13   recall that conversation, if I had them with them

14   and told them what I was taking.

15   Q.          Do you know whether you told any of

16   them that you had been self-medicating for pain or

17   depression?

18   A.          I believe I did.

19   Q.          And when was that?

20   A.          I believe I said that to them in -- if

21   not at the time for the discussion for the

22   reference, in other circumstances.

23   Q.          So you're not sure whether or not you

24   told them about it in the conversation about

Adam P. Hall, D.O.                                          May 18, 2009

50

1   getting the reference?

2   A.        Correct.

3   Q.        But you think you talked to all three

4   of them about it?

5   A.        Well, yes, they knew that I had a

6   medical condition and I had taken time off for two

7   surgeries during the residency.  And so I had

8   explained to them what was going on, that I had a

9   chronic pain condition and I was receiving

10  subsequent treatment for it.  And the issues

11  surrounding it, that I had issues with major

12  depression, numerous thoughts of suicide, things

13  along that line.  So I had bared my soul to them

14  so to speak.

15  Q.        To all three of them?

16  A.        To everybody who would listen,

17  everybody in the program who would listen.

18  Q.        Who else did you talk to about your

19  depression or pain issues?

20  A.        Again, anybody who would listen.  I

21  talked with, I believe, all the residents who were

22  there.  I know I had numerous conversations with

23  the attendings about it.  I know I talked with

24  Dr. Werhan about it.  I talked with

51

1    Dr. Brown about it.

2    Q.          Dr. Werhan.  And who was the other

3    person?  I'm sorry.

4    A.          Dr. Brown.

5    Q.          Yes.  Who was the other person,

6    Dr. Brown?

7    A.          Yes.

8    Q.          When did you talk to Dr. Werhan about

9    these problems?

10   A.          I'm trying to think of the time period,

11   but I believe about November of 2005 I discussed

12   this situation with him.

13   Q.          And what did you tell him?

14   A.          We had a long talk in the anesthesia

15   office.  And I told him about my medical issues,

16   and that I was always in a lot of pain.  Honestly

17   that's about all I can recall from that

18   conversation, but I know that I had discussed the

19   situation at length with him.

20   Q.          And when you say you discussed the

21   situation at length, why don't you explain to me

22   what situation exactly you're referring to.

23   A.          The chronic pain issue.

24   Q.          And what was the chronic pain from?

52

1   A.          I had connective tissue disease.  A

2   problem with my foot.  I had bilateral plantar

3   fascitis.  I had had my achilles tendon

4   reconstructed a few years prior.  And I had some

5   toe deformities from it as well.  So I was

6   complaining of the pain related to that.

7   Q.          When did your -- and I'm obviously not

8   a doctor.  I'm going to call them foot issues.

9   A.          Sure.

10  Q.          Does that work?

11  A.          Sure, that's fine.

12  Q.          And we'll know that that's what we're

13  talking about.  When did that start?

14  A.          '96.

15  Q.          Okay.  So the time you talked to

16  Dr. Werhan you had been experiencing the chronic

17  pain and the foot issues for about nine years?

18  A.          Yes.

19  Q.          Did you talk to Dr. Werhan about your

20  depression issues?

21  A.          Yes.

22  Q.          And what did you tell him about that?

23  A.          I believe I used words like I had

24  thought about hurting myself in the past.  I

53

1    believe I -- you know, I had expressed that there

2    was a feeling of lack of luster for life.  And

3    then I thought about hurting myself, that I had a

4    plan.  Things along that line.

5              I can't remember the exact details, but

6    I know that there were issues where I talked about

7    my relationship with my ex.  We had a very long

8    dialogue about it, but I know that I expressed in

9    there the issues that were surrounding my

10   depression.

11   Q.        And how long had you been having issues

12   with depression?

13   A.        Since '96.  I would say about three

14   months after I had my initial flare-up with my

15   foot.

16   Q.        Did you ever discuss with Dr. Werhan

17   issues of alcohol abuse?

18   A.        No.

19   Q.        Did you ever discuss with him issues

20   with chemical dependency?

21   A.        I don't think we discussed chemical

22   dependency.  But I do believe I told him I had

23   self-prescribed as I believe this issue that came

24   up had been in regards to self-prescribing for

Adam P. Hall, D.O.                                    May 18, 2009

54

1   Ultram.

2   Q.          I'm sorry, for what?

3   A.          For Ultram.

4   Q.          And that was for your foot?

5   A.          Yes.

6   Q.          What is Ultram?

7   A.          Ultram is called Tramadol.  It's a --

8   and when you ask about this, do you want the

9   medical or just a general definition of it?

10  Q.          Something I can understand.

11  A.          Okay.  It's a pain medicine.  But it's

12  not, per se, an opiate.

13  Q.          How does it work?

14  A.          It works on the opiate receptor, but

15  they call it a semisynthetic analog.  And it

16  doesn't have the same euphoric potential as the

17  full opiates.

18  Q.          Do you specifically remember telling

19  Dr. Werhan that you were self-prescribing Ultram?

20  A.          I don't know if I specifically said it,

21  but the issue came up with Dr. Hilliard

22  previously.  And I believe it did come up in

23  subsequent conversations with Dr. Werhan.

24  Q.          The issue being that you were

55

1    self-prescribing it?

2    A.          Yes.

3    Q.          Do you remember anything specifically

4    at all about discussions with Dr. Werhan such as

5    anything you said or anything that he said on the

6    issue of you self-prescribing Ultram?

7    A.          I don't recall.  I just remember having

8    a conversation with Dr. Hilliard one time about it

9    and Dr. Werhan may have been in that discussion.

10   Maybe.  I don't remember.  I know I was in

11   Dr. Hilliard's office discussing it.  Dr. Werhan

12   may have been in there at that time.  But I don't

13   know if he was or if he wasn't 'cause Dr. Zucco

14   may still have been the program director at that

15   time.

16   Q.          When did Dr. Werhan become the program

17   director?

18   A.          Late 2005.

19   Q.          I guess backing up still talking about

20   Dr. Werhan for a moment, do you recall telling

21   Dr. Werhan that you were self-prescribing anything

22   other than Ultram?

23   A.          I may have had the discussion with him

24   about the self-prescribing of Elavil when I was a

Adam P. Hall, D.O.                                    May 18, 2009

56

1    resident in the family practice program as I think

2    I had discussed with most of the attendings the

3    issue as I was trying to get references from most

4    of them.

5    Q.          References for?

6    A.          For the Medical Board when I applied.

7    So I had talked with most of them that I had had

8    numerous offers from Dr. Reddy, Dr. Furbee,

9    Dr. Zucco and felt that that was probably

10   adequate.  But I believe I may have talked with

11   Dr. Werhan in regards to trying to get the

12   reference letters.  So I had, again, opened up

13   about it to him.

14   Q.          But you're not sure one way or the

15   other whether --

16   A.          I'm not.  I'm not.  I had a lot of

17   discussions with people about it.

18   Q.          You had earlier been referring to a

19   conversation that you had with Dr. Hilliard?

20   A.          Yes.

21   Q.          And when was that?

22   A.          I believe it was August of 2005.  It

23   was in regards to the self-prescribing of Ultram.

24           MR. MEZIBOV:  Did you say August '05?

57

1          THE WITNESS:  I believe that's when it

2    was.  I'm not sure.

3    Q.          And why were you talking to

4    Dr. Hilliard at that time?

5    A.          Because the Medical Board had launched

6    an investigation for self-prescribing the Ultram.

7    The pharmacist in the community had called the

8    Board because I had self-prescribed.  And the

9    Medical Board launched an investigation around

10   this time period.  And I had told the Medical

11   Board I had been self-prescribing for pain.  They

12   said that was not adequate, but really didn't

13   launch a further investigation.  But they had

14   called, I think it's the pharmacist in addition to

15   calling the Medical Board had also called

16   Dr. Hilliard.  And Dr. --

17   Q.          Who was the pharmacist?  I'm sorry.

18   A.          I don't know.  It was a -- I don't know

19   the person's name.  They were at a CVS in

20   Columbus.

21   Q.          Which CVS?

22   A.          The one off of High Street and Morse

23   Road.

24   Q.          Okay.

Adam P. Hall, D.O.                                    May 18, 2009

58

1   A.          And so they called Dr. Hilliard.  And I

2   went into Dr. Hilliard's office.  And we had a

3   very brief discussion.  He was -- I believe the

4   emotion would have been irate, and just said don't

5   do that again.  You're not supposed to be

6   self-prescribing.  And have your -- and I told

7   him, well, I have a lot of pain.  He said, have

8   your doctor do it.  Have your orthopedic surgeon

9   do it.

10          So I told him about the foot condition

11  and the fact that I was in a lot of pain.  He

12  said, just have your orthopedic surgeon take care

13  of that issue.  And that was the extent of the

14  conversation.

15  Q.          How do you know that the pharmacist had

16  called Dr. Hilliard?

17  A.          He said that they had called him.

18  Q.          Dr. Hilliard said?

19  A.          Yes.

20  Q.          So Dr. Hilliard then called you in to

21  talk.  I mean, you hadn't approached him, correct?

22  A.          No, I had not.

23  Q.          And he was angry that you were

24  self-prescribing Ultram?

Adam P. Hall, D.O.                                    May 18, 2009

59

1    A.          Yes.

2    Q.          Did you have any discussions with

3    Dr. Hilliard about self-prescribing anything other

4    than Ultram?

5    A.          No.  It was a very brief conversation.

6    Q.          So he knew that you were

7    self-prescribing Ultram and he wasn't happy about

8    it?

9    A.          Yes.

10   Q.          Did you at any occasion, that occasion

11   or any other occasion, tell Dr. Hilliard that you

12   had addiction or chemical dependency issues?

13   A.          No.

14   Q.          Did you at that point or any other

15   point tell Dr. Hilliard that you had depression

16   issues?

17   A.          I may have, but I'm not sure.

18   Q.          Why didn't you have your doctor

19   prescribe to you medication?

20   A.          I think at that point in time, it may

21   have been a weekend, I may not have been able to

22   have access to him, I may have called his service.

23   There might have been a variety of reasons.  I

24   don't remember exactly.  But the issue was I was

60

1    not getting the kind of response that I wanted.

2    And I had talked with him on numerous occasions as

3    well telling him about my chronic pain, how I was

4    suicidal.  And I just never really got the

5    medication response that I wanted.

6                So I think I took it in my own hands

7    because I felt that I was not being treated

8    appropriately.

9    Q.          Who was your orthopedic surgeon?

10   A.          Dr. Greg Berlet.

11   Q.          Berlet?

12   A.          B-E-R-L-E-T.

13   Q.          And when you were just speaking saying

14   you didn't think you were getting the care that

15   you needed, you were talking about Dr. Berlet?

16   A.          Yes.

17   Q.          During the time that you were at

18   Doctors, did you see any other physicians for your

19   chronic pain other than Dr. Berlet?

20   A.          I did see a podiatrist one time and --

21   at her office formally.  But she also worked in

22   the operating room and would inject me informally.

23   Q.          And who was that?

24   A.          I cannot remember her name to save my

Adam P. Hall, D.O.                                    May 18, 2009

61

1    life.

2    Q.        So did you say you just saw her

3    informally, or was it --

4    A.        One time I saw her at her office

5    because she was going to prescribe some inserts

6    for my shoes as I was looking for any sort of

7    relief with any method or modality.  And she said

8    she had some good inserts.  I would have to come

9    to her office to discuss it.  But that was the

10   only time I saw her.  And then otherwise I saw her

11   in the operating room and she would give me

12   injections of steroids into my foot.

13   Q.        So she never prescribed any medication

14   for you, correct?

15   A.        Correct.

16   Q.        I'm just trying to figure out the name

17   of the podiatrist.  I thought I had it there and I

18   don't.

19             What steroids did this podiatrist

20   inject you with?

21   A.        Kenalog.

22   Q.        Anything else?

23   A.        Just Kenalog.  Well, I take that back.

24   There might have been some lidocaine mixed in with

Adam P. Hall, D.O.                                    May 18, 2009

62

1    the Kenalog.

2    Q.          I'm sorry.  Lidocaine?

3    A.          Lidocaine.

4    Q.          What's that?

5    A.          It's a local anesthetic to numb the

6    area when they do the injection.

7    Q.          Did you also at times inject steroids

8    yourself?

9    A.          Yes.

10   Q.          How many times did the podiatrist

11   inject the Kenalog?

12   A.          I would say in the period between '04

13   and '05, three or four times.

14   Q.          What about in '06?

15   A.          I wasn't there in '06.  I mean, between

16   January and February, I did not work with her.

17   And the only podiatrist who injected me was

18   Dr. Davy at one time.

19   Q.          So the time in April was Dr. Davy?

20   A.          Davy.

21   Q.          The other podiatrist, you said it was a

22   female?

23   A.          Yes.

24   Q.          Do you remember anything else about

Adam P. Hall, D.O.                                    May 18, 2009

63

1    her?

2    A.        Age, 55 to 60.

3    Q.        Anything else you remember?

4    A.        No.

5    Q.        And what was her race?

6    A.        Caucasian.

7    Q.        And then Dr. Davy, who is he?

8    A.        He was one of the staff podiatrists.

9    Q.        And did he also inject you with

10   steroids?

11   A.        Yes.

12   Q.        What did he inject you with?

13   A.        Celestone.

14   Q.        Celestal?

15   A.        Celestone, C-E-L-E-S-T-O-N-E.

16   Q.        And did he do that just once?

17   A.        Yes.

18   Q.        And that was the incident in April of

19   2006 that led to your termination?

20   A.        Yes.

21   Q.        And I know I asked you this, I don't

22   remember, but did you also inject yourself --

23   A.        Yes.

24   Q.        -- with steroids?  What did you inject

Adam P. Hall, D.O.                                    May 18, 2009

64

1    yourself with?

2    A.        Kenalog.

3    Q.        Anything else?

4    A.        I would mix it with lidocaine.

5    Q.        But not this Celestone?

6    A.        No.

7    Q.        How long were you injecting yourself

8    with Kenalog?

9    A.        Before I came to Doctors, I had done

10   some self-injection at home.  And I had used some

11   steroids from the hospitals that I had moonlighted

12   at.  So I would say as far back as 2003.  But not

13   very often.  Maybe once in a blue moon there.  It

14   definitely became more frequent when I was at

15   Doctors.

16   Q.        So you had diverted Kenalog previous to

17   Doctors?

18   A.        Yes.

19   Q.        Were you ever issued a prescription for

20   Kenalog?

21   A.        No.

22   Q.        Were you ever administered Kenalog by

23   Dr. Berlet?

24   A.        No.  He never -- well, you know, I

65

1    can't say.  He did a surgery on me.  Two

2    surgeries.  And I don't know if during the course

3    of the procedures he may or may not have injected.

4    Q.          Well, other than what may have happened

5    during a surgery, all of -- is it accurate to say

6    that all of the Kenalog that you received you had

7    diverted either from Doctors or somewhere else

8    that you've worked?

9    A.          Yes.

10   Q.          And this Celestone that you diverted on

11   April 13th, I believe?

12   A.          Uh-huh.

13   Q.          Was that the only time that you had

14   taken Celestone?

15   A.          Yes.

16   Q.          And that was the only time you had

17   diverted the Celestone at Doctors?

18   A.          Yes.

19   Q.          How many times did you divert Kenalog

20   while you were at Doctors?

21   A.          Well, with every time that I was

22   injected by the podiatrist, so however many times

23   that she gave it.  And as I was using it on a more

24   frequent basis and when I didn't have access to

Adam P. Hall, D.O.                                    May 18, 2009

66

1    her, I would say in the range of another five or

2    six times in addition to hers.

3    Q.        Five or six times that you had

4    administered it?

5    A.        Correct.

6    Q.        Plus how many times you think she did?

7    A.        Three or four.

8    Q.        How did you go about getting it, the

9    Kenalog?

10   A.        The Kenalog was not under lock and key.

11   It was in the -- what they call the back stand for

12   the supply cart.  So it was freely accessible to

13   anesthesia or nursing staff.

14   Q.        Did you ever tell any of the physicians

15   that you were working with that you were either

16   diverting or self-prescribing Kenalog?

17   A.        Well, yes.

18   Q.        Who did you tell?

19   A.        One of the attendings was in the room

20   when I was getting injected by the podiatrist.

21   Q.        Who was that?

22   A.        I believe on more than one occasion it

23   was Dr. Zucco.  And then also I believe Dr. Werhan

24   had walked in one time when I was getting injected

67

1    as well.

2    Q.          But Dr. Zucco and Dr. Werhan didn't

3    know you were diverting?

4    A.          I think they knew that I didn't have a

5    prescription and that the podiatrist had been

6    grabbing it -- we were grabbing it out of the back

7    supply, yes.

8    Q.          Why do you think they knew that?

9    A.          Because I think they had -- I had told

10   them -- I'd asked Dr. Zucco on one occasion about

11   the pain.  And he goes, yeah, use the Kenalog

12   because the podiatrist had asked about it.  So I

13   believe they knew, yes.

14   Q.          You think Dr. Zucco told you just to go

15   ahead and take the Kenalog?

16   A.          Yes.  I don't know if he said to go

17   ahead and take it.  But I had had the discussion

18   with him when I was having pain, and he may or may

19   not.  To the best of my recollection, there was

20   discussions about that.

21   Q.          Did you ever tell Dr. Zucco or

22   Dr. Werhan that you had just taken the Kenalog?

23   A.          Like I said, on numerous occasions

24   attendings had walked into the room.  So I don't

Adam P. Hall, D.O.                                          May 18, 2009

68

1   know if I had told them, but I knew they were

2   aware of it.

3   Q.          You knew that they were aware that you

4   were being injected with something?

5   A.          Yes.

6   Q.          But you don't know whether or not they

7   -- you don't know how -- you don't know if they

8   knew how you --

9   A.          Procured it, correct.  Do you mind if

10  we take a quick break.

11  Q.          That's fine.  That works.

12              (A short recess is taken.)

13              MR. MEZIBOV:  Did you want to

14  clarify --

15              THE WITNESS:  Yes.  Since -- we wanted

16  to clarify, or I wanted to clarify on the issue

17  with Dr. Zucco advising me to take it, again, I

18  don't recall the specifics, if he did or if he

19  didn't.  So I don't want to say something that

20  would be misleading so --

21  Q.          Okay.  So you don't recall him advising

22  you to take the Kenalog?

23  A.          I don't, no.

24  Q.          Okay.  You just think that he was in

69

1    the room while it was being administered?

2    A.          Yes.  And I think they knew about it

3    and they were aware of it and they probably

4    overlooked it because they were sympathetic to the

5    issues they knew that I was having with my feet.

6    Q.          But you're assuming that?

7    A.          I am.

8    Q.          There was no discussion about how you

9    got it or anything along those lines?

10   A.          Yeah.  To the best of my recollection,

11   no.

12   Q.          Was Roseann Morrison the female

13   podiatrist?

14   A.          Yes, that's her name.

15   Q.          When you were previously at Doctors

16   during medical school, was that the rotation that

17   you failed?

18   A.          No.

19   Q.          Was your rotation there cut short?

20   A.          At Doctors?

21   Q.          Yes.

22   A.          Not that I recall.

23   Q.          Do you recall anyone from Doctors

24   asking you to leave or anything like that?

70

1  A.          No.

2  Q.          Okay.  So as far as you know, you left

3  voluntarily at the end of --

4  A.          Yes.  I did my rotations and then moved

5  on to the next facility.

6  Q.          Where was the rotation then that you

7  had failed while you were in medical school?

8  A.          It was in Kansas City.  It was an

9  internal medicine rotation.

10  Q.          Where in Kansas City was that?

11  A.          Independence.

12  Q.          That's where I lived when I was born.

13  A.          That's where David -- or David Cook is

14  from, that area, Independence, Blue Springs.

15  Q.          Yeah, I was born at the hospital where

16  Truman died.

17  A.          Truman Medical Center, right?

18  Q.          I don't think it was called that then.

19  General Hospital or something like that.

20  Anyway --

21  A.          Small world.

22  Q.          Okay.  So it was internal medicine in

23  Independence, Missouri?

24  A.          Uh-huh.

Adam P. Hall, D.O.                                    May 18, 2009

71

1    Q.        And what was the name of the hospital?

2    A.        It wasn't.  It was a private practice.

3    Q.        Okay.  What was the private practice?

4    A.        I don't remember the name of the

5    practice itself, but I believe the physician I

6    worked with was a Dr. Johnson.

7    Q.        Now, when you failed that rotation,

8    were you on some sort of probation then?  Or did

9    that affect your status with the medical school?

10   A.        Well, it delayed -- it was going to

11   delay my graduation by a few weeks as I needed a

12   certain required number of weeks of training.  And

13   so I was actually supposed to take vacation prior

14   to my graduation.  Instead I had to find another

15   rotation to finish.

16   Q.        Okay.  Other than your residency in

17   Missouri and the anesthesiologist residency with

18   Doctors, have you ever been terminated by any

19   other employers?

20   A.        California terminated me.

21   Q.        And you're talking about when you

22   didn't have the Boards passed?

23   A.        Right.

24   Q.        Was there any other reason why you were

72

1    terminated in California?

2    A.          No.  Just that I didn't have a license.

3    Q.          Any other employers that have

4    terminated your employment involuntarily other

5    than when you left voluntarily?

6    A.          Nothing that I can recall.

7    Q.          When we talked about earlier -- just

8    jumping back a little bit.  I apologize.

9                We talked earlier about when you were

10   at Creighton and they put you on a leave.  Did

11   they tell you what type of leave that you were

12   being placed on?

13   A.          They may have.  I don't -- again, it's

14   been a long time so I don't remember.

15   Q.          And at that point, which is February of

16   1996, had you already applied to medical schools

17   when you left Creighton?

18   A.          I believe I had, yes.

19   Q.          Do you remember when you applied to

20   medical schools?

21   A.          Well, as there were two different

22   types, the M.D., the allopathic route, and the

23   D.O., I applied to numerous ones.  And depending

24   on the deadlines and things like that, I may have

Adam P. Hall, D.O.                                    May 18, 2009

73

1    applied -- I think the M.D.s had an earlier

2    decision process, so I had applied to some M.D.

3    schools earlier.  And then I applied to some D.O.

4    schools later as, again, the timeline and things

5    like that.

6    Q.        Do you think that you had already been

7    admitted to medical school at the time that you

8    were put on leave at Creighton?

9    A.        I may or may not have.  I don't believe

10   I was.  I think I received a notice of acceptance

11   to Des Moines after February.

12   Q.        Okay.  We were talking earlier before

13   we went on break about your, I guess, history

14   around the time when you were at Doctors.

15   A.        Yes.

16   Q.        How long had you -- how long of a

17   period did you self-prescribe the Ultram?

18   A.        The Ultram was hit or miss.  It was

19   sporadic when I would prescribe it.  I don't know

20   how many times I prescribed it honestly before

21   that period.  I would say maybe just the one time.

22   I really don't remember if I ever prescribed it

23   before that.

24   Q.        What was Dr. Berlet prescribing you for

74

1    pain?

2    A.          I think that we were using over the

3    counters for most of the pain relief with the

4    thought process that we were going to have to go

5    down surgery.  He was going to try a few

6    modalities before the surgical plan.

7    Q.          What does that mean, "a few

8    modalities"?

9    A.          Things outside of surgery.

10   Conservative treatment.  He was going to do

11   lithotripsy and see if that would work.  Basically

12   like shockwave lithotripsy.  And if that didn't

13   resolve the plantar fascitis and the orthotics, he

14   was going to move to surgery fairly quickly as it

15   had been bothering me for quite some time.

16   Q.          What about after the surgery, did he

17   prescribe anything for pain other than -- did he

18   prescribe anything for pain at all?

19   A.          He did, just postsurgical relief.

20   Nothing of any long-term duration.

21   Q.          What did he prescribe postsurgical?

22   A.          Percocet.

23   Q.          And do you remember how long you took

24   that?

Adam P. Hall, D.O.                                    May 18, 2009

                                                              75

1    A.        Probably less than two weeks.

2    Q.        And then you continued to have pain

3    after the surgery?

4    A.        I did.

5    Q.        Did you say you had two surgeries

6    during your residency at Doctors?

7    A.        I did.

8    Q.        And when were those?

9    A.        I believe the end of 2004 was the first

10   one.  It may have been early 2005.  And I want to

11   say that was on my left foot, but I may have

12   the -- I may have the foots [sic] reversed.  And

13   then subsequently a few months later, they did the

14   other foot in '05.

15   Q.        And do you believe you were on Percocet

16   after each surgery?

17   A.        Yes.  The second surgery I required

18   OxyContin for just a few days as well.

19   Q.        Did you discuss with Dr. Berlet after

20   the surgeries that you still, you know, were

21   continuing to have pain?

22   A.        I believe so, yes.

23   Q.        Did you ask him to prescribe anything?

24   A.        I don't know what I asked him to do.  I

Adam P. Hall, D.O.                                    May 18, 2009

76

1    sort of left the decision making in his hands.

2    But I had expressed to him that the pain was so

3    extreme that on numerous occasions I was suicidal.

4    I had a plan to hurt myself.  That I was under

5    extreme duress from the pain.  That I wasn't

6    enjoying -- that I had a horrible quality of life.

7    So numerous issues related to the severity of the

8    pain.  I may or may not have asked for pain

9    relief.  I'm sure I did.  I said, I can't be in

10   this pain forever or I'm going to end my life.  I

11   know I said that to him.  And I don't think pain

12   medications were discussed even though I had said

13   that's essentially what I was seeking out his

14   treatment for.

15   Q.        Did you tell him that you were talking

16   the Ultram?

17   A.        At the time I had told him that I had

18   self-prescribed medications on numerous occasions

19   because I was just trying to get any sort of

20   relief that I could, either from the depression or

21   from the pain.

22   Q.        Did you tell him what you had

23   self-prescribed?

24   A.        I believe I did.

Adam P. Hall, D.O.                                         May 18, 2009

77

1    Q.        What was Dr. Berlet's response, if any,

2    to the fact that you were self-prescribing?

3    A.        I don't know.  I think his response

4    was, you know, let's try this -- these treatment

5    modalities and see if we can help your pain by

6    doing this lithotripsy.  And if not, we'll move to

7    surgery.

8    Q.        Are you still seeing Dr. Berlet?

9    A.        No.

10   Q.        Are you still having problems with your

11   foot pain?

12   A.        No.

13   Q.        When did that stop?

14   A.        About -- I would say a year after my

15   last surgery both feet seemed to quiet down to the

16   point that I didn't have much pain.

17   Q.        And did you just have the two surgeries

18   that we discussed?

19   A.        On my feet?

20   Q.        Yes.

21   A.        No.  I've had a total of six.

22   Q.        When was the last surgery?

23   A.        2005.

24   Q.        And that was while you were at Doctors?

Adam P. Hall, D.O.                                    May 18, 2009

78

1    A.        Yes.

2    Q.        When did you stop self-prescribing the

3    Ultram?

4    A.        I stopped everything.  My sobriety date

5    is 7-15-06.  But prior to that, I believe the last

6    time I had self-prescribed was the previous year

7    in '05, which I subsequently talked to

8    Dr. Hilliard about and was advised to not do.

9    Q.        Did you stop self-prescribing the

10   pain --

11   A.        The Ultram.

12   Q.        Okay.

13   A.        Not the steroids.

14   Q.        Well, the steroids you weren't

15   prescribing?  You were --

16   A.        I was taking.

17   Q.        Still.  Okay.  So after the

18   conversation in about August of '05 with

19   Dr. Hilliard and when he said stop doing it, you

20   stopped?

21   A.        I stopped the self-prescribing of

22   Ultram, correct.

23   Q.        And you started using Kenalog.  And

24   then the -- what was the one you used on one

Adam P. Hall, D.O.                                    May 18, 2009

79

1    occasion?

2    A.          Celestone.

3    Q.          Celestone on one occasion.  Were you

4    using anything else for pain during that time

5    period from August of '05 to July of '06?

6    A.          Anything and everything

7    over-the-counter I could get my hands on, so

8    Tylenol and Ibuprofen in large doses.

9    Q.          How much would you take?

10   A.          I would max out on the ibuprofen every

11   day.  And probably max out on the Tylenol every

12   other day.  So probably about 4 grams of Tylenol

13   every other day.  And ibuprofen, 800 three times a

14   day, so about 2,400 milligrams.

15   Q.          When you say that you stopped using

16   July 15, '06, what do you mean?  What did you stop

17   using?

18   A.          Everything that was not prescribed to

19   me by a monitoring physician except for

20   over-the-counters.

21   Q.          So you continued to use

22   over-the-counter Advil, Tylenol?

23   A.          Right.  But less -- at a much lower

24   dosage and a much lower frequency.

Adam P. Hall, D.O.                                    May 18, 2009

80

1    Q.         During your residency at Doctors, we've

2    talked about the fact that you for a short time

3    used OxyContin and Percocet, correct, after your

4    surgeries?

5    A.         Correct.

6    Q.         That you self-prescribed Ultram up

7    until about August of 2005, correct?

8    A.         Correct.

9    Q.         And then that you diverted Kenalog,

10   you're not sure how many times.  Maybe approaching

11   ten?

12   A.         Yes.

13   Q.         And were there any other medications

14   that you took during the time that you were a

15   resident at Doctors?  And Elavil, I guess.  We

16   talked about the Elavil.

17   A.         I stopped taking Elavil after '03.

18   It's far too sedating to be on.

19   Q.         So you were not using Elavil at all

20   while here.  Were you taking anything for

21   depression while you were a resident at Doctors?

22             MR. MEZIBOV:  You were shaking your

23   head while Alison was asking the question.  The

24   question was about Elavil, and I don't think there

Adam P. Hall, D.O.                                          May 18, 2009

81

1    was a response.

2    A.          I stopped taking Elavil as of '03.

3    And, no, I was not on any antidepressants while at

4    Doctors.

5    Q.          Were you on any other medications while

6    you were a resident at Doctors other than the ones

7    that I just listed?

8    A.          Just over-the-counters.

9    Q.          Nothing else?

10   A.          No.

11   Q.          What about since July 15th of '06, what

12   medications have you taken?  You've told me you've

13   taken some over-the-counter pain medication.

14   A.          Sure.

15   Q.          What else?

16   A.          I was prescribed an antidepressant by a

17   psychiatrist.

18   Q.          And what was that?

19   A.          We started with a couple different

20   ones.  Initially I was diagnosed with bipolar

21   which was later changed to major depression.  And

22   so they had treated me initially with something

23   called Symbyax for bipolar.  It was just for a

24   short period of time.  And it was later changed to

Adam P. Hall, D.O.                                    May 18, 2009

82

1    Celexa.  And then I'm trying to think of the other

2    medication.  There was another one in there, but I

3    was having some issues with side effects.  And

4    then eventually we came to Effexor.

5    Q.          Effexor?

6    A.          Uh-huh.

7    Q.          And that's what you're taking now?

8    A.          I'm not on any right now.  I was

9    discharged a little while ago from the

10   psychiatrist's office per the Medical Board's

11   guidelines.  And he does not think that I -- I'm

12   mood stable and he doesn't think that I need

13   antidepressants at this point.

14   Q.          When did you stop taking Effexor?

15   A.          Well, I had stopped with him.  And I

16   did actually go back on it recently with my

17   primary care doctor just because I had noticed

18   some fatigueability and lethargy and that was

19   started back about two months ago.

20   Q.          The Effexor was?

21   A.          Yes.

22   Q.          But you're not taking it currently?

23   A.          No, I am taking it currently.

24   Q.          Okay.

Adam P. Hall, D.O.                                    May 18, 2009

83

1    A.        Sorry.

2    Q.        What's your current dosage of Effexor?

3    A.        75 a day.  75 milligrams a day.

4    Q.        Okay.  Any other medications that

5    you've taken since July 15th of '06?

6    A.        Just over-the-counters.

7    Q.        Do you take anything for sleep?

8    A.        I do, yes.

9    Q.        And what's that?

10   A.        Unisom.

11   Q.        Have any of your healthcare providers

12   expressed concern about you taking Unisom with

13   your chemical dependency history?

14   A.        No.

15   Q.        Any other sleep medication that you've

16   taken since July of '06?

17   A.        I had taken some Trazodone earlier in

18   the treatment plan, but didn't like the side

19   effect.  It had made me groggy the next day.

20   Q.        Okay.  Any other medications that

21   you've taken since July of '06 that we haven't

22   discussed?

23   A.        Since July of '06 I took -- I had an

24   issue with some back pain in September of last

Adam P. Hall, D.O.                                    May 18, 2009

84

1    year.  I had gone out of town and had done some

2    water sports and had injured my back.  And I tried

3    some conservative treatment for it.  It didn't

4    work.  I called my monitoring physician, who is

5    aware of my chemical dependency issue, and said,

6    I'm not getting any relief.  And so I was started

7    on Vicodin for a short period of time, which I

8    kept a log of and submitted to the Board.  And

9    then also destroyed the remainder of the pills

10   that went unused in front of the Ohio Physicians

11   Health Board.

12   Q.        How long were you on the Vicodin?

13   A.        About ten days.

14   Q.        Who is your monitoring physician?

15   A.        Dr. Susan Daab.

16   Q.        Is she also your primary care

17   physician?

18   A.        Yes.

19   Q.        How do you spell her last name?

20   A.        It's D-A-A-B.

21   Q.        Have you seen any other physicians -- I

22   guess backing up.  How long has Dr. Daab been your

23   primary care physician?

24   A.        I had seen her before -- I believe

85

1    before the chemical dependency issue one time.

2    And then she was very close to where I live, so I

3    made her my monitoring physician after the Board

4    restrictions.  So I believe 2006 is when she

5    became my monitoring physician in addition to my

6    primary care physician.

7                        - - - - -

8              Thereupon, Defendants' Exhibit 3 is marked

9    for purposes of identification.

10                       - - - - -

11   Q.        Dr. Hall, we had talked previously

12   about the issue that you had when you were first

13   trying to get an Ohio license.

14             Do you remember that?

15   A.        Yes.

16   Q.        And you told me that there was

17   ultimately a hearing surrounding the issue of the

18   circumstances surrounding your residency ending in

19   Missouri, correct?

20   A.        Yes.

21   Q.        And I've handed you what we've marked

22   as Exhibit 3.  And this is a report and

23   recommendation that is based on a hearing before

24   Sharon Murphy on August 24, 2005.

Adam P. Hall, D.O.                                          May 18, 2009

86

1          Do you recognize this document?

2     A.          Yes.

3     Q.          And is this the report and

4     recommendation after the hearing on the issue of

5     those circumstances surrounding your residency

6     ending?

7     A.          Yes.

8     Q.          And if you'll look at, I guess, the

9     third page from the end, it's labeled at the

10    bottom OhioHealth/Hall 0087?

11    A.          Okay.

12    Q.          Underneath there where we've got the

13    little stars there kind of in the middle of the

14    page, these are the conclusions, I guess, of the

15    hearing officer; is that correct?

16    A.          Yes, it looks like it.

17          MR. MEZIBOV:  Objection.  You can

18    answer.  Answer as best you know.

19    A.          Yes, to the best of my knowledge that's

20    what that is.

21    Q.          And was it your understanding that she

22    had determined that you had been untruthful when

23    asked by the hospital about why you missed your

24    on-call shift?

Adam P. Hall, D.O.                                          May 18, 2009

87

1    A.        Yes.

2    Q.        And you had admitted that?

3    A.        Yes.

4    Q.        You just hadn't admitted that you were

5    on more than cold medicine at the time?

6    A.        Yes.

7    Q.        But they went ahead and ultimately

8    granted your license, correct?

9    A.        Yes.

10   Q.        And that was under a probationary

11   period initially, correct?

12   A.        Yes.

13                      - - - - -

14        Thereupon, Defendants' Exhibit 4 is marked

15   for purposes of identification.

16                      - - - - -

17   Q.        Handing you what we've marked as

18   Exhibit 4, this is an entry of order before the

19   State Medical Board of Ohio.

20        Do you recognize this?

21   A.        Yes.

22   Q.        And you see there on the last page

23   where it's dated December 14, 2005?

24   A.        Yes.

Adam P. Hall, D.O.                                    May 18, 2009

88

1   Q.        And is this -- and go ahead and take a

2   look at it.  Is this the order granting your

3   license at that time?

4   A.        I believe.

5   Q.        Go ahead.

6   A.        I believe it is, yes.

7   Q.        And then I guess it became effective 30

8   days after mailing and notification of approval by

9   the Board?

10  A.        Right.

11  Q.        And was it your understanding that

12  initially your license would be suspended for 30

13  days?

14  A.        Yes.

15  Q.        And then after that, you would be

16  subject to probationary conditions for two years?

17            MR. MEZIBOV:  Objection only to the

18  extent the document speaks for itself.

19  Q.        Was that your understanding?

20  A.        To the best of my understanding, yes.

21  I didn't know about the two-year aspect of it, but

22  yes.

23  Q.        Go ahead and look on the first page

24  where it says probationary conditions.  Do you see

89

1    where I'm reading under C?

2    A.        Yes.

3    Q.        Does that refresh your recollection --

4    A.        Yes.

5    Q.        -- as to whether you were on probation

6    at that point?

7    A.        Yes.

8    Q.        Did OhioHealth or Doctors rather

9    initially decide not to enter into another or a

10   second year contract for your residency based on

11   the issues you were having with the Medical Board,

12   if you know?

13   A.        The second year issues, I don't know.

14   That would be a CA3.  I believe they entered into

15   a CA3.  And I don't know if there were issues with

16   the Medical Board that were causing complications

17   at the time.

18   Q.        Do you remember having to ask Doctors

19   to renew your contract after they had initially

20   decided not to?

21   A.        Can you be more specific as to the time

22   period?

23   Q.        Sure.

24                      - - - - -

90

1          Thereupon, Defendants' Exhibit 5 is marked

2     for purposes of identification.

3              - - - - -

4     Q.        I'm handing you what we've marked as

5     Exhibit 5.  And this looks like a letter from you

6     to Dr. Hilliard dated March 1, 2006.

7     A.        Okay.

8     Q.        Do you recognize this?

9     A.        Yes.

10    Q.        Okay.  What is this?

11    A.        This is a letter that I wrote to

12    Dr. Hilliard to indicate that the action that he

13    had performed was predicated on an erroneous

14    document from the Medical Board.

15    Q.        Okay.  And what action had he taken?

16    A.        He had decided not to renew my contract

17    for my senior year level year, which would be the

18    PTY4.

19    Q.        Okay.  So this would have been to renew

20    your contract in early '06?

21    A.        That's correct.

22    Q.        Okay.  Because I think I had initially

23    said the second year, and that wouldn't have been

24    right.  It would have been for the third year?

Adam P. Hall, D.O.                                      May 18, 2009

91

1    A.         Third year, that's correct.

2    Q.         And what was the error that the Ohio

3    Board had made?

4    A.         The Board had indicated that I had lied

5    in my application to the Medical Board for

6    licensure.  That was not correct.  The Board made

7    a correction by an entry nunc pro tunc on February

8    8 of 2006 that indicated that they had made a

9    mistake and that it should have been corrected to

10   read that I had lied to the program director at

11   the time I was a resident in Missouri.  And so

12   they revised that.

13   Q.         And Doctors then agreed to extend your

14   contract for the third year?

15   A.         Yes.

16   Q.         Doctors' records indicate that you

17   began the anesthesia residency program at Doctors

18   on February 2, 2004?

19   A.         I believe that's correct, yes.

20                   - - - - -

21        Thereupon, Defendants' Exhibit 6 is marked

22   for purposes of identification.

23                   - - - - -

24   Q.         Handing you what we've marked as

Adam P. Hall, D.O.                                    May 18, 2009

92

1    Exhibit 6, this is a Resident Contract between you

2    and Doctors.

3              Do you recognize this?

4    A.        Yes.

5    Q.        And was this your first Resident

6    Contract for the period beginning February 2, '04

7    and ending February 1, '05?

8    A.        Yes.

9    Q.        Looking on the second page of Exhibit

10   6, is that your signature dated February 2nd --

11   I'm sorry, February 3, 2004?

12   A.        Yes.

13   Q.        So then the first two pages of Exhibit

14   6, that's the first part of the Resident Contract,

15   correct?

16   A.        Yes.

17   Q.        And then there's some addendums?

18   A.        Yes.

19   Q.        And then is that your signature then at

20   the end of the first addendum?  It's labeled at

21   the bottom OhioHealth/Hall 0925?  Is that your

22   signature dated February 3, '04?

23   A.        Yes.

24   Q.        And then following that, there's an

Adam P. Hall, D.O.                                              May 18, 2009

93

1    Addendum A, correct?

2    A.         Yes.

3    Q.         And this is -- that's your signature

4    then at the bottom of Addendum A?

5    A.         Yes.

6    Q.         And then following that is Addendum B?

7    A.         Yes.

8    Q.         And that's your signature there on the

9    last page of Exhibit 6?

10   A.         Yes.

11   Q.         That one is dated, though, October 23,

12   2004.  Do you know why you signed Addendum B at a

13   later date?

14   A.         I believe there may have been some

15   deficiencies in my progress that they wanted to

16   address.

17   Q.         So you were placed on an academic

18   review.  That would initially be for six months on

19   November 23rd, '04?

20   A.         Yes.

21   Q.         What were the deficiencies or problems

22   that led to being placed on probation or academic

23   review?

24   A.         Specifically I don't know all the

94

1    specifics.  But I would be speculating that there

2    may have been some performance issues or

3    interpersonal issues that may have been at the

4    core of the problem because as it reads, the

5    academic review was to assess behavioral,

6    interpersonal, professional competencies and

7    skills related to the resident training program.

8    So that would be my best guess.

9    Q.          Okay.  Well, I don't want you to guess.

10   Do you remember being placed on probation back in

11   November of 2004?

12   A.          Yes.

13   Q.          Who informed you of that?

14   A.          I believe it was Dr. Zucco.

15   Q.          Do you remember anything that Dr. Zucco

16   told you as far as why you were being placed on

17   probation?

18   A.          Specifically, no.  I think we had a

19   discussion about some generalized reasons.  And he

20   gave me a performance evaluation and indicated

21   that I was making progress, which was not as quick

22   as other residents, but I was still progressing in

23   a positive fashion.

24   Q.          Did you have any conversations with

95

1    anyone at Doctors other than Dr. Zucco about the

2    fact that you were being placed on probation in

3    October of '04 -- I'm sorry, November of '04?

4    A.        I don't believe so.  The only person

5    that I may have had conversations with is

6    Dr. Hilliard because his signature is on there

7    next to mine.  But I don't specifically remember

8    talking with him about this.  I may have signed

9    this and then they gave it to Dr. Hilliard to sign

10   as well.

11   Q.        So you just assume that he knew about

12   it based on the fact that he signed this?

13   A.        Correct.

14   Q.        Were you told by Dr. Zucco or anyone

15   else that there were some issues with

16   inappropriate interactions with staff and patients

17   prior to November of '04?

18   A.        Can you be more specific about

19   inappropriate interactions?

20   Q.        Well, first of all, were you -- was

21   that discussed with you?

22   A.        I believe that what had been discussed

23   is sometimes I would have conversations in the OR

24   and they thought that sometimes I lacked focus and

96

1   they wanted me to be less chatty.  But nothing to

2   the extent that there was anything inappropriate

3   or abusive or of a context of a graphic nature or

4   anything like that.

5   Q.          So as far as you recall, it was more

6   about being chatty and not focusing when you were

7   in the OR?

8   A.          Correct.  Correct.

9   Q.          When you were placed on probation in

10  November of '04, were you also required to undergo

11  counseling?

12  A.          Yes.

13  Q.          And who did you go to counseling with?

14  A.          I believe his name was Dr. Kirkland,

15  Robin Kirkland.

16  Q.          I'm sorry?

17  A.          A Dr. Robin Kirkland.

18  Q.          And how long did you attend counseling

19  with Dr. Kirkland?

20  A.          I don't know specifically how many

21  sessions.  Maybe four or five sessions.  I don't

22  know if it was on a weekly basis or --

23  Q.          And that was something that you were

24  required to complete in order to come off

Adam P. Hall, D.O.                                      May 18, 2009

97

1    probation?

2    A.        Correct.

3    Q.        And as far as you know, did you

4    complete what you needed to do?

5    A.        Yes.

6    Q.        Did Dr. Kirkland recommend any further

7    counseling for you?

8    A.        No.

9    Q.        Did Dr. Kirkland ever provide you with

10   any sort of diagnosis?

11   A.        Not that I'm aware of.

12   Q.        Was the purpose of your counseling with

13   Dr. Kirkland, as far as you know, related to this

14   issue of inappropriate interactions?

15   A.        It may or it may not have been related

16   to that.  I'm not sure what the exact nature of it

17   was.

18   Q.        Do you know why you were required to go

19   to counseling?

20   A.        It was something that they requested

21   that I do.

22   Q.        Did you talk to Dr. Kirkland about your

23   issues with either depression or pain?

24   A.        I'm not sure I discussed it with him.

98

1    I don't know if I felt comfortable enough at that

2    time and to have that kind of dialogue with him.

3    Q.        Just going back for a moment, you had

4    earlier testified that you had conversations with

5    Dr. Berlet indicating that you were at times

6    suicidal?

7    A.        Yes.

8    Q.        Did Dr. Berlet ever refer you to any

9    mental health care professional?

10   A.        No.

11   Q.        Did he ever suggest to you that you

12   speak with your primary care physician about

13   emotional issues?

14   A.        No.

15   Q.        Do you recall what Dr. Berlet's

16   response was when you told him that you were

17   feeling suicidal?

18   A.        I believe it was have a hopeful

19   outlook.  Hopefully we can resolve the pain issues

20   and that would take care of those feelings.

21   Q.        Did you discuss with Dr. Kirkland that

22   you had been feeling suicidal?

23   A.        I don't know if I did or didn't.  As I

24   said, I may not have felt that I could approach

Adam P. Hall, D.O.                                   May 18, 2009

99

1    that subject with him.

2    Q.          Do you remember the topic of your

3    counseling sessions with Dr. Kirkland?

4    A.          I really don't.  I think I just went

5    there and went through the motions.

6               MR. MEZIBOV:  Are we approaching a

7    breaking point?

8               MS. DAY:  Sure, we can take a break.

9    It's 12:41.  How long do you want?

10              MR. MEZIBOV:  45 minutes.

11                   - - - - -

12              Thereupon, a luncheon recess is taken

13              at 12:41 p.m.

14                   - - - - -

15

16

17

18

19

20

21

22

23

24

100

1             Monday Afternoon Session

2             May 18, 2009, 1:51 p.m.

3                    - - - - -

4             Thereupon, Defendants' Exhibit 7 is

5     marked for purposes of identification.

6                    - - - - -

7     Q.        Now, Dr. Hall, I'm handing you what

8     we've marked as Exhibit 7.  Do you recognize this?

9     A.        Yes.

10    Q.        Is this a copy of your application to

11    Doctors when you applied for the anesthesiology

12    residency?

13    A.        Yes.

14    Q.        Is that your signature on the last page

15    dated December 9, 2003?

16    A.        Yes.

17    Q.        And I notice that there isn't anything

18    on here where you reference the residency in

19    family practice.

20             Was there any discussion prior to your

21    hire where you told anyone at Doctors about that

22    residency?

23    A.        I believe I did.  I mean, there's also

24    nothing in here about the California one.  So, I

101

1    mean, they knew.  They knew about the programs I

2    had been in previously.

3    Q.        Did you tell Dr. Zucco or anyone else

4    at Doctors before you were offered the residency

5    that you were no longer at the -- or no longer

6    doing the residency in Missouri?

7    A.        Yes.

8    Q.        Who did you tell that?

9    A.        That I was no longer training in

10   Missouri?

11   Q.        Yes.

12   A.        I believe it was Dr. Zucco when I came

13   for my interview.

14                      - - - - -

15        Thereupon, Defendants' Exhibit 8 is marked

16   for purposes of identification.

17                      - - - - -

18   Q.        Handing you what we've marked as

19   Exhibit 8, and this is a copy of your Resident

20   Quarterly Evaluation at Doctors.  The top says a

21   quarterly date of September 30, 2004.

22             Do you recognize this?

23   A.        Yes.

24   Q.        Is that your signature at the bottom

Adam P. Hall, D.O.                                    May 18, 2009

102

1    for resident's signature dated November 10, 2004?

2    A.          Yes.

3    Q.          And following the first page, there are

4    three handwritten pages signed by Dr. Zucco, who

5    is the program director.

6                Have you had a chance to review these

7    pages prior to today?

8    A.          I had seen these before today, yes.

9    Q.          Did you see these at the time you were

10   given your evaluation, this particular quarterly

11   evaluation in November of '04?

12   A.          I don't know if I saw this paperwork,

13   but I know I discussed the evaluation with

14   Dr. Zucco.

15   Q.          In reading here on the top of the

16   second page in the second sentence, it says, it is

17   unanimously agreed that for his time in training,

18   Adam has not reached his level of expectation.

19                Did I read that correctly?

20   A.          Yes.

21   Q.          And was that your understanding at the

22   time you were given this evaluation, Exhibit 8?

23   A.          Yes.

24   Q.          And it was at this time that you were

Adam P. Hall, D.O.                                        May 18, 2009

103

1    placed on a six-month probation?

2    A.        Yes.

3    Q.        And this was the probation we had

4    talked about earlier where you were sent to

5    counseling with Dr. Kirkland?

6    A.        Yes, that's correct.

7                        - - - - -

8              Thereupon, Defendants' Exhibit 9 is marked

9    for purposes of identification.

10                       - - - - -

11   Q.        Handing you what we've marked as

12   Exhibit 9, this is another Resident Quarterly

13   Evaluation of you while you were at Doctors.  And

14   this one's quarterly date at the top is December

15   31, 2004.

16             Is that your signature at the bottom

17   dated January 7th, '05?

18   A.        Yes.

19   Q.        Do you recall receiving this

20   evaluation?

21   A.        I do believe I received it.  I mean, I

22   signed it, so yes.

23   Q.        Do you recall this, receiving this

24   evaluation?

Adam P. Hall, D.O.                                          May 18, 2009

104

1    A.        Yes.

2    Q.        And at that point, was it determined

3    that you would remain in the probationary status

4    as it had been previously determined?

5    A.        I believe so, yes.

6    Q.        So your first Resident Contract with

7    Doctors we talked about before, Exhibit 6, that

8    expired February 1, 2005; is that correct?

9    A.        Yes.

10   Q.        But Doctors issued another contract to

11   you following the first year?

12   A.        Yes.

13                      - - - - -

14        Thereupon, Defendants' Exhibit 10 is

15   marked for purposes of identification.

16                      - - - - -

17   Q.        Handing you what we've marked as

18   Exhibit 10, this is another Resident Contract

19   between you and Doctors.  And this one is for the

20   period February 2, '05 to February 1, 2006.

21             Do you recognize this?

22   A.        Yes.

23   Q.        And is that your signature on the

24   second page dated January 26, 2005?

105

1    A.        Yes.

2    Q.        And then similar to the first contract,

3    there's an addendum following the first two pages?

4    A.        Uh-huh.  Yes.

5    Q.        And is that your signature following

6    that addendum at the bottom of the page that's

7    labeled, Bates labeled 0990?

8    A.        Yes.

9    Q.        And then following that, there's an

10   Addendum B.  It's page 0991 at the bottom.  Do you

11   see where I am?

12   A.        Yes.

13   Q.        And this Addendum B relates to the fact

14   that you were on probation at that time which was

15   to be from November 23rd, '04 to April 23rd, '05?

16   A.        Yes.

17   Q.        And that's your signature there on the

18   last page?

19   A.        Yes.

20   Q.        And that's the same probation that was

21   later added to your first year contract, correct?

22   It's the same thing?

23   A.        Yes, it looks similar.

24   Q.        Do you recall an incident in September

Adam P. Hall, D.O.                                    May 18, 2009

1    of '05 when some syringes were found in one of the

2    locker rooms with your -- with AH?

3    A.        Yes.

4    Q.        And were you questioned about that?

5    A.        Yes.

6    Q.        And who questioned you?

7    A.        Well, initially there was some

8    suspicion in the department as to drug use.  And I

9    came forward and said that it had been mine.  It

10   had been my syringe that had fallen out of my

11   pocket.

12   Q.        Who did you talk to about it?

13   A.        I believe it was Dr. Furbee, but it may

14   have been another attending.

15   Q.        Was there one syringe or two?

16   A.        Two.

17   Q.        So there was -- your recollection is

18   that there was just some kind of talk in the

19   department of drug use.  That's how you found out

20   about it?

21   A.        Yes.

22   Q.        And what did you tell Dr. Furbee?

23   A.        It may or may not have been Dr. Furbee,

24   but whoever I spoke with, I told him that it had

Adam P. Hall, D.O.                                    May 18, 2009

107

1    come out of my pocket.

2    Q.          That both of them had?

3    A.          Yes.

4    Q.          Do you know what had been in the

5    syringe?

6    A.          The first one was labeled

7    Neo-Synephrine.

8    Q.          And was that what had been in the

9    syringe prior to you dropping it?

10   A.          Yes.

11   Q.          And what about the other syringe?

12   A.          It was empty.  There was nothing in it.

13   Q.          So did you drop both syringes?  I'm

14   confused.

15   A.          Yes.

16   Q.          Did you drop one of them on purpose to

17   see what would happen?

18   A.          Yes.

19   Q.          Did you drop one on accident first, or

20   how did it happen?

21   A.          Yes.  I was in the bathroom.  I know I

22   had a syringe in my pocket.  I had just come from

23   an ICU patient.  As part of the transport of an

24   ICU patient, we kept presser agents in a case.  If

Adam P. Hall, D.O.                                    May 18, 2009

108

1    their vitals were unstable, we could give them

2    something.  I was coming back from -- it was a

3    long case and I had taken just a few minutes to go

4    to the bathroom in between the next case.  And

5    when I bent over, the syringe fell out of my

6    pocket.

7    Q.          Did it fall into the toilet?

8    A.          Yes.  Yes.  And I didn't put my hand in

9    to grab it out.  And by the time it had

10   circulated, the syringe had gone down.  So I

11   didn't immediately report to anyone because I

12   wasn't really sure what had happened to the

13   syringe.  I thought that it had just flushed into

14   the pipes and was gone and it was really not an

15   issue.  It was not a narcotic and I thought it was

16   gone into the septic system.

17            It floated back through a few days

18   later.  And when someone found it and said what's

19   this, I came forward and said that it was an

20   accident.  It had fallen out of my pocket.

21            One of the attendings felt the story

22   was unlikely.  And so to try and recreate the

23   incident, I went into the bathroom with a syringe,

24   not using the best judgment, and I flushed it.  It

Adam P. Hall, D.O.                                          May 18, 2009

109

1    went up again.  Thinking it was going to come back

2    fairly quickly, it didn't.  And I -- a few days

3    later it came out.  And I said, yeah, that's what

4    I thought.  I tried to save face and instead made

5    the situation worse.

6    Q.        There had been nothing in the second

7    syringe?

8    A.        No.

9    Q.        Who did you talk to after the second

10   syringe incident?

11   A.        I believe Dr. Hilliard was made aware.

12   I'm not sure if he was made aware after the first

13   syringe or after the second syringe.  But I did

14   talk with him, told him what had happened.  That

15   it was, you know, a rash decision to put the

16   second one in.  The first one was an accident.

17   And he sent me for urine drug testing.

18   Q.        Do you know what you were tested for at

19   that point?

20   A.        I don't.

21   Q.        Do you know what the results were of

22   that drug test?

23   A.        They were negative for opiates or any

24   sort of narcotics.

110

1    Q.          Then in October of 2005, do you recall

2    an incident where there had been a complaint about

3    you throwing a bloody sponge?

4    A.          Yes.

5    Q.          Who did you throw that at?

6    A.          The incident was between myself and a

7    scrub tech.  I don't know her full name.  Christy

8    was her first name.

9    Q.          Christy?

10   A.          Yes.

11   Q.          So what happened on that incident?

12   A.          Well, what had happened was I had a

13   patient who had had an A-line inserted.  And I

14   applied a pressure dressing when I had

15   discontinued the line as the patient didn't need

16   it for further monitoring.

17              In regards to it being a bloody sponge,

18   there was a spot of blood on a 4-by-4 because I

19   had put pressure on it as we were breaking down

20   the OR, which post-op they were getting the

21   patient ready for transport and waking them up,

22   part of the procedure for breaking down the

23   equipment is to throw out supplies that we don't

24   need.  And as this patient's bleeding had stopped

111

1    and it had been on there for a little while, I was

2    removing the bandage.  Christy was standing by the

3    trash can.  I had I want to say tossed, just was

4    throwing the sponge away and it hit her.

5              I apologized for the situation, but

6    apparently the situation escalated.  And the

7    sequence -- these events, I believe, make it sound

8    like I was more flippant, but I don't believe

9    that's how I was during that situation.

10   Q.        Did you make a comment to her to the

11   effect of, those are hospital-issued scrubs; if

12   you get blood on it, you can wash it off?

13   A.        I may have said that afterwards, it's

14   not a big deal, which I obviously minimized the

15   situation.

16   Q.        You obviously what?

17   A.        Minimized the situation.

18   Q.        So were you throwing it at her like

19   playfully, or were you trying to get it in the

20   trash?

21   A.        I was throwing it out in the trash can.

22   Q.        And she just --

23   A.        In proximity.

24   Q.        Okay.  So who -- I assume someone came

112

1   to talk to you about that incident?

2   A.       I'm not sure who I spoke with.  It

3   might have been Dr. Werhan who had come at the

4   time and got my side of the story.  But I don't

5   recall who I spoke with.

6   Q.       Was it discussed with you by anyone at

7   Doctors there was concern about your actions from

8   an infection control standpoint?

9   A.       I don't know if someone from infectious

10   disease spoke with me.  I don't recall that.

11   Q.       Do you recall being told that you

12   shouldn't be throwing bloody sponges near people

13   or something like that?

14   A.       There may have been discussion to that

15   extent.

16   Q.       Do you remember being reprimanded for

17   doing that?

18   A.       Yes, I believe.

19   Q.       Were you asked to begin biweekly

20   counseling sessions with a behavioral specialist

21   at that point?

22   A.       I may have been asked to begin that,

23   but I don't know when they were going to start

24   that.  I don't recall when they were going to

Adam P. Hall, D.O.                                    May 18, 2009

113

1   start doing those biweekly evaluation or

2   counseling sessions.

3   Q.        So did you go to counseling with anyone

4   other than Dr. Kirkland?

5   A.        I did.

6   Q.        Who else was that?

7   A.        Dr. Jeri O'Donnell.

8   Q.        And did you go to see Dr. Jeri

9   O'Donnell as a result of the bloody sponge

10  incident?

11  A.        I think there might have been a series

12  of events that led to them wanting me to have a

13  behavioral evaluation by her.  It may not have

14  just been the sponge.  It may have been the other

15  issues.

16  Q.        The other issues --

17  A.        Just syringes that we talked about.

18  Q.        The syringes.  Anything else?

19  A.        I would be speculating.

20  Q.        Okay.  How long did you go to sessions

21  with Jeri O'Donnell?

22  A.        I don't know the exact number of

23  sessions or the exact time frame, but for a period

24  beginning in 2006 until the end of my employment.

Adam P. Hall, D.O.                                    May 18, 2009

114

1    Q.          Did you discuss with Jeri O'Donnell

2    your issues with the pain with your foot?

3    A.          Yes.

4    Q.          And did you discuss with her issues

5    with the substance abuse or chemical dependency?

6    A.          I didn't discuss issues with the

7    chemical dependency.  I don't believe that I had

8    raised it at the time, so it was not an issue.

9    But I did bring up the chronic pain and depression

10   issues.

11   Q.          Did you talk to Jeri O'Donnell about

12   the fact that you had been self-prescribing?

13   A.          I may or may not have.  I don't know if

14   I did.

15   Q.          Do you know if you talked with Jeri

16   O'Donnell about the fact that you've been

17   diverting steroids for your foot?

18   A.          I may or may not have.  I may have told

19   her that I was having someone inject me for

20   chronic pain, but I don't remember the exact

21   specifics of our conversations.

22   Q.          We had talked before about the fact

23   that you had been diverting steroids for your foot

24   for sometime even before you were at Doctors?

115

1    A.        Right.

2    Q.        Prior to the incident in April of '06,

3    had you ever written them as a prescription for a

4    patient and then went and gotten them for yourself

5    versus just taking them?

6    A.        Prior to this incident?

7    Q.        Prior to the one in --

8    A.        No.

9    Q.        So I think I was pretty unclear about

10   that.  So prior to the April 13, '06 incident, you

11   had never written them for a patient?

12   A.        That's correct.

13   Q.        Do you know whether Jeri O'Donnell gave

14   you any particular diagnosis?

15   A.        I don't.  I don't know the assessment

16   or diagnosis that she gave me.

17   Q.        Do you know whether or not she -- did

18   she refer you to any other mental health care

19   providers?

20   A.        No.

21   Q.        Did she ever suggest that you seek

22   treatment with anyone else for depression,

23   suicide, that type of thing?

24   A.        No.  I think at the time I had

Adam P. Hall, D.O.                                    May 18, 2009

116

1    discussed the situation with her about my major

2    depression.  I knew I had depression.  I don't

3    know if it was diagnosed as major depression, but

4    I discussed the situation with her.  And I think

5    she asked if I was still actively suicidal.  And I

6    said I have good days and bad days.  I'm getting

7    better.  So I'm hopeful, and I don't think I'm

8    going to go down that route.

9              So I think that the urgent issue or the

10   consideration of an emergency-type situation where

11   I might be more contemplative had been addressed.

12   So I think she -- we may or may not have mentioned

13   for me to seek counseling, but it would have been

14   on a more informal basis for me to follow up on my

15   own timeline.

16   Q.          Did she ever suggest that you seek

17   treatment to get medication for your depression?

18   A.          I don't remember.

19   Q.          But you don't think you talked with her

20   about chemical dependency or addiction issues?

21   A.          No.  I honestly was -- I didn't think I

22   had an issue with chemical dependency.  I was in

23   denial up until that incident.

24   Q.          And by "that incident," you mean the

Adam P. Hall, D.O.                                    May 18, 2009

117

1    incident in April?

2    A.        In April of 2006, that's correct.

3    Q.        How soon after that incident did you

4    begin to believe that you may have a chemical

5    dependency?

6    A.        I was in denial for a couple of months

7    afterwards.  I had spoken with Dr. Hilliard upon

8    termination that he advised rehab.  Jeri O'Donnell

9    had advised rehab, but not specifically what sort

10   of rehab.  I wasn't really sure myself if, you

11   know, if there was -- what issue there was to

12   address.  But with some self-reflection, talking

13   with family members, about six to eight weeks

14   after the termination, I think, I was ready to

15   enter into rehab.

16   Q.        Did anyone other than Dr. Hilliard from

17   OhioHealth tell you that they thought you should

18   go into rehab?

19   A.        Jeri O'Donnell did.

20   Q.        Did anyone other than Dr. Hilliard as

21   far as people that you knew in connection with

22   your duties as an anesthesiology resident?

23   A.        Let me understand that question.  Ask

24   me to go into rehab?

Adam P. Hall, D.O.                                    May 18, 2009

118

1    Q.         Yes.

2    A.              No.  I was pretty much in denial.  And

3    I don't know if they ever noticed that.  I tried

4    to put on a calm face at work and was stoic, so I

5    don't know if they ever knew the extent of the

6    issues.

7    Q.         You don't know if anyone at --

8    A.         No, I don't.

9    Q.         -- at Doctors knew you were chemically

10   dependent?

11   A.         Correct.

12   Q.         Was the first time the issue of you

13   being chemically dependent, the first time that

14   that came up after the April 13th incident?

15   A.         On a formal notification, you mean,

16   like saying this -- let me understand the

17   question.  That there was more of a formal --

18   Q.         No.  When was the first time that the

19   issue of you being or possibly being chemically

20   dependent, did that come up with anybody at

21   Doctors at any time before the April 13th

22   incident?

23   A.         No.

24   Q.         After the April 13th incident, did the

Adam P. Hall, D.O.                                    May 18, 2009

119

1    issue of you being chemically dependent or

2    possibly being chemically dependent or needing to

3    go to rehab, was that discussed with anyone other

4    than Jeri O'Donnell and Dr. Hilliard?

5    A.          No.  Let me correct that.  I spoke with

6    the EAP a month after being terminated because

7    there was a window of opportunity for treatment,

8    and I sought it with EAP.  And they actually

9    didn't want to listen to me.

10   Q.          So you were permitted to use the EAP

11   for a month after you were terminated?

12   A.          Yes.  I don't know if I was permitted

13   to use them.  I sought their counseling.

14   Q.          And you didn't have to pay for it?

15   A.          I never got a bill, let me put it that

16   way.

17   Q.          Who did you see through them?

18   A.          I don't know.  I don't know who the

19   counselor was.  I made an appointment and I went

20   over and talked to him.

21   Q.          Was that a man or a woman?

22   A.          It was a man.

23   Q.          And you met with him in person?

24   A.          Yes.

Adam P. Hall, D.O.                                    May 18, 2009

120

1    Q.         Were you no longer seeing Jeri

2    O'Donnell at that point?

3    A.         I was not.

4    Q.         Why not?

5    A.         I didn't have insurance.  Financially I

6    had no resources to speak of.

7    Q.         And the man through EAP, you said he

8    didn't want to listen?

9    A.         Correct.

10   Q.         Why do you say that?

11   A.         We spoke for about five minutes and

12   maybe a little bit longer and just didn't think he

13   could help me.  Didn't really offer me options

14   so --

15                    - - - - -

16        Thereupon, Defendants' Exhibit 11 is

17   marked for purposes of identification.

18                    - - - - -

19   Q.         Handing you what we've marked as

20   Exhibit 11, this is another evaluation of you

21   while you were an anesthesiology resident at

22   Doctors.  This is for the -- it looks like for the

23   first quarter of '05 through March 31st of '05.

24             Is that your signature on the second

Adam P. Hall, D.O.                                May 18, 2009

121

1    page dated June 2, '05?

2    A.         Yes.

3    Q.         And was this given to you by Dr. Zucco?

4    A.         Yes.

5    Q.         And it looks like on the second page,

6    he says you've been gradually improving over the

7    past few months.

8    A.         Is that a question?

9    Q.         Yes.  Is that what it says?  I just

10   want to make sure that's what it says.

11   A.         It looks like that, yes.

12   Q.         Do you remember receiving this

13   evaluation?

14   A.         Yes.

15   Q.         What do you recall about it, I guess

16   about your meeting with Dr. Zucco?  I assume you

17   met with him, right?

18   A.         Yes.

19   Q.         What do you remember about that?

20   A.         I believe it was sort of a short

21   evaluation, about five minutes.  And he was

22   recommending that I be advanced in my training.

23   Q.         So at that point, were you taken off

24   probation?

Adam P. Hall, D.O.                                    May 18, 2009

122

1    A.        I don't believe so.  If you look at the

2    contract, Exhibit 10, there was still a

3    probationary period with the second year contract,

4    or was this -- I'm sorry.  This was in June of

5    '05.  I may have been taken off.

6    Q.        Your initial probationary period was

7    supposed to be from November 23, '04 to April 23,

8    '05.  Do you know if that was ever extended?

9    A.        I don't.  I don't think it was, but I

10   may be wrong.

11                    - - - - -

12        Thereupon, Defendants' Exhibit 12 is

13   marked for purposes of identification.

14                    - - - - -

15   Q.        I'm handing you what we've marked as

16   Exhibit 12.  This is another quarterly evaluation

17   of you.  This one looks like it's for July '05

18   through the end of September '05.

19             Is that your signature on the second

20   page?

21   A.        Yes.

22   Q.        Do you remember when you received this

23   evaluation?

24   A.        I don't.

Adam P. Hall, D.O.                                    May 18, 2009

123

1    Q.        Is this -- is the signature above yours

2    Dr. Werhan?

3    A.        Yes, it looks like his.

4    Q.        Do you recall meeting with Dr. Werhan

5    to discuss this evaluation?

6    A.        I may have.  I don't recall.

7                     - - - - -

8         Thereupon, Defendants' Exhibit 13 is

9    marked for purposes of identification.

10                    - - - - -

11   Q.        Handing you what we've marked as

12   Exhibit 13, this is another quarterly evaluation

13   of you.  This one is for the quarter October 1

14   through the end of December 2005.

15             And is that your signature on the

16   second page --

17   A.        Yes.

18   Q.        -- dated, it looks like, 4-11-06?

19   A.        Yes.

20   Q.        And is this also signed by Dr. Werhan

21   and Dr. Hilliard?

22   A.        Yes.

23   Q.        Do you recall receiving this evaluation

24   in early -- sometime the first quarter of '06?

Adam P. Hall, D.O.                                    May 18, 2009

124

1    A.         I don't recall receiving it, but

2    apparently I did because my signature is on it.

3    Q.         Do you recall any meeting where your

4    performance was evaluated with Dr. Werhan and

5    Dr. Hilliard in early '06?

6    A.         In early '06?  I know I had a series of

7    discussions in '06 with Dr. Hilliard, but I don't

8    know if it was related to this, to my

9    competencies.  I think it was more administrative.

10   Q.         Do you remember discussion that you

11   need to focus more and quit trying so hard to be

12   everyone's friend and issues like that?

13   A.         I know Dr. Werhan and I had spoken

14   obviously on occasions outside of this where he

15   wanted me to be more focused and diligent.  And I

16   applied his recommendations to the operating

17   environment.

18   Q.         So you recall him talking to you about

19   getting distracted?

20   A.         I think there were some occasions where

21   we had talked about that, yes.

22   Q.         During those -- any of those

23   discussions with Dr. Werhan, did you ever call to

24   his attention that any of your performance

1   deficiencies could have something to do with

2   chemical dependency?

3   A.          I don't think we ever spoke about

4   chemical dependency, but we had a long talk about

5   my underlying medical problems, foot problems.  I

6   told him what I had been going through.  I don't

7   remember when it was, but I had a very impassioned

8   discussion with him about what was going on in my

9   life.

10   Q.          And that was the chronic pain?

11   A.          Yes.

12   Q.          I think we talked about that before.

13   A.          Yes.

14                       - - - - -

15          Thereupon, Defendants' Exhibit 14 is

16   marked for purposes of identification.

17                       - - - - -

18   Q.          Handing you what we've marked as

19   Exhibit 14, this is another contract.  This one is

20   a little bit different format, but it's another

21   contract between you and Doctors for your final

22   year of residency from February 2, '06 to February

23   1, '07.

24          Do you recognize this document?

126

1    A.          Yes.

2    Q.          And is that your signature on the

3    fourth page --

4    A.          Yes.

5    Q.          -- dated March 3, '06?

6    A.          Correct.

7    Q.          And then on the fourth page, is that

8    your signature at the bottom on Addendum A?

9    A.          Yes.

10   Q.          And then the last two pages, these are

11   designated as Appendix I at the top?

12   A.          Okay.

13   Q.          Are these the conditions of your

14   probationary status with the Ohio Medical Board?

15   A.          Yes.

16   Q.          So did Doctors offer you this contract

17   after the issue was cleared up with the Ohio

18   Medical Board on your license?

19   A.          Yes.

20   Q.          And I think we already talked about how

21   at that time, you were going to be on probation

22   for a period after they gave you your license?

23   A.          Right, for the two years.

24   Q.          Right.  And so this contract with

127

1    Doctors incorporated the same terms of your

2    probation --

3    A.         Yes, that's correct.

4    Q.         -- with the Medical Board?

5    A.         Yes.

6    Q.         Did you understand that Doctors had the

7    ability to terminate your contract if you were not

8    fulfilling your performance expectations?

9             MR. MEZIBOV:  Objection to the form of

10   the question, but you can answer.

11   Q.         I'll show you where it is in the

12   contract.  But I mean, before that, did you

13   understand at the time you signed Exhibit 14 that

14   Doctors could terminate your contract if you

15   weren't meeting performance expectations?

16            MR. MEZIBOV:  Same objection.  You can

17   answer.

18   A.         As I understood it, the performance

19   issues were being addressed to all parties'

20   satisfactions.  And that termination was an

21   option, but we were working in a rehabilitative

22   program.

23   Q.         So it would be fair to say that when

24   you entered into Exhibit 14, your understanding

128

1    was that you were going to be completing the third

2    year?

3    A.          Correct.

4    Q.          And even though you knew that there

5    were performance issues because those had been

6    discussed with you, that you planned to work on

7    them?

8    A.          Yes.

9    Q.          And that Doctors planned to continue

10   working with you on those issues?

11   A.          Yes.

12   Q.          And did you understand that if you did

13   not meet expectations, that they could terminate

14   the contract?

15          MR. MEZIBOV:  Objection.  Same

16   objection as before, form of the question.

17   A.          Again, I had discussed the issues at

18   hand.  All parties were aware of my previous

19   performance issues.  I was contrite and expressed

20   that I wanted to be compliant and work through the

21   issues and that I appreciated their understanding

22   of the issues.

23          So I do not believe that termination

24   would be a formal action as I thought that we were

Adam P. Hall, D.O.                                    May 18, 2009

                                                              129

1    going to work through the issues.

2    Q.          Okay.  So you didn't think they were

3    going to terminate your contract?

4    A.          I didn't believe based on the evidence

5    that I had provided them that that was a

6    necessary --

7    Q.          Based on what had happened up to the

8    point that you had signed this?

9    A.          Correct.  I believed those issues had

10   been addressed to our mutual satisfaction.

11   Q.          What about going forward after March

12   when this was signed, did you understand that --

13   maybe I'm making it too complicated.

14              Did you understand that Doctors could

15   terminate your contract based on things that you

16   might do after March 3rd of 2006?

17              MR. MEZIBOV:  Objection.  Go ahead.

18   A.          Can you just rephrase the question

19   again for me?

20   Q.          Sure.  When you signed this contract on

21   March 3rd of 2006, did you understand that Doctors

22   could terminate the contract based on things that

23   you did or didn't do going forward?

24              MR. MEZIBOV:  Objection.  You can

130

1   answer.

2           THE WITNESS:  Okay.

3   A.          Again, the issues that were in the past

4   had been dealt with.  I felt Doctors had

5   addressed -- both Doctors and I had addressed the

6   issues.  We were making corrective action stance.

7   I believed that Doctors had the right to terminate

8   an employee, but that rehabilitation was the

9   options that parties were going to pursue should

10  anything happen.  I was not formally anticipating

11  a termination nor was I anticipating that I would

12  be diagnosed with a chemical dependency issue.

13  Q.          Okay.  So did you understand that if

14  you stole drugs from Doctors, that they would

15  terminate your contract?

16          MR. MEZIBOV:  Objection.  You can

17  answer.

18  A.          Again, while my actions were improper

19  and may or may not have been stealing, Doctors

20  Hospital did have the -- hold on a second here.  I

21  need to think about answering this one.  Okay.

22  Rephrase the question for me one more time.

23  Q.          I'll just ask it again.  So did you

24  understand that if you stole drugs from Doctors,

Adam P. Hall, D.O.                                          May 18, 2009

131

1    that they could terminate your contract?

2              MR. MEZIBOV:   Objection.   You can

3    answer.

4    A.        I don't believe that I fully understood

5    the ramifications of my actions.   So, no, I did

6    not know that I would be terminated for this

7    action.

8    Q.        A moment ago you testified, "Again,

9    while my actions were improper and may or may not

10   have been stealing...."   Do you recall that

11   testimony?

12   A.        Yes.

13   Q.        What do you mean by "may or may not

14   have been stealing"?

15   A.        Well, it asked me to make a legal

16   analysis and I'm not --

17   Q.        I'm not certainly asking for your legal

18   analysis.   You're not claiming that you didn't

19   steal drugs from Doctors, are you?

20   A.        What I'm claiming is that I was under

21   extreme duress at the time, I was in a lot of pain

22   and I wasn't thinking properly, so what I did I

23   know was improper.

24   Q.        Are you claiming that you didn't steal

132

1    drugs from Doctors?

2              MR. MEZIBOV:  Objection.  It's

3    argumentative.

4              MS. DAY:  It's a question.

5              MR. MEZIBOV:  It's argumentative.

6    Q.        Are you claiming that you didn't steal

7    drugs from Doctors?

8    A.        What I'm claiming is that my actions

9    may or may not be theft, but my actions were

10   improper.

11   Q.        Okay.  Well, let's take stealing out of

12   it.  You admitted that you took drugs from Doctors

13   that you didn't pay for and that weren't

14   prescribed to you?

15   A.        Yes.

16   Q.        Did you read Exhibit 14 before you

17   signed it?

18   A.        Yes.  That's Addendum A or are we

19   talking about the entire contract?

20   Q.        Well, we'll start with the entire

21   thing.  Did you read Exhibit 14?

22   A.        Yes.

23   Q.        Looking on the second page, the second

24   paragraph, do you see where it says, "Should the

Adam P. Hall, D.O.                                    May 18, 2009

133

1    Resident, by action or inaction, commit or allow

2    to occur any action or course of action, which the

3    Institution reasonably believes involved moral

4    turpitude, or is contrary to the interests of

5    patient care or the general welfare of the

6    Institution, the Institution may terminate the

7    Agreement without prior notice"?

8    A.        Yes.

9    Q.        Did I read that correctly?

10   A.        Yes.

11   Q.        Would you agree that charging a patient

12   for a drug that you were going to take yourself,

13   and did take yourself, would be contrary to the

14   interests of patient care or the general welfare

15   of the institution?

16            MR. MEZIBOV:  Objection.  If you're

17   asking him to offer an opinion as to whether he

18   violated the contract, there's an objection.  I

19   think that's what you're asking.

20            You can answer as best you can.

21            THE WITNESS:  Okay.

22   A.        So rephrase the question again.

23   Q.        Sure.  Would you agree that charging a

24   patient for a drug that the physician then takes

Adam P. Hall, D.O.                                    May 18, 2009

134

1    himself is contrary to the general welfare of

2    Doctors?

3              MR. MEZIBOV:  Objection.  It assumes

4    facts not in evidence.  Go ahead.

5    A.         Yes, I believe the action would be

6    contrary to the interests of the patients.

7    Q.         On the incident in question, which I

8    guess we've established was on April 13, 2006,

9    what did you do?  How did you get the -- I've

10   forgotten what it was.

11   A.         The Celestone?

12   Q.         Yes, the Celestone.

13   A.         What I did is I had the patient's

14   information from a case that I had done earlier in

15   the day.  I used their information via a nurse.  I

16   gave that information to a nurse because I had

17   written an order in the patient's chart.  And I

18   obtained the Celestone out of the Pyxis, which is

19   the drug dispensing machine at the hospital.

20   Q.         So Pyxis, if I understand it correctly,

21   is the system that tracks medication?

22   A.         Correct.

23   Q.         It keeps track of who is prescribing

24   it, correct?

Adam P. Hall, D.O.                                        May 18, 2009

135

1   A.          Correct.

2   Q.          It keeps track of what patient it's

3   being checked out to?

4   A.          Correct.

5   Q.          And it keeps track of kind of a count

6   of what should be there, what goes in, what comes

7   out?

8   A.          Yes.

9   Q.          So you, through a nurse -- do you

10  remember which nurse it was?

11  A.          I don't.

12  Q.          So you, through a nurse, got the

13  Celestone for a patient?

14  A.          Yes.

15  Q.          And at the time that you got the

16  Celestone for the patient, I guess my question is

17  were you intending all along to use it yourself?

18  A.          Yes.

19  Q.          And were they out of --

20  A.          Kenalog?

21  Q.          -- Kenalog?

22  A.          Yes.  It was a backorder.  I believe

23  the military may have been using it, so it was out

24  of supply at the time.

Adam P. Hall, D.O.                                    May 18, 2009

136

1    Q.          They were out of Kenalog, and you were

2    in pain?

3    A.          Yes.

4    Q.          And so the Kenalog wasn't -- Pyxis

5    wasn't used for the Kenalog?

6    A.          Correct.

7    Q.          So that's why you hadn't --

8    A.          Gone that route before, that's correct.

9    Q.          And so now the Kenalog is out.  You're

10   in pain.  And so you decide to issue it to a

11   patient or say you were issuing it to a patient so

12   you could get the Celestone?

13   A.          Correct.

14                          - - - - -

15       Thereupon, Defendants' Exhibit 15 is

16   marked for purposes of identification.

17                          - - - - -

18   Q.          We're handing you what we've marked as

19   Exhibit 15.  It says Physician Orders, Single Use

20   Form.  Is that your signature at the bottom?

21   A.          Yes.

22   Q.          Do you recognize this?

23   A.          Yes.

24   Q.          Was this the order for the Celestone

137

1    that we just talked about on --

2    A.        Yes.

3    Q.        I guess when did you find out that

4    you'd been caught?

5    A.        Well, the nurse had asked me about it,

6    about giving the medication.  And I guess it was

7    for a charting issue.  And I said, don't worry

8    about it, or I'll take care of it.  I don't

9    remember exactly what I said, but I had blown her

10   off so that she wouldn't ask about it.  And then

11   maybe an hour or so later, Dr. Werhan came up to

12   me and asked me what had happened to the

13   medication, and I told him what had happened.  I

14   had basically taken the drug for myself as I was

15   having a lot of pain.  And he then mentioned that

16   that might be considered fraud and told me to go

17   rectify the situation immediately.

18   Q.        And did you then do something to

19   rectify the situation?

20   A.        I went up to the pharmacy, told them to

21   remove the charge from the patient's account.

22   Gave them my insurance information and told them

23   to charge me.

24   Q.        Were you planning on doing that before

Adam P. Hall, D.O.                                    May 18, 2009

138

1   you got caught, notifying the pharmacy to charge

2   you?

3   A.          I was basically not really thinking

4   about anything except trying to get the pain

5   relieved.  I was hoping to try and get it through

6   the pharmacy, as I had called them earlier, and I

7   couldn't procure it through a single dose vile

8   because they only prescribed it, I want to say, in

9   like a 10 cc bottle for pediatrics.  And they had

10  mentioned that it was in the Pyxis in single dose

11  syringes.

12          And so I just wanted to expedite things

13  to get it because I just wanted to get out of pain

14  as quickly as possible.  So it may have been in

15  the back of my mind that I was going to take care

16  of things, but that was not my first thought.

17  Q.          And you were caught that same day,

18  right?

19  A.          Correct.

20  Q.          So what's the difference between the

21  Celestone and the other one, Kenalog?  What's the

22  difference between Celestone and Kenalog?

23  A.          I don't think there's much of a

24  difference.  They're just different types of

Adam P. Hall, D.O.                                    May 18, 2009

139

1    steroids.  But they are what they call

2    glucocorticoids, which have a strong

3    antiinflammatory effect plus the potential

4    mood-altering effects as well.

5    Q.          What are the mood-altering effects?

6    A.          There's some euphoria.  You usually see

7    it in higher doses.  But in my case with the

8    underlying major depressive disorder, it was just

9    any sort of relief from the pain caused me to be

10   elated.  So there were some mood-altering effects

11   from the standpoint that I was no longer in pain.

12   Q.          Wouldn't that be true of any pain

13   reliever?

14   A.          Not necessarily.  These had a pretty

15   potent effect.  There was also some weight gain

16   that can happen with the glucocorticoids.  I mean,

17   there's a hole host of effects.

18   Q.          Did you understand after Doctors

19   terminated your contract that you had the ability

20   to appeal it to a grievance committee?

21   A.          I did.

22   Q.          Were you familiar with the corrective

23   action and resident grievance policy prior to

24   utilizing it yourself?

Adam P. Hall, D.O.                                        May 18, 2009

140

1    A.        Was I familiar with it?

2    Q.        Yes.

3    A.        I don't know if I was as familiar as I

4    am now with it but --

5    Q.        Had you read it?

6    A.        The corrective action policy handout,

7    no.  I mean, I basically knew that I was going

8    through some formal sanctions such as the

9    probation and things like that so -- but I don't

10   believe I read the corrective action policy word

11   for word.

12             (A short recess is taken.)

13   Q.        Going back to Exhibit 14, that third

14   page under -- it's labeled 0750?

15   A.        Yes.

16   Q.        Under professional activity, the second

17   paragraph, do you see where it says, "In the event

18   the Resident has or becomes aware of any health

19   condition which could potentially affect the

20   Resident's ability to practice medicine, or if the

21   performance of essential functions of his/her job

22   requires reasonable accommodation in order to

23   facilitate the Resident's continued practice of

24   medicine or essential requirements of his/her job,

Adam P. Hall, D.O.                                    May 18, 2009

141

1    the Resident is required to immediately inform the

2    residency Program Director and/or the VPME."

3                    Did I read that correctly?

4    A.        Yes.

5    Q.        Did you believe while you were a

6    resident at Doctors that you had a health

7    condition that affected your ability to do your

8    job?

9    A.        Yes.

10   Q.        Did you understand that per your

11   contract, Exhibit 14, you were supposed to notify

12   the program director or the VPME of that fact?  I

13   mean, I know it's here.

14   A.        Sure.

15   Q.        But whether or not you understood that

16   I guess is what I'm asking?

17   A.        Did I understand that, no.

18   Q.        And you would agree that you did not

19   notify the program director or the VPME of the

20   health condition you had that was affecting or

21   could affect your ability to practice medicine or

22   do your job?

23   A.        Yes, I would agree with that.

24   Q.        Did you understand that one of the

Adam P. Hall, D.O.                                    May 18, 2009

142

1    terms of your probationary license with the state

2    was to obey all laws and rules governing the

3    practice of osteopathic medicine?

4    A.          Yes.

5    Q.          After the Kenalog was injected by --

6    was it Dr. Davy?

7    A.          Celestone.

8    Q.          Yes, the Celestone was injected by

9    Dr. Davy.  Do you know what happened with the

10   syringe?

11   A.          I believe he had it.  I don't know.  I

12   think he may have put it in the Sharps Container.

13   Q.          You didn't dispose of it?

14   A.          To the best of my recollection, no.

15   Q.          What did you normally do with the

16   syringe after you were done with it?

17   A.          On the previous encounter you're

18   talking about, or this one?

19   Q.          I guess I meant in general.

20   A.          In general I usually took supplies home

21   and did the injection at home.  I think I may have

22   done one at the hospital, but I would usually put

23   it in a Sharps Container.  Or if I was home, I

24   would just throw it in the trash.

Adam P. Hall, D.O.                                    May 18, 2009

143

1    Q.        In the incident in September of '05

2    when the syringe fell out of your pocket, what

3    pocket did you have it in?

4    A.        Front pocket.

5    Q.        And how did it fall out, the one that

6    fell out by accident?

7    A.        When I bent over to flush the toilet,

8    it was basically sitting in the pocket and fell

9    forward.

10   Q.        When you flushed?

11   A.        Right.

12                   - - - - -

13        Thereupon, Defendants' Exhibit 16 is

14   marked for purposes of identification.

15                   - - - - -

16   Q.        Handing you what we've marked as

17   Exhibit 16, this is a Doctors Hospital Department

18   of Graduate Medical Education Corrective Ation and

19   Grievance Policy.

20        Do you recognize this?

21   A.        No.  This is the first time I've seen

22   this, I believe.  Let me make sure.  This is the

23   first time I've seen this.

24   Q.        Did you ever see a different version of

144

1   this Corrective Action and Grievance Policy?

2   A.          A different version of this, no, not to

3   my recollection.

4   Q.          After -- well, I guess after Dr. Werhan

5   approached you about the incident on April 13,

6   2006, what happened after you -- and you told me

7   you went up and talked to the pharmacy and

8   switched over the drugs so that they wouldn't be

9   charged to the patient?

10              What happened after that?

11  A.          Can you be a little bit more specific?

12  Q.          Sure.  Were you allowed to finish your

13  shift?

14  A.          For that day?

15  Q.          Yes.

16  A.          This is for the day in question of

17  the -- yes.

18  Q.          Were you at the end of your shift at

19  that point when Dr. Werhan approached you?

20  A.          I believe so.  I mean, to the best of

21  my recollection, I believe I was allowed to

22  finish.  And I may be wrong.  But to the best of

23  my recollection, I was allowed to finish after I

24  had taken care of the medicine through the

Adam P. Hall, D.O.                                    May 18, 2009

145

1   pharmacy.

2   Q.          And when was the next that you heard

3   more about the incident or what was going to

4   happen with your employment?

5   A.          A few days later.

6   Q.          What happened?

7   A.          I was called to the Medical Education

8   Office and spoken with in regards to what had

9   happened.  And then a few days after that, I was

10  terminated.

11  Q.          Who was there in the office when you

12  were called in?

13  A.          To Medical Education, I believe it was

14  Dr. Werhan and Dr. Hilliard.

15  Q.          Just the three of you?

16  A.          I believe Stacy Caster, who was one of

17  the -- I don't know what her exact function was,

18  maybe Dr. Hilliard's secretary or VP of residency,

19  I don't know exactly her title, but I believe she

20  was in the meeting, too.

21  Q.          And what was discussed?

22  A.          The discussion involved the

23  inappropriate behavior that occurred.  And then I

24  was basically told to go to work and there would

Adam P. Hall, D.O.                                    May 18, 2009

146

1    be a decision a few days later.

2    Q.          And at that point, did you explain --

3    during that meeting, did you explain what had

4    happened?

5    A.          Yes.

6    Q.          And then how did you find out that your

7    contract was being terminated?

8    A.          I was advised to go to Medical

9    Education.  They asked for my badge and my pager.

10   And I was told to get my supplies, my personal

11   belongings and vacate.

12   Q.          Who told you that your contract was

13   being terminated?

14   A.          The formal notification I believe I got

15   was from their internal attorney, Terri Meldrum.

16   I don't remember who gave me the paperwork,

17   whether it was Stacy or Dr. Hilliard, but someone

18   in Medical Education informed me of that.

19   Q.          Do you remember what date -- what was

20   your last day when they told you to go home?

21   A.          I don't.  I know it was sometime around

22   the end of April.

23                    - - - - -

24          Thereupon, Defendants' Exhibit 17 is

Adam P. Hall, D.O.                                    May 18, 2009

147

1    marked for purposes of identification.

2                      - - - - -

3    Q.         Handing you what we've marked as

4    Exhibit 17, this is a letter from Dr. Hilliard to

5    you dated April 20, 2006.

6               Do you recognize this letter?

7    A.         Yes.

8    Q.         And in this letter, Dr. Hilliard

9    notifies you that your contract was being

10   terminated effective immediately?

11   A.         Yes.

12   Q.         Did you receive this in the mail?

13   A.         I don't remember if it was in the mail

14   or if I got it at work.

15   Q.         And then in the last paragraph, he

16   notifies you that you could request

17   reconsideration to the Medical Education

18   Committee?

19   A.         Correct.

20   Q.         And did you do that?

21   A.         I did.

22   Q.         And did you appear at that meeting on

23   April 26th?

24   A.         Yes.

148

1    Q.          And what happened at that meeting?

2    A.          I presented myself to the Graduate

3    Medical Education Committee.  I had spoken with

4    Jeri O'Donnell prior to that.  I was advised that

5    I should ask for rehabilitation of some sort.  I

6    wasn't sure what rehabilitation I might have

7    needed, but I informed them that I thought I

8    needed rehabilitation or at least some sort of

9    formal evaluation, and left it in their hands at

10   that point.

11   Q.          And you said earlier that you had also

12   talked to Dr. Hilliard or he had said that he

13   thought you needed some sort of --

14   A.          At the end of that appeals committee,

15   that's what he said.

16   Q.          Okay.  On that same day?

17   A.          Yes.

18   Q.          Okay.  And so he told you that he

19   thought you needed some sort of rehabilitation?

20   A.          He did.  And he said that he would

21   advocate for my return should I complete a formal

22   program.  So we didn't discuss as to what type of

23   rehabilitation, but just that there should be some

24   corrective action taken.

149

1    Q.          And that if you completed

2    rehabilitation, that he would advocate for you?

3    A.          Yes.

4    Q.          Did you have any discussions with

5    Dr. Werhan about going to rehabilitation or

6    anything along those lines?

7    A.          No.  After the -- I don't believe I

8    did.  But after the termination and the appeals

9    committee, I really had -- I didn't have any more

10   communication with the hospital or anybody on

11   staff.

12                    - - - - -

13        Thereupon, Defendants' Exhibit 18 is

14   marked for purposes of identification.

15                    - - - - -

16   Q.          Handing you what we've marked as

17   Exhibit 18, this is another evaluation of you.

18   And this one is signed at the second page dated

19   March 16, '06.

20          Did you ever receive this evaluation?

21   A.          I did.

22   Q.          Do you know why it's not signed by you?

23   Do you think there was a version that you signed?

24   A.          There may have been.  I don't know.

Adam P. Hall, D.O.                                          May 18, 2009

150

1    Q.        But you do recall receiving this?

2    A.        Yes, I do.

3    Q.        What do you recall about that?

4    A.        Can you be more specific?

5    Q.        Yes.  What about it do you recall?  Who

6    was there?

7    A.        I don't remember who was there.

8    Q.        But you just know that you received

9    this?

10   A.        Yes.

11   Q.        Did you receive it while you were still

12   a resident at Doctors?

13   A.        I don't know if I was still a resident.

14   This may have been something that showed up after

15   the fact.

16                        - - - - -

17          Thereupon, Defendants' Exhibit 19 is

18   marked for purposes of identification.

19                        - - - - -

20   Q.        I'm handing you what we've marked as

21   Exhibit 19.  This is a letter from Terri Meldrum

22   at OhioHealth to Patrick Smith dated March 6,

23   2007.

24          Was Patrick Smith your attorney at one

Adam P. Hall, D.O.                                May 18, 2009

151

1    point?

2    A.        Yes.

3    Q.        Have you seen this letter before?

4    A.        Yes.

5    Q.        And was this -- were you notified that

6    prior to this -- I guess did you hear prior to

7    this that OhioHealth was -- or Doctors Hospital

8    was denying your request to return?

9    A.        Prior to this letter?

10   Q.        Yes.

11   A.        No.

12   Q.        After you appeared before the committee

13   requesting that they reconsider the termination of

14   your contract -- here we go.

15                   - - - - -

16        Thereupon, Defendants' Exhibit 20 is

17   marked for purposes of identification.

18                   - - - - -

19   Q.        I was a little out of order.  Sorry

20   about that.  Handing you what we've marked as

21   Exhibit 20, this is a letter to you from

22   Dr. Hilliard.  And this is where he's notifying

23   you on May 3rd that the committee at Doctors had

24   decided to uphold the termination of your

152

1      contract?

2      A.          Yes.

3      Q.          And is this letter how you were

4      notified that the committee had decided to uphold

5      the termination of your contract?

6      A.          Yes.

7      Q.          Did you receive this letter in the

8      mail?

9      A.          More than likely.  I was no longer

10     employed there so --

11     Q.          After May 3rd, did you contact

12     Dr. Hilliard, Dr. Werhan or anybody else at

13     Doctors to make any other requests that they

14     reconsider the decision to terminate your

15     contract?

16     A.          After this?

17     Q.          Right.  After May 3rd?

18     A.          I'm not sure if I did or if I didn't

19     specifically to them.  I may have called other

20     entities besides Doctors to try and fix the

21     situation.  But between the period of August and

22     February, there was no reason to contact anybody

23     because I was in a rehab program.  I didn't have a

24     license in the state and had to basically address

Adam P. Hall, D.O.                                      May 18, 2009

153

1    that issue.

2    Q.          And I understand that then later in

3    2007, you asked to be reinstated?

4    A.          Correct.

5    Q.          But I guess then, and I think you may

6    have already answered this, but just to make sure,

7    during the period from May of '06 to August of '06

8    when you went into rehab, do you recall any

9    contact that you had with anyone else at Doctors

10   or anyone at Doctors requesting that they

11   reconsider the termination of your contract or

12   things to that effect?

13   A.          I honestly can't remember.  I don't

14   believe I did.

15   Q.          You said, "I may have called other

16   entities besides Doctors to try and fix the

17   situation."

18   A.          Yes.

19   Q.          Who were you referring to?

20   A.          The AOA, The American Osteopathic

21   Association, and the AOCA to see if I could get

22   some help after going through rehab to see if

23   there would be something down the road that they

24   could help me with.

Adam P. Hall, D.O.                                    May 18, 2009

154

1    Q.          And did you talk to anyone at either of

2    those organizations?

3    A.          I believe so, yes.  I talked to the

4    head of the AOA.  I don't remember his name.  And

5    a lady named Joyce Obradavic.  And I don't

6    remember who I spoke to at the AOCA.

7    Q.          And what did they tell you?

8    A.          I really didn't get anywhere with them.

9    Q.          Do you remember what they told you?

10   A.          Well, the AOA -- I take that back.  The

11   AOA said that after going through rehab, that if a

12   program would accept me, they would authorize the

13   expansion of any program, osteopathic program, for

14   an emergency slot so I could finish my year.  The

15   AOA was advocating for me to finish.

16              The AOCA said that basically they would

17   do whatever the AOA recommended.  But, again, I

18   don't remember who I spoke to there.  There were

19   numerous people there I spoke with.

20   Q.          So after your contract was terminated,

21   then did you have to go before the State Medical

22   Board again?

23   A.          After the termination at Doctors, yes.

24   Q.          And how did the Medical Board become

Adam P. Hall, D.O.                                    May 18, 2009

155

1    aware of what was going on?

2    A.        Well, the hospital reported the

3    diversion incident to the Medical Board.  About

4    the time that they called me, I had already

5    entered or was entering into rehab.  So I told

6    them that the issue was being addressed and I was

7    going into rehab.

8    Q.        Did the Medical Board order you to

9    submit to an examination at The Woods at Parkside?

10   A.        I don't know if they ordered me to do

11   it.  I believe that I was already on my way to do

12   it, but I don't know if there was an order to do

13   it.

14   Q.        But you did submit to a three-day

15   examination at The Woods at Parkside?

16   A.        Correct.

17                     - - - - -

18         Thereupon, Defendants' Exhibit 21 is

19   marked for purposes of identification.

20                     - - - - -

21   Q.        Handing you what we've marked as

22   Exhibit 21, this is a Step I Consent Agreement

23   between you and the State Medical Board.

24             Do you recognize this?

156

1    A.         Yes.

2    Q.         Is that your signature on the last page

3    dated August 30, 2006?

4    A.         Yes.

5    Q.         Looking on the second page of Exhibit

6    21 at the top, E, do you see where this says,

7    "Dr. Hall admits that the Board ordered him to

8    submit to a three-day examination at The Woods at

9    Parkside..."?

10            Does that refresh your recollection on

11   whether or not the Board had ordered you to the

12   examination?

13   A.         Again, it's something in writing here.

14   I don't remember if they ordered me.  I knew I was

15   aware of it and I told them I was entering into

16   it, so it may be boilerplate.  But I don't

17   remember the exact sequence.

18   Q.         Okay.  It also says there that it was

19   based on a self-report that you were terminated

20   from the anesthesia residency program because you

21   diverted for self-use.

22            Is that true, did you report it to --

23   what had happened to the Board?

24   A.         I believe that I talked with them prior

Adam P. Hall, D.O.                                          May 18, 2009

157

1   to the offense being reported by Doctors.  But,

2   again, I don't know if I talked to them before

3   they got the report from Doctors or if I talked to

4   them after.

5   Q.          So then the Board suspended your

6   license indefinitely at that point, correct?

7   A.          Correct.

8   Q.          When you went for your evaluation at

9   The Woods at Parkside, did you tell anyone there

10  that you had been terminated from a residency once

11  for flushing an empty syringe?

12  A.          I don't recall.

13  Q.          Is that true?  Were you ever terminated

14  from a residency for flushing an empty syringe?

15  A.          No.

16  Q.          Sorry to back up, but I just found one

17  of these that I didn't show you.  I apologize.

18                      - - - - -

19          Thereupon, Defendants' Exhibit 22 is

20  marked for purposes of identification.

21                      - - - - -

22  Q.          Dr. Hall, I'm handing you what we've

23  marked as Exhibit 22.  I realize I'm way out of

24  order here, but is this another one of your

Adam P. Hall, D.O.                                    May 18, 2009

158

1    Resident Quarterly Evaluations?

2    A.        Yes.

3    Q.        This one for the quarter ending April

4    30, '04.  Is that your signature at the bottom

5    where it says resident's signature?

6    A.        Yes.

7    Q.        Dated June 24, '04?

8    A.        Yes.

9    Q.        And who gave you this evaluation?

10   A.        It looks like Dr. Furbee's signature.

11   Q.        Do you recall receiving this

12   evaluation?

13   A.        Yes.

14   Q.        And do you recall discussion about your

15   interpersonal skills at that point?

16   A.        It's listed on there so --

17   Q.        I know it's listed on there.

18   A.        I imagine we talked about it, but I

19   don't remember it in detail.

20   Q.        Do you remember anything about this

21   particular evaluation?

22   A.        No.

23   Q.        So after you finished with rehab, and

24   we talked about how you worked for a while out of

Adam P. Hall, D.O.                                    May 18, 2009

159

1    state because you didn't have a license in Ohio?

2    A.        Correct.

3    Q.        And then you reapplied or applied to be

4    reinstated at Doctors?

5    A.        Correct.

6    Q.        At the time that you applied for

7    reinstatement at Doctors, you didn't yet have your

8    license reinstated, correct?

9    A.        No, I didn't.

10   Q.        Why did you apply before your license

11   was reinstated?

12   A.        The issue that happened in 2007, it was

13   late February when I put the application in.  The

14   Board had told me I was getting a Step II Consent

15   Agreement early in February.  When I was going to

16   go before the Board, it was already done.  All the

17   paperwork had been done so it was going to be a

18   rubber-stamp meeting.  And what happened is the

19   date of their board meeting was a snowstorm and it

20   cancelled the board.  It was like, they said, the

21   first time in 30 years that it had happened that

22   there was a snowstorm.  So I had already put the

23   application in.  And so I hadn't received it, but

24   I was anticipating I was going to receive it.  And

Adam P. Hall, D.O.                                    May 18, 2009

160

1     it was supposed to be around the same time I got

2     the license back.  It just happened that the

3     weather delayed things.

4     Q.        And your attorney at the time, Patrick

5     Smith, had wrote a letter to OhioHealth or Doctors

6     asking that you be reinstated; is that correct?

7     A.        Yes.

8     Q.        Did you make any personal application

9     yourself, you know, not through your attorney at

10    that time?

11    A.        No.

12    Q.        And then you received Exhibit 19 that

13    we already talked about.  That was the letter

14    dated March 6th?

15    A.        Yes.

16    Q.        After you received Exhibit 19 and you

17    were notified that you weren't going to be

18    reinstated, did you do anything to appeal that

19    decision?

20    A.        No.  They said it was final and

21    unappealable, so I proceeded forward for what I

22    believe was an impermissible rehiring issue.

23    Q.        Did you go to Doctors at all to talk to

24    Dr. Blackwell?

Adam P. Hall, D.O.                                    May 18, 2009

161

1   A.        No.

2   Q.        Do you recall any conversation with

3   Dr. Blackwell about the decision not to reinstate

4   you?

5   A.        Did I have any formal -- can you

6   rephrase the question?

7   Q.        Do you recall any conversation with

8   Dr. Blackwell about the decision not to reinstate

9   you in 2007?

10  A.        No.

11  Q.        Do you recall any conversation with

12  anyone at Doctors other than Dr. Blackwell about

13  the decision not to reinstate you in 2007?

14  A.        No.  All correspondence was through my

15  attorney.  I believe all correspondence was

16  through my attorney.  I don't remember any

17  conversation with people.

18  Q.        Did you go to Doctors, meaning

19  physically enter the hospital, at all in 2007?

20  A.        I believe so, yes.

21  Q.        Okay.  What was the purpose of that?

22  A.        I believe I handed off the packet from

23  Pat Smith to them, and I believe that was it.

24  That was the only time.

Adam P. Hall, D.O.                                      May 18, 2009

162

1    Q.          "The packet from Pat Smith," that being

2    the request to reinstate you?

3    A.          Correct.

4    Q.          What was in that packet?

5    A.          Documentation of a completed state

6    Board approved rehab program.  Recommendation

7    letters from the addictionologists.  And the

8    consent agreements from the Medical Board along

9    with Pat's letter.

10                       - - - - -

11        Thereupon, Defendants' Exhibit 25 is

12   marked for purposes of identification.

13                       - - - - -

14   Q.          I'm handing you what we've marked as

15   Exhibit 23.  And this is a copy of the Step Ii

16   Consent Agreement between you and the State

17   Medical Board.

18               Do you recognize this document?

19   A.          Yes.

20   Q.          And is that your signature on the back

21   page dated March 5, 2007?

22   A.          Yes.

23   Q.          Is this the consent agreement under

24   which your license was reinstated?

Adam P. Hall, D.O.                                              May 18, 2009

                                                                        163

1    A.        Yes.

2    Q.        And there were certain conditions of

3    that reinstatement, correct?

4    A.        Yes.

5    Q.        And that at the time you were, and

6    still are, I guess, under probation with the State

7    Medical Board?

8    A.        Yes.

9    Q.        And one of those conditions of your

10   license is that you shall not, without prior Board

11   approval, administer, personally furnish or

12   possess, except as they except out, of which we'll

13   go over in a second, any controlled substances as

14   defined by state or federal law; is that correct?

15   A.        That's correct.

16   Q.        And that does not include drugs that

17   are prescribed to you, you know, through the

18   knowledge of your physicians.  And we already

19   talked about that.  And you keep a log of those,

20   correct?

21   A.        Correct.

22   Q.        Something I don't understand, how were

23   you going to complete your anesthesiology

24   residency without being able to administer,

Adam P. Hall, D.O.                                    May 18, 2009

164

1    personally furnish or possess any controlled

2    substances?

3    A.          The issue of training with controlled

4    substances had been addressed prior to this

5    restriction.  I had to use narcotics in well over

6    2,000 cases.  There's guidelines for the

7    osteopathic anesthesiology programs that tell

8    residents how many cases they can do.  I received

9    the training that I needed prior to this

10   restriction with narcotics.

11          As far as I had the qualifications for

12   the job.  And I believe that Doctors regarded me

13   as disabled looking at this restriction.  So I

14   believe that I have the essential -- I have the

15   qualifications for the duties of an

16   anesthesiologist, but they regarded me as

17   disabled.

18   Q.          Well, I understand that's your claim in

19   this lawsuit.  I want you to logically describe to

20   me how you were going to be an anesthesiology

21   resident or an anesthesiologist under this

22   restriction that you were not to administer,

23   personally furnish or possess any controlled

24   substance?  How was that going to work, if you

Adam P. Hall, D.O.                                    May 18, 2009

165

1    know?

2    A.        Well, if you're asking me how that can

3    happen, there are numerous ways to get around this

4    restriction.  The first would be that as an

5    anesthesia resident, we always have access to an

6    attending.  That's part of being a resident.  So

7    an attending has to be immediately available

8    during a residency.

9              So during an induction, the anesthetic,

10   the narcotics could be given by the attending.  If

11   during the case I deemed it necessary for a

12   patient to get more narcotics, I could call the

13   attending back in.

14             If there's an emergency situation, an

15   emergency supercedes this restriction.  So I would

16   be determining whether or not an emergency --

17   something had risen to the level of being an

18   emergency that this patient would need narcotics.

19             Additionally, there are numerous ways

20   to perform anesthesia without using narcotics

21   during a case.

22   Q.        Would you agree there are some patients

23   who need narcotics in the practice of anesthesia?

24   A.        I would agree that some patients need

1    narcotics.

2    Q.          In those cases, you would have gotten

3    an attending?

4    A.          Yes.

5    Q.          So you wouldn't have been able -- and I

6    understand that you have to have access to an

7    attending as a resident?

8    A.          Correct.

9    Q.          I understand that.  But if you were to

10   go back and do an anesthesiology residency, you

11   would need to have an attending present to

12   administer any type of controlled substances?

13   A.          Correct.

14   Q.          And when you say that there are

15   numerous ways to perform anesthesia without

16   administering narcotics, you are saying that there

17   would be -- not every patient would be using

18   narcotics?

19   A.          Correct.

20   Q.          But you're not suggesting that you

21   would use a different course of medication because

22   you were not able to administer the narcotics?  I

23   mean, you're not suggesting that, are you?

24   A.          No.  There are other types of cases

Adam P. Hall, D.O.                                    May 18, 2009

167

1    that are performed routinely that don't utilize

2    narcotics.

3    Q.          You also, I think, said that if there

4    was an emergency, that these restrictions

5    wouldn't -- they would be superseded by the

6    emergency?

7    A.          Correct.

8    Q.          Why do you say that?

9    A.          Well, to my understanding, that's how

10   the Board -- I talked with the Board about that.

11   I don't have that in writing.  But to my

12   understanding, I have discussed that with the

13   Board and that is -- I don't want to say it's like

14   a good samaritan, but basically if you see an

15   emergency, you can react to it.  You don't have to

16   wait for somebody to come and give the narcotics.

17   It would be like if somebody saw a fire, you don't

18   have to wait for a firefighter to start fighting

19   the fire.

20   Q.          When did they tell you that?

21   A.          A while ago.  I don't remember who I

22   spoke to.

23   Q.          Okay.  So when you reapplied or you

24   applied to have your residency reinstated, you had

Adam P. Hall, D.O.                                      May 18, 2009

168

1    envisioned that you would have an attending take

2    care of at any time there's the use of or a need

3    for a controlled substance?

4    A.          Yes.

5    Q.          And that otherwise you would only be

6    able to administer anesthesia when it was other

7    than a controlled substance?

8    A.          Correct.

9    Q.          I know you said it was routine to use

10   noncontrolled substances.  How much of the time

11   did you use controlled substances versus not when

12   you were an anesthesia resident?

13   A.          Can you be a little bit more specific?

14   Q.          I'm trying to figure out how much of

15   the time as an anesthesia resident you were

16   administering narcotics versus not?

17   A.          During the course of a day, 8 hours

18   worth of anesthesia or 12 hours or however many

19   hours, we probably give narcotics less than a

20   total of ten minutes.  You frontload people at the

21   beginning of a case and it takes you all of about

22   15 seconds, or, I'm sorry, about 5 seconds to push

23   the medication in.  So then they've been given the

24   narcotics and they last in the bloodstream for a

Adam P. Hall, D.O.                                            May 18, 2009

169

1    while.  And if you need to redose, you can redose

2    later.  But, again, it's a very quick time span.

3    Q.          As an anesthesia resident, you would

4    have had access to controlled substances, right?

5                MR. MEZIBOV:  Objection.  You can

6    answer.

7    A.          Per this consent agreement, no.

8    Q.          How would you not have had access?  I

9    mean, how would that work?

10   A.          They were kept in the Pyxis.

11   Q.          You obviously had no trouble getting

12   them before?

13               MR. MEZIBOV:  Objection.  Is that a

14   question?

15   Q.          As an anesthesia resident, you or any

16   other anesthesia resident has the ability to

17   obtain narcotics?

18               MR. MEZIBOV:  Objection.  Go ahead and

19   answer.

20   A.          Based on this, I would be restricted

21   from having access to them.  As they're controlled

22   substances, they're locked up per DEA guidelines.

23   You have to have somebody check them out.  So

24   knowing my restriction, I would know that they're

Adam P. Hall, D.O.                                    May 18, 2009

170

1    not going to let me have access to this

2    medication.

3    Q.          You wouldn't be able to check them out

4    for you or a patient, correct?

5    A.          Correct.

6    Q.          What would happen if, say, Doctors

7    reinstates you, you finish your anesthesia

8    residency and you're no longer a resident, could

9    you, under this consent agreement, work as an

10   attending?

11              MR. MEZIBOV:  Objection.  You can

12   answer.

13   A.          I've talked with the Medical Board.

14   Pending approval into a program, they'll remove

15   this restriction.  It's a compliance issue.  I was

16   compliant.  They were willing or they have done it

17   before for others, they've lifted this restriction

18   to allow them to continue to train.  I talked with

19   them.  So as long as I'm in compliance, they're

20   willing to lift it.

21              As far as speculating when I'm done,

22   there might be accommodations made to have another

23   attending or a nurse anesthetist give the

24   narcotics.  But I don't envision this being a

Adam P. Hall, D.O.                                        May 18, 2009

171

1    permanent restriction.

2    Q.          But it hasn't been lifted as of yet?

3    A.          It hasn't because I haven't been

4    accepted back into a program.

5    Q.          Well, has it been lifted?

6    A.          I haven't asked to have it lifted.

7    Q.          Would you agree that if this consent

8    agreement, Exhibit 23, were in place, that you

9    would not be able to work independently as an

10   anesthesiologist?

11              MR. MEZIBOV:  Objection.  You can

12   answer.

13   A.          I would be speculating.  I don't know.

14   I know there are anesthesiologists who have

15   restrictions who are able to work.  It would be

16   speculative at best.

17   Q.          But you couldn't independently

18   administer a controlled substance?

19   A.          Correct.

20                         - - - - -

21              Thereupon, Defendants' Exhibit 24 is

22   marked for purposes of identification.

23                         - - - - -

24   Q.          Handing you what we've marked as

172

1    Exhibit 24, this is the letter to the State

2    Medical Board of Ohio from Dr. David Goldberg

3    dated October 16, 2006.

4              Do you recognize this?

5    A.        Yes.

6    Q.        And did Dr. Goldberg interview you for

7    the purpose of evaluating your status and ability

8    to return to a medical practice?

9    A.        Yes.

10   Q.        And Dr. Goldberg said that if you

11   followed some conditions and recommendations, that

12   he thought that you would be capable of practicing

13   medicine, correct?

14   A.        Yes.

15   Q.        And one of those conditions that he

16   felt needed to take place was counseling for a

17   minimum of 6 to 12 months, correct?

18   A.        Correct.

19                            - - - - -

20        Thereupon, Defendants' Exhibit 25 is

21   marked for purposes of identification.

22                            - - - - -

23   Q.        Handing you what we've marked as

24   Exhibit 25, this is a letter to Danielle Bickers

Adam P. Hall, D.O.                                              May 18, 2009

173

1   of the State Medical Board of Ohio from

2   Dr. Victoria Sanelli --

3   A.          That's correct.

4   Q.          -- dated December 19, 2006?  Do you

5   recognize this document?

6   A.          Yes, I do.

7   Q.          And Dr. Sanelli said that she -- is it

8   a she?  She also believes that you're capable of

9   practicing medicine under some conditions as well,

10  correct?

11  A.          Correct.

12  Q.          Such as being monitored very closely by

13  a supervising physician, correct?

14  A.          Correct.

15  Q.          And having drug screens and other

16  continued meetings for chemical dependency, that

17  type of thing, correct?

18  A.          Correct.

19  Q.          And she also says there that given your

20  history of poor judgment in the past, she would

21  advise that you not have ready access to

22  controlled substances, correct?

23  A.          Correct.

24  Q.          Did you ever have any healthcare

Adam P. Hall, D.O.                                          May 18, 2009

174

1    provider suggest to you that you not practice

2    anesthesiology?

3    A.          To the best of my recollection, no.

4    Q.          Did you ever discuss whether or not

5    anesthesiology was a good career choice for

6    someone with your history with any of your

7    healthcare providers?

8    A.          I may have.  I don't recall.

9                        - - - - -

10            Thereupon, Defendants' Exhibit 26 is

11   marked for purposes of identification.

12                        - - - - -

13   Q.          Handing you what we've marked as

14   Exhibit 26, this is a report from a Dr. Henry at

15   Rush Medical Center in Chicago.

16            Do you recognize this document?

17   A.          Yes.

18   Q.          And were you evaluated by Dr. Henry on,

19   or I guess beginning on January 9, 2007?

20   A.          That sounds like the right date.

21   Q.          And was this report something that was

22   being submitted to the Missouri State Board

23   regarding your license there?

24   A.          Yes.

175

1    Q.          I'm going to direct you to the second

2    to last page.  It's Bates labeled at the bottom

3    18.

4    A.          Okay.

5    Q.          Now, Dr. Henry issued an opinion that

6    there had been some sort of theme with your

7    history relating to your inability to conduct

8    yourself in an ethical and forthright manner?

9                MR. MEZIBOV:  Objection to the

10   characterization.

11   Q.          Looking at the second sentence on the

12   second to last page, do you see where it says,

13   "The central theme appears to relate to Dr. Hall's

14   inability to consistently conduct himself in an

15   ethical and forthright manner."

16               Did I read that correctly?

17   A.          Yes.

18   Q.          And did Dr. Henry have an opinion that

19   at the present time, it was not appropriate for

20   you to be working autonomously?

21   A.          Yes, that was his opinion.

22   Q.          He didn't think you should be working

23   in a setting where you did not have continuous

24   access to supervision and mentoring, correct?

Adam P. Hall, D.O.                                                    May 18, 2009

176

1   A.          Yes, that's what his conclusion was.

2   Q.          And he also didn't think that you were

3   -- it would be appropriate for you to practice

4   medicine at that time?

5   A.          Correct.

6   Q.          I'm looking now on the last page under

7   No. 9.  It was also his opinion that if in the

8   future you were able to practice medicine, that

9   you should not work in an emergency room or any

10  other setting where you do not have consistent

11  access to mentoring, monitoring and supervision,

12  correct?

13  A.          Yes.

14              MS. DAY:  Why don't we take a little

15  break.

16              THE WITNESS:  Okay.

17              (A short recess is taken.)

18                  - - - - -

19          Thereupon, Defendants' Exhibit 27 is

20  marked for purposes of identification.

21                  - - - - -

22  Q.          Handing you what we've marked as

23  Exhibit 27, the first page is a Charge of

24  Discrimination, Charge No. 532-2007-00817 filed

Adam P. Hall, D.O.                                           May 18, 2009

177

1    with the EEOC.

2                Is that your signature on the bottom

3    left dated March 19, 2007?

4    A.          Yes.

5    Q.          And this is a charge that you filed

6    claiming that Doctors discriminated against you

7    based on your disability by terminating your

8    employment, correct?

9    A.          Yes.

10   Q.          And looking at the second page of this

11   same exhibit, 27, this is a Dismissal and Notice

12   of Rights that was signed by Daniel Cabot and

13   dated May 9, 2007.

14               Have you seen this before?  Do you

15   recognize this?

16   A.          Yes.

17   Q.          And in this notice, which is also for

18   charge 532-2007-00817, the EEOC was notifying you

19   that your charge wasn't timely filed, correct?

20   A.          Correct.

21                         - - - - -

22               Thereupon, Defendants' Exhibit 28 is

23   marked for purposes of identification.

24                         - - - - -

Adam P. Hall, D.O.                                    May 18, 2009

178

1   Q.        We're handing you what we've marked as

2   Exhibit 28.  The first page is a Charge of

3   Discrimination.  It was filed at least with the

4   Ohio Civil Rights Commission, Charge No. 34398.

5             Do you recognize this?

6   A.        Yes.

7   Q.        And I notice that it's -- this, at

8   least, copy is not signed.  Was this something

9   that you had filled out on-line?

10  A.        No.  I actually believe Marc and I

11  worked on this.

12            THE WITNESS:  Didn't we work on this?

13            MR. MEZIBOV:  Answer the best you

14  recall.

15  A.        To the best of my ability, I worked

16  with my attorney on drafting this.  So the

17  original may have had the signature on it.  I

18  don't know.

19  Q.        Do you recall submitting a charge with

20  the Ohio Civil Rights Commission on-line?

21  A.        No.

22  Q.        Okay.  Looking at the second page, this

23  is a Letter of Determination from the Ohio Civil

24  Rights Commission dated February 21, 2008.  And

179

1    this is for the charge, Ohio Civil Rights

2    Commission, Charge No. 34398.

3              Do you recognize this document?

4    A.        Yes.

5    Q.        And in this Letter of Determination,

6    the Ohio Civil Rights Commission is letting you

7    know that they've determined that there's no

8    probable cause of determination based on the

9    charge that you filed on an affidavit that you

10   submitted on April 9, 2007?

11   A.        That's what their findings of fact

12   says, yes, or the decision.  Sorry.

13   Q.        That's okay.  Now in this charge, the

14   first page of 28, in this charge you're claiming

15   that Doctors discriminated against you on the

16   basis of your disability by refusing to reinstate

17   you in March of '07, correct?

18   A.        I believe they regarded me as disabled.

19   Q.        That's what you're claiming in the

20   charge?

21   A.        Yes.

22   Q.        Do you believe that you are, in fact,

23   disabled under the law?  I mean, do you have a

24   belief one way or the other?

Adam P. Hall, D.O.                                          May 18, 2009

180

1            MR. MEZIBOV:  There's an objection.

2            MS. DAY:  That's okay.

3   A.       Rephrase the question again for me.

4   Q.       Do you believe that you are disabled?

5            MR. MEZIBOV:  Objection.  You can

6   answer.

7            THE WITNESS:  Answer did you say?

8            MR. MEZIBOV:  As best as you can.

9   A.       Yes.

10  Q.       Looking at the third page now of

11  Exhibit 28, this is a Dismissal and Notice of

12  Rights from the EEOC.

13           Do you recognize this?

14  A.       Yes.

15  Q.       Dated July 26, 2008?  That's when they

16  mailed it anyway?

17  A.       Okay.  Yes, this looks familiar.

18  Q.       And in this notice, the EEOC is letting

19  you know that they have adopted the findings of

20  the state agency?

21  A.       Yes.

22  Q.       And the findings of the state agency

23  then would be the second page of Exhibit 28?

24  A.       Yes.

Adam P. Hall, D.O.                                    May 18, 2009

181

1                    - - - - -

2            Thereupon, Defendants' Exhibit 29 is

3     marked for purposes of identification.

4                    - - - - -

5     Q.        Handing you what we've marked as

6     Exhibit 29, this is another Charge of

7     Discrimination.

8               Is that your signature at the bottom

9     dated August 6, 2007?

10    A.        Yes.

11    Q.        Based on the stamp, it looks like this

12    was a charge filed with the EEOC.  Do you

13    recognize this document?

14    A.        Yes.

15    Q.        Do you know whether or not this charge

16    is still pending?

17    A.        I don't.

18                    - - - - -

19            Thereupon, Defendants' Exhibit 30 is

20    marked for purposes of identification.

21                    - - - - -

22    Q.        Handing you what we've marked as

23    Exhibit 30, these are your responses to

24    OhioHealth's interrogatories in this case.

Adam P. Hall, D.O.                                          May 18, 2009

182

1          Do you recognize this document?

2     A.          Yes.

3     Q.          And is that your signature on the last

4     page?

5     A.          Yes.

6     Q.          And did you work with your attorney in

7     providing answers to the various written questions

8     from OhioHealth?

9     A.          Yes.

10    Q.          Looking at the third page, in

11    interrogatory No. 1, this is where OhioHealth was

12    asking you to identify people that you believe may

13    have knowledge relating to this case.  Are you

14    there on page 3?  I just want to ask you about

15    some of these people.

16          Looking at page 4, in response to

17    interrogatory 1, there's a whole bunch of people

18    listed.  Do you see what I'm referring to?

19    A.          Yes.

20    Q.          Are these names you had provided to

21    your attorney of people who may have knowledge

22    regarding your claims?

23    A.          Yes.

24    Q.          Have you talked to any of these people,

Adam P. Hall, D.O.                                        May 18, 2009

183

1    and their names continue onto page 4 and 5, about

2    being a witness for you in this case?

3              MR. MEZIBOV:  Let me caution you,

4    anything that you -- if you've had any discussions

5    with these people and if you've had any

6    discussions with these people as a result of

7    communication with me in connection with my

8    request, I'm directing you not to answer the

9    question.

10              MS. DAY:  So wait a minute.  What?

11              MR. MEZIBOV:  I just want to make sure,

12    if you're asking him to disclose any communication

13    he's had with witnesses in connection with any

14    request I may have made to --

15              MS. DAY:  You're not talking about

16    conversations where you weren't present?

17              MR. MEZIBOV:  Maybe.  Why don't you ask

18    him if he has.

19    Q.        Have you had any discussion with any of

20    these people about being a witness in this case?

21    A.        Based on what March just said, I can't

22    answer that question.

23              MR. MEZIBOV:  You can answer whether

24    you have.  It's yes or no.

184

1    A.        Yes.

2    Q.        Who have you had conversation with on

3    this list about being a witness in this case?

4              MR. MEZIBOV:  You can answer the

5    question as to whom -- with whom you've had a

6    conversation, period.

7    A.          In regards to this case, or just to be

8    a witness for me?

9    Q.        Who of these people have you had a

10   conversation with in which you discussed with them

11   being a witness in this case?

12   A.        Dr. Sam Westenskow.  Dr. Jaime Ruhl.

13   Dr. Tony Zucco.  Dr. Dan Blake and Dr. Nathan

14   Hanflink.

15   Q.        And Dr. Nathan --

16   A.        Hanflink.  That's supposed to be

17   H-A-N-F-L-I-N-K.

18             MR. MEZIBOV:  Before another question

19   is asked, let me consult with you.

20   Q.        I'm sorry.  Was that it?

21   A.        Yes.

22   Q.        Okay.

23             (A short recess is taken.)

24   Q.        Why do you believe that Dr. Sam

185

1    Westenskow might have information related to this

2    case?

3    A.          It's actually Westen, that's supposed

4    to be an S, W-E-S-T-E-N-S-K-O-W.  He was a

5    resident in the program with me, and I maintained

6    close contact with him as a friend.

7    Q.          Okay.  What information do you think

8    that he has that might relate to your claims?

9    A.          Sam and I were very close.  And I think

10   I shared with him and some of the other residents

11   my issues that I was having, my medical issues.

12   So I think they know about it.  They may be

13   character witnesses as well.

14   Q.          What about Dr. Jaime Ruhl, who is that?

15   A.          He was another resident.

16   Q.          And what information do you believe

17   Dr. Ruhl might have relating to your claims?

18   A.          Same thing, close contact, personal

19   information.

20   Q.          What about Dr. Zucco, what information

21   do you believe he might have?

22   A.          Program director, he knew who I worked

23   with before.  Friend.

24   Q.          And he wasn't the program director when

186

1    your contract was terminated?

2    A.         Correct.

3    Q.         And he wasn't the program director when

4    your request for reinstatement was denied,

5    correct?

6    A.         Correct.

7    Q.         And that was Dr. Werhan at that point?

8    A.         Yes.

9    Q.         For both?

10   A.         Yes.

11   Q.         Who's Dr. Daniel Blake?

12   A.         He was a resident a year ahead of me.

13   So, again, another colleague and friend.

14   Q.         Any particular information that you

15   believe he may have relating to your claims?

16   A.         Again, just worked close with him.

17   Character reference.  Personal information.

18   Q.         What about Dr. Reddy?  What information

19   do you believe that Dr. Reddy may have that

20   relates to your claim?

21   A.         Did I mention Dr. Reddy?

22   Q.         Yes, on page 4 at the bottom.

23   A.         Are you sure it wasn't supposed to be

24   Dr. Hanflink?

187

1    Q.        Did I skip him?

2    A.        Dr. Reddy was one of the attendings at

3    the program who gave me a reference to the Medical

4    Board, a personal reference.  I discussed at

5    length some of my personal issues with him.

6    Q.        Any particular knowledge relating to

7    your claims that you believe he may have?

8    A.        I'm not sure.  He may.

9    Q.        And then what about Dr. Hanflink, who

10   is he?

11   A.        He was, again, another senior resident,

12   colleague, personal friend.

13   Q.        Any particular information you believe

14   he has relating to your claims?

15   A.        Same thing.  We had discussions at

16   length about my health issues.  I talked with most

17   of the residents in the program about it.

18   Q.        Dr. Trevor Davy, that's the podiatrist,

19   right, who gave you the injection?

20   A.        Yes.

21   Q.        Other than the fact that he gave you

22   the injection on April 13th, any other information

23   or knowledge that you believe he has related to

24   your claims?

Adam P. Hall, D.O.                                         May 18, 2009

188

1    A.          I don't believe so.

2    Q.          What about Dr. Furbee?

3    A.          Anesthesia attending, close personal

4    friend.

5    Q.          What information do you believe that

6    Dr. Furbee may have relating to your claims?

7    A.          Knowledge of the chronic pain, chronic

8    foot pain.

9    Q.          And Stacy Caster, what information do

10   you believe that she may have relating to your

11   claims?

12   A.          She was the residency coordinator.  And

13   I dealt with her on numerous occasions.  I don't

14   know beyond that.  She may or may not have

15   knowledge.

16   Q.          Who's David Sullivan?

17   A.          David Sullivan is the Ohio Physicians

18   Health Program liaison that I coordinate with, so

19   he's aware of my substance abuse program.  He's

20   the individual who coordinates my compliance with

21   the Medical Board through Ohio Physicians Health

22   Program.

23   Q.          Okay.  What knowledge do you believe

24   that he would have relating to your claims?

Adam P. Hall, D.O.                                    May 18, 2009

189

1    A.          About the substance dependence.

2    Q.          Turning to page 6, in interrogatory 5,

3    it's near the bottom of the page, this is where

4    Doctors is asking you about the employers that

5    you've attempted to secure employment with since

6    April of '06.

7                And then in the answer, you've got

8    several, 14, and different listings in response to

9    Interrogatory No. 5.

10               Have there been any -- since you

11   answered these interrogatories, in addition to

12   these 14, are there any that you remember in

13   addition to these 14 that you didn't at that time?

14   A.          There may be more.  The list was

15   exhaustive.  I called every hospital in the State

16   of Ohio, every program in the State of Ohio, and

17   programs outside of Ohio for anesthesia.  And

18   there were numerous declines because I'm not Board

19   certified, so the list could be exhaustive.

20   Q.          Do you keep a list anywhere of all the

21   places you've applied?

22   A.          Yes.  I have actually a little booklet

23   that I have of all the places that I've talked to.

24   Q.          Well, make sure that you provide that

Adam P. Hall, D.O.                                    May 18, 2009

190

1    to your attorney.

2    A.          Okay.

3    Q.          In Interrogatory No. 7, this is on page

4    9 at the bottom, here OhioHealth is asking you to

5    identify income that you've received.  And then

6    you provide rough estimates for '06, '07 and '08?

7    A.          Yes.

8    Q.          In '06, what were the sources of your

9    income?  One was obviously Doctors?

10   A.          Right.

11   Q.          What other sources of income did you

12   have in '06?

13   A.          The urgent care in Ohio and the ER in

14   Missouri.

15   Q.          Anything else?

16   A.          No.

17   Q.          Did you end up earning more in '06

18   working elsewhere, you know, places other than

19   Doctors than you would have had you stayed in your

20   residency?

21   A.          Yes.

22   Q.          Because your residency didn't pay a

23   hundred thousand dollars a year?

24   A.          No.

191

1    Q.        I think it was -- do you recall what it

2    was?

3    A.        About $46,000.

4    Q.        Yes.  It looks like Exhibit 14 on the

5    second page, it says $46,370.  And then what were

6    your sources of income in 2007?

7    A.        County Wide Health.  I take that back,

8    it was a few shifts at -- in Missouri in January

9    at the two ERs that I listed, Cedar County and

10   Nevada.  And then the rest of the year was at

11   County Wide Health.

12   Q.        And then what about in 2008?

13   A.        That would Adam P. Hall, D.O.

14   Incorporated.

15   Q.        Have you had any sources of income

16   since April 2006 other than the employment that we

17   discussed at the beginning of your deposition?

18   A.        No.

19   Q.        Have any of the places that you have

20   applied for employment since October of 2006

21   indicated that they weren't going to hire you

22   based on anything anyone at OhioHealth had told

23   them?

24   A.        I have not heard anything to that

Adam P. Hall, D.O.                                    May 18, 2009

192

1     effect.

2                     - - - - -

3           Thereupon, Defendants' Exhibit 31 is

4     marked for purposes of identification.

5                     - - - - -

6     Q.        Handing you what we've marked as

7     Exhibit 31, this is a copy of the amended

8     complaint in this case.

9           Do you recognize this document?

10    A.        Yes.

11    Q.        Looking at the fifth page, do you see

12    where it says statement of claims, breach of

13    contract?

14    A.        Yes.

15    Q.        And then in paragraph 24, it says,

16    "Defendants' actions breached the terms and

17    conditions of the employment contract between Ohio

18    Health and Plaintiff."

19          Did I read that correctly?

20    A.        Yes.

21    Q.        Are you claiming in this lawsuit that

22    Doctors breached the contract with you?

23    A.        Yes.

24    Q.        Okay.  What contract are you claiming

193

1    that Doctors breached?

2    A.        I would assume my senior-level

3    contract.

4    Q.        The --

5    A.        Exhibit 14.

6    Q.        You have a good memory if that's right.

7    A.        Numbers I'm very good at.  Yes, Exhibit

8    14.  It's attached to the complaint, too.

9    Q.        It's attached to the complaint as

10   Exhibit C, I think?

11   A.        Yes.

12   Q.        But it was also Exhibit 14 in this

13   deposition?

14   A.        Correct.

15   Q.        Okay.  What portions of Exhibit C are

16   you claiming that Doctors breached?

17            MR. MEZIBOV:  Objection.  You can

18   answer as best you can.

19            THE WITNESS:  Okay.

20   Q.        You can't ask your attorney to answer

21   the question.  You can tell me that you're not

22   sure what provisions or you can explain it to me

23   in your own words, but you can't take your break

24   and ask your attorney about it.  And I understand

Adam P. Hall, D.O.                                    May 18, 2009

194

1    that some people know what they're claiming and

2    sometimes they don't.  That's fine.

3              If you don't know where it is in

4    Exhibit C, can you explain to me how you think

5    Doctors breached their contract?

6    A.        Well, you know, I believe that the

7    breach of contract came out of the provision where

8    they stated that I violated my consent agreement

9    with the Board where they say basically obey the

10   law.  That was their provision stated that they

11   could terminate my contract.

12             Again, what I said earlier, my actions

13   may have been improper, there may have been theft,

14   I haven't been found guilty of any criminal

15   activity.  So that's where I think the breach came

16   from.

17   Q.        Are you aware of any other way that you

18   believe that Doctors breached any contract with

19   you?

20   A.        Well, under federal EEO law, I believe

21   that there was a duty to be provided

22   rehabilitation.  That would be part of the

23   contract of an employer and I don't believe the

24   federal protections applied either.

Adam P. Hall, D.O.                                    May 18, 2009

195

1    Q.        Here, still in this Exhibit 31, your

2    complaint, there's an attachment, Exhibit D.

3    A.        Okay.

4    Q.        This is an OhioHealth Human Resources

5    Policy and Procedure, Fitness for Duty?

6    A.        Correct.

7    Q.        Do you recognize this document?

8    A.        Yes.

9    Q.        And this is a version of this policy.

10   It says revised June 2005, correct?

11   A.        Yes.

12   Q.        How did you obtain a copy of this

13   policy?

14   A.        I went over to OhioHealth human

15   resources at Grant or Riverside, I don't remember,

16   and picked it up there.

17   Q.        Who did you get it from?

18   A.        I don't remember.  Human resources, I

19   assume.

20   Q.        You don't remember any person in

21   particular that you spoke with?

22   A.        No.

23   Q.        When did you get a copy of this?

24   A.        I believe early 2007.

Adam P. Hall, D.O.                                    May 18, 2009

196

1    Q.        So after you were terminated?

2    A.        Yes.

3    Q.        And what led you to request a copy of

4    Exhibit D here, the Fitness for Duty policy from

5    HR?

6    A.        Let me revise that.  I do believe I got

7    this earlier than '07.  I believe I got it in '06

8    when I was at The Woods at Parkside.  I believe I

9    had talked with someone about EAP, things like

10   that being offered, and I looked it up after I was

11   released, procured it from HR.

12   Q.        So it may have been '06?

13   A.        It may have been, or '07.  I'm not sure

14   of the timeline.

15   Q.        What led you to request a copy of the

16   policy?  Why did you request it?

17   A.        Because in going through the rehab

18   program, I had started to look up some things

19   on-line and felt that there were some protections

20   I was afforded under the law.

21   Q.        So then did you call HR at OhioHealth?

22   I mean, just walk me through how it happened.

23   A.        You mean how did I get it?  I don't

24   remember how it happened.  I think I may have gone

Adam P. Hall, D.O.                                    May 18, 2009

197

1    over there and said, I need to get the HR policy

2    on impairment.

3    Q.          This policy, Exhibit D, was this the

4    only policy that you requested a copy of?

5    A.          It was what I asked for.  I mean, this

6    is all they gave me.

7    Q.          So you didn't get an entire book of the

8    HR policies and procedures?

9    A.          No.  I just asked them about a Fitness

10   for Duty and this is what they brought out.

11   Q.          Did you ever see this policy, Exhibit

12   D, at any point during your employment with

13   Doctors?

14   A.          I don't believe so.

15   Q.          You think the first time you got it was

16   when you went over and requested it?

17   A.          Correct.

18   Q.          Are you claiming in this lawsuit that

19   Doctors violated Exhibit D, this Fitness for Duty

20   policy?

21            MR. MEZIBOV:  Objection.  You can

22   answer.

23   Q.          If you know.

24   A.          I believe that's part of my claim, yes.

Adam P. Hall, D.O.                                        May 18, 2009

198

1   Q.          And how do you believe that Doctors

2   violated the Fitness for Duty policy?

3   A.          On page 3 of 6, B, employment issues,

4   "No decisions regarding employment are made until

5   all circumstances have been investigated and

6   management and Human Resources have been

7   consulted."

8               "Employees whose drug/alcohol test

9   results are positive..."  No. 2, "Employees whose

10  drug/alcohol test results are positive and whose

11  circumstances are appropriate for continued

12  employment may be offered the option of returning

13  to work once appropriate referral, rehabilitation

14  and other conditions are met as outlined below."

15              So I believe that's where the breakdown

16  in the employment policy occurred.

17  Q.          Any other way you think they violated

18  it?

19  A.          I think there's numerous things in No.

20  2.  EAP wasn't involved.

21  Q.          I guess why do you believe that --

22  you're still reading from this page 3 of 6?

23  A.          Yes.

24  Q.          Why do you believe that this policy was

Adam P. Hall, D.O.                                          May 18, 2009

199

1    implicated in your termination?

2    A.          It was implicated?

3    Q.          Yes.  Why do you believe this policy

4    even applies?

5                MR. MEZIBOV:  There's an objection, but

6    you can answer.

7    A.          I believe it was violated.

8    Q.          Why do you believe it applies to your

9    situation?

10   A.          Because the situation was for

11   diversion.  And I think they had a responsibility,

12   based on what I'm reading there, to investigate

13   it, have human resources be involved with it.  I

14   don't believe the due diligence occurred on that.

15   Q.          Do you know anything about what Doctors

16   did to investigate the incident when you diverted

17   in October -- or, I'm sorry, April of '06?

18   A.          I don't.  Besides asking me my version

19   of events, that was it.

20   Q.          Well, you admitted what happened?

21   A.          I admitted what happened, that's

22   correct.

23   Q.          You're also claiming in this case that

24   Doctors discriminated against you based on your

Adam P. Hall, D.O.                                    May 18, 2009

200

1    disability?

2    A.         Correct.

3               MR. MEZIBOV:  Objection.

4    Q.         And would that disability be chemical

5    dependency?

6    A.         Yes.

7    Q.         Any other disability that you're aware

8    of?

9    A.         That I have?

10   Q.         Correct.

11   A.         At the time when I went through rehab,

12   I was diagnosed with a major depressive disorder

13   and chemical dependency.  I would imagine at the

14   time, that was considered a psychological

15   impairment as severe as it was.

16   Q.         Do you believe that you're being

17   discriminated against based on your psychological

18   impairment as well as a chemical dependency?

19   A.         Can you repeat the question again?

20   Q.         Do you believe that Doctors

21   discriminated against you based on a psychological

22   impairment as well as -- well, I guess they're

23   both psychological.

24              Do you believe that Doctors

Adam P. Hall, D.O.                                    May 18, 2009

201

1    discriminated against you based on your

2    psychological impairment in addition to chemical

3    dependency?

4    A.        That would be difficult for me to say.

5    I would be speculating.

6    Q.        Are you aware of any facts to support

7    your disability discrimination claim in addition

8    to what you've already testified about today?

9    A.        No.  I don't know of any additional

10   facts.

11            MS. DAY:  Why don't we take a quick

12   break.  I think we might be done or close to it.

13            (A short recess is taken.)

14   Q.        Just a few things.  After you received

15   notice that Doctors was not going to reinstate

16   you, I guess in March of '07, did you ever have

17   any conversations with anyone from Doctors

18   regarding why they weren't going to reinstate you

19   or the reasons for that decision?

20   A.        No.

21   Q.        Do you have any knowledge as to how

22   that decision was made, the decision not to

23   reinstate you?

24   A.        I have seen the affidavit of

Adam P. Hall, D.O.                                          May 18, 2009

202

1   Dr. Blackwell.

2   Q.          Anything other than that?

3   A.          No.

4   Q.          After you found out that you were not

5   going to be reinstated, what effect did that have

6   on you?

7   A.          It was devastating.

8   Q.          When you say "it was devastating," what

9   do you mean by that?

10  A.          Psychologically, emotionally,

11  financially.  I believed I had made amends for my

12  previous mistakes, that I had complied with

13  Dr. Hilliard's recommendation to seek

14  rehabilitation.  And I was hopeful that I would be

15  able to move forward with my life after these

16  problems had been addressed, corrective action had

17  been applied to them.

18  Q.          At the time that your reinstatement was

19  denied in March of '07, where were you with your

20  psychological issues at that point?

21              MR. MEZIBOV:  Objection.  Do you mean

22  medically, psychologically, socially?

23  Q.          At that point in March of '07, were you

24  on medication for depression or for the bipolar

Adam P. Hall, D.O.                                    May 18, 2009

203

1   diagnosis?

2   A.          I was no longer on the bipolar medicine

3   as it was a diagnosis made early in the remission

4   process.  And most of the doctors agree that you

5   couldn't place a diagnosis on an Axis I diagnosis

6   early on in recovery.  So it was lifted later by

7   my psychiatrist to depression.  I don't remember

8   if I was on medication at that time.  More than

9   likely I was.

10  Q.          In March of '07, do you recall what

11  medication you were on?

12  A.          I think they were trying different

13  ones.  I think at the time, it was Celexa.  But I

14  couldn't tolerate it all that well, so I may have

15  been on it for a couple weeks and then they took

16  me off.  C-E-L-E-X-A.

17  Q.          When did you stop taking

18  antidepressants?

19  A.          Well, I had stopped for a period of

20  time at the end of '07 to -- towards the end of

21  '07 and most of '08.  And then recently I just

22  went back on.  As I said, I was feeling tired,

23  some lethargy, and my primary care physician

24  started me back on Effexor.

Adam P. Hall, D.O.                                    May 18, 2009

204

1    Q.        Has there been any time since March of

2    '07 that your depression or emotional issues have

3    prevented you from working?

4    A.        Since what date?

5    Q.        March of '07.

6    A.        No.

7    Q.        Did you seek counseling or other mental

8    health care treatment as a result of Doctors'

9    decision not to reinstate you?

10   A.        I was already seeing a psychiatrist in

11   the state.  So, no, I don't believe that I had to

12   seek additional psychiatry resources.  But we did

13   discuss the termination and how it affected me.

14   Q.        And what psychiatrist was that?

15   A.        Dr. Kevin Ware.

16   Q.        Did you need to increase the frequency

17   of your sessions with him as a result of the

18   decision not to reinstate you?

19   A.        No.  I mean, he's medical management,

20   so he's not psychological management.  He would be

21   adjusting your dose until you have an appropriate

22   effect.

23             I believe at the time I was seeing a

24   Rich Petruska on a weekly basis, who was a

205

1    psychologist that the Missouri Medical Board had

2    recommended and I was seeing here.  So we were

3    seeing each other on a frequent basis and I was

4    talking to him about my issues.

5    Q.          What was his name again?

6    A.          Rich Petruska, P-E-T-R-U-S-K-A.

7    Q.          Did you have to increase your sessions

8    with Rich Petruska as a result of --

9    A.          No.  We were okay with once a week.

10   And I found other avenues to try and cope,

11   exercise, prayer, meetings.

12   Q.          Are you still attending meetings?

13   A.          I do.

14   Q.          Which meetings do you attend?

15   A.          Well, it just depends.  I do Columbus

16   area meetings for the most part.

17   Q.          Do you do AA?

18   A.          Yes.

19   Q.          And what else?

20   A.          Just AA.  Well, I take that back.

21   There's aftercare which I'm required to go to on

22   the weekends.  That's with Parkside.

23   Q.          Have you been able to maintain sobriety

24   since July of '06?

Adam P. Hall, D.O.                                          May 18, 2009

                                                                    206

1    A.         Absolutely.

2    Q.         Does that include alcohol?

3    A.         Absolutely.  Everything.  Anything that

4    I've had has been prescribed through my physician.

5              MS. DAY:  Okay.  I don't have any

6    further questions.  I appreciate your time today.

7    We reserve the right to inquire further should

8    that become necessary based on discovery that is

9    produced.  Other than that --

10             MR. MEZIBOV:  Let me just ask a couple

11   questions.

12                  - - - - -

13             DIRECT EXAMINATION

14   BY MR. MEZIBOV:

15   Q.         Dr. Hall, you mentioned a few moments

16   ago in response to Ms. Day's questions that you

17   were responding to I think the terms was a

18   recommendation made by Dr. Hilliard that you seek

19   and complete a rehabilitation program?

20   A.         Correct.

21   Q.         Could you tell us the circumstances

22   surrounding that?  I used the term

23   "recommendation," but describe for us how that

24   came about.

Adam P. Hall, D.O.                                    May 18, 2009

207

1    A.          When I went in front of the Medical

2    Education Committee, and I believe it was May of

3    '06 or late April, I believe their decision was

4    sent out in the mail around May, at the Graduate

5    Medical Education Committee, I had suggested

6    rehabilitation.  I didn't specifically say drug

7    and alcohol rehabilitation, but I felt there was

8    some issue that needed to be addressed.  Something

9    was undiagnosed at the time that needed to be

10   addressed.

11              So I said, I'm seeking rehabilitation

12   action for what is going on.  I need to be

13   evaluated.

14              They had mentioned earlier in my

15   third-year contract that they wanted me to have a

16   psychological evaluation or psychiatric

17   evaluation, and I felt for sure that something was

18   amiss and needed to be evaluated, so I had

19   mentioned that to them, but they decided against

20   it.

21              However, at the end of the session,

22   Dr. Hilliard approached me and said that he wished

23   me the best and that he would like -- he would

24   recommend me if I would go do a rehab program.  So

Adam P. Hall, D.O.                                    May 18, 2009

208

1    pursuant to his recommendations, a few months

2    later I did.  And then -- and, again, in support

3    of that --

4    Q.        Let me stop you there.  There's been

5    some questions about and testimony concerning

6    Exhibit D, which is attached to the complaint.

7              When did you first become aware of the

8    existence of Exhibit D?

9    A.        As I said earlier, I'm not sure of the

10   timeline, but sometime after the termination.

11   Q.        And what did you do with Exhibit D or

12   what action did you take as a result of seeing

13   Exhibit D?

14   A.        I filed the breach of contract.

15   Q.        Let me ask it another way:  From your

16   perspective, what's the significance of Exhibit D

17   to the lawsuit that you've brought?

18   A.        The significance is that following my

19   termination and learning knowledge of how others

20   have been treated, this is what I believe is part

21   and parcel of my terms of employment in my

22   contract, that these protections would be afforded

23   me as they have been to other people.

24   Q.        When you say "other people," what's

Adam P. Hall, D.O.                                    May 18, 2009

209

1    your basis for that statement?

2    A.          Since termination I have through

3    rehabilitation discovered numerous people who have

4    been through OhioHealth who had this protection

5    afforded to them.

6    Q.          One other area of question.  Ms. Day

7    asked you about your disability discrimination

8    claim.  And I'm directing you to page 5 of the

9    amended complaint, paragraph 26 in which there's a

10   statement about disability discrimination.  And

11   the statement is made that, the actions of

12   Defendants violated Plaintiff's rights as secured

13   by the Americans with Disabilities Act to be free

14   from discrimination on the basis of disability.

15            It goes on to say "or the history or

16   perception thereof, in opportunities for

17   employment."

18            What's your understanding of the nature

19   of your discrimination claim as it relates to a

20   perception of a disability?

21   A.          I believe they regarded me as disabled

22   from the restriction on the license showing that

23   there's basically -- and from the statements made

24   from various addictionologists that I shouldn't

Adam P. Hall, D.O.                                     May 18, 2009

210

1    have easy access to narcotics, that there's a

2    chemical dependency issue, they regarded me as

3    chemically dependent, and thus the disability.

4              MR. MEZIBOV:  I don't have any other

5    questions.

6                        - - - - -

7                    RECROSS-EXAMINATION

8    BY MS. DAY:

9    Q.          I guess I just have one in follow up.

10   You never were subjected to any drug or alcohol

11   testing in connection with your termination at the

12   time you were terminated, correct?

13   A.          No.

14   Q.          I'm correct?

15   A.          Right.

16   Q.          That was a really horrible way to say

17   it, but I know how that comes out on the

18   transcript sometimes.

19              So you're not claiming that you were

20   terminated based on the results of a drug test?

21   A.          Correct.

22              MS. DAY:  I don't have any more

23   questions.

24              MR. MEZIBOV:  That's it.  And we'll

Adam P. Hall, D.O.                                        May 18, 2009

211

1        take signature if it's ordered.

2                    MS. DAY:  Yes, I need it.

3                         - - - - -

4                Thereupon, the foregoing proceedings

5                concluded at 5:05 p.m.

6                         - - - - -

```
1    State of Ohio      :        C E R T I F I C A T E
2    County of Franklin: SS
3        I, Tracy J. Schell, a Notary Public in and for
4    the State of Ohio, certify that Adam P. Hall, D.O.,
5    was by me duly sworn to testify to the whole truth
6    in the cause aforesaid; testimony then given was
7    reduced to stenotype in the presence of said
8    witness, afterwards transcribed by me; the
9    foregoing is a true record of the testimony so
10   given; and this deposition was taken at the time
11   and place specified on the title page.
12       Pursuant to Rule 30(e) of the Fed. R. Civ. P.,
13   the witness and/or the parties have not waived
14   review of the deposition transcript.
15       I certify I am not a relative, employee,
16   attorney or counsel of any of the parties hereto,
17   and further I am not a relative or employee of any
18   attorney or counsel employed by the parties hereto,
19   or financially interested in the action.
20       IN WITNESS WHEREOF, I have hereunto set my hand
21   and affixed my seal of office at Columbus, Ohio, on
22   May 29, 2009.
23   _____
24   Tracy J. Schell, Notary Public - State of Ohio
     My commission expires November 5, 2013.
```

Realtime - Videoconferencing - Trial Presentation - Video

213

# Witness Errata and Signature Sheet

Spectrum Reporting LLC
333 East Stewart Avenue
Columbus, Ohio 43206
Phone - 614-444-1000    Fax - 614-444-3340
Email - admin@spectrumreporting.com    Ref: TJ1684AH

Correction or Change Reason Code

1 - Misspelling  2 - Word Omitted
3 - Wrong Word   4 - Clarification
5 - Other Correction (Please explain)

Sheet _____ of _____

| Page/Line | Correction, Addition, or Change | Reason Code |
|---|---|---|
| 193/21 | Based on what Mark | 1 |
| 194/23 | and I believe the federal protections | |
| 194/24 | applied there | |
| 10/8 | 43235 | 1 |
| 20/16-18 | The case had a 41A dismissal as a voluntary dismissal. | 3, 4 |
| 10/20 21 | dismissed c prejudice | |

I, Adam P. Hall, D.O., have read the entire transcript of my deposition taken in this matter, or the same has been read to me. I request that the changes noted on my errata sheet(s) be entered into the record for the reasons indicated.

Date  6/19/09        Signature _____

The witness has failed to sign his deposition within the time allowed.

Date _____    Signature _____