# Adam Patrick Hall, D.O.

4142 Charter Oak Way
Columbus, OH 43219
Ph: (614) 915-1834 (cell)
Ph: (740) 534-9801
Fx: (740) 534-9806
E-mail: Anedoc2007@yahoo.com

## EDUCATION

| | |
|---|---|
| Anesthesia Residency<br>Doctor's Hospital<br>Columbus, Ohio | 02/2004 - 04/2006 |
| Family Practice Residency<br>Medical Center of Independence<br>Independence, MO | 01/2003 - 06/2003 |
| Anesthesia Residency<br>Riverside County Regional Medical Center<br>Riverside, CA | 07/2001 - 08/2002 |
| Internship<br>Peninsula Hospital<br>Far Rockaway, NY | 06/2000 - 06/2001 |
| Des Moines University - Osteopathic Medical Center<br>Des Moines, IA<br>Doctor of Osteopathic Medicine | 08/1996 - 06/2000 |
| Creighton University<br>Omaha, NE | 08/1995 - 02/1996 |
| University of Missouri<br>Columbia, MO<br>B.A. Chemistry | 08/1992 - 12/1994 |
| United States Air Force Academy<br>Colorado Springs, CO | 06/1991 - 02/1992 |

## PROFESSIONAL EXPERIENCE



| | |
|---|---|
| General/Family Medicine (no pediatrics) | 01/2008- present |
| DBA Pinnacle Wellness & Longevity Center | |
| Ironton, OH 45638 | |
| | |
| Locum Tenens, ER/Urgent Care/General Medicine | 02/2006 - 01/2008 |
| | |
| Anesthesia Resident | 02/2004 - 04/2006 |
| Doctor's Hospital | |
| Columbus, OH | |
| | |
| ER Physician | 06/2003 - 02/2004 |
| Cameron Regional Medical Center | |
| Cameron, MO | |
| | |
| ER Physician | 06/2003 - 02/2004 |
| Excelsior Springs Medical Center | |
| Excelsior Springs, MO | |
| | |
| ER Physician | 06/2003 - 02/2004 |
| Pershing memorial Hospital | |
| Brookfield, MO | |
| | |
| Family Medicine Resident | 01/2003 - 06/2003 |
| Medical Center of Independence | |
| Independence, MO | |
| | |
| Sabbatical - Board Prep | 08/2002 - 12/2002 |
| | |
| Anesthesia Resident | 07/2001 - 08/2002 |
| Riverside County Regional Medical Center | |
| Riverside, CA | |
| | |
| Internship | 06/2000 - 06/2001 |
| Peninsula Hospital | |
| Far Rockaway, NY | |

CERTIFICATIONS

| | |
|---|---|
| ABIME/CIME | 02/2009 |
| ATLS | 10/2007 |
| ACLS | Recert P |
| BLS | Recert P |
| PALS | Recert P |

LICENSURE/DEA

\*Available upon Request
OHIO/FLORIDA/KENTUCKY


PROFESSIONAL MEMBERSHIPS
American Board of Independent Medical Examiners
American Osteopathic Association
American College of Family Practice
American Osteopathic College of Anesthesia

*Adam Hall, D.O.*

*7532 State Line Rd*
*Prairie Village, KS 66208*
*913-381-3602*
*aphall9900@hotmail.com*

December 14, 2003

Dear Sir or Madam,

I am applying for the anesthesiology residency at Doctor's Hospital in Columbus in hopes of completing my anesthesia training at a solid educational institution. I am familiar with Doctor's Hospital and Columbus as I spent approximately eight months of my third year of medical school there and I enjoyed the hospital and staff very much.

Anesthesia is my calling in medicine and I am dedicated to pursuing it. I enjoyed anesthesia while I was in California however due to California state law my training was delayed. I am enthused to return to anesthesia and I intend to work diligently with an unwavering commitment to the hospital and staff.

Thank You,

Adam Hall



EXHIBIT

2

*Adam Hall, D.O.*

**Adam Patrick Hall**
aphall9900@hotmail.com

<u>**Contact Address**</u>                                    <u>**Home/Alternate Address**</u>
7532 State Line Rd                                    7532 State Line Road
Prairie Village, KS      66208                         Prairie Village, KS      66208
913-381-3602
913-961-5347

**Education**

08 / 1996 – 06 / 2000   Des Moines University - Osteopathic Medical Center , Des Moines , Iowa
Doctor of Osteopathy, 06 / 2000

08 / 1992 - 12 / 1994   University of Missouri, Columbia
Chemistry
Bachelor of Arts, 12 / 1994
07 / 1991 - 02 / 1992   United States Air Force Academy, Colorado Springs, Colorado
N/A

**Memberships in Honorary/Professional Societies**
MAOPS, AOA, AMA

**Previous Residencies/Fellowships**

07 / 2001 - 08 / 2002   Anesthesiology
Riverside County Regional Medical Center
Moreno Valley, California, United States Of America

**Work Experience**
10 / 2003 –   Sullivan County Hospital
Emergency Physician
Provide clinic and emergency room coverage.

06 / 2003 –   Cedar County Medical Center
Emergency Physician
Provide Emergency room coverage
06 / 2003 –   Pershing Hospital
Emergency Physician
Provide Emergency room coverage
05 / 2003 –   Cass Medical Center
Emergency Physician
Provide emergency room coverage.

**Research Experience**
10 / 2003 - 11 / 2003   St. Lukes Hospital
Research Assistant, Dr. Gallet
Evaluation or thyroid nodules via fine needle aspiration and retrospective analysis of
data to determine if an on-site cyto technologist helps to decrease the number of
false negatives and insufficient samples
12 / 1999 - 03 / 2000   Baylor Medical Center
research assistant, Dr. Aziz Shibani, neurology

OhioHealth/Hall
0136

Assisted in literature searches, collated data, and helped in journal article review for later publication

## Publications/Presentations/Poster Sessions
Dr. Aziz Shibani, Dr. Adam Hall, "Thymoma and Myasthenia Gravis", Journal of Pediatric Neurology, January, 2000

## Volunteer Experience
06 / 2003 - 10 / 2003   Kansas City Free Health Clinic
Physician
Provide free health care for indigent and working poor.
08 / 2000 - 10 / 2003   ASPCA
Foster Parent
Provide foster home for abused and neglected animals.
11 / 1999 - 11 / 2003   Kansas City Soup Kitchen
Assistant
Helped to serve food during the holidays for the indigent.
09 / 1992 - 10 / 2003   Habitat for Humanity
Project Assistant
Help build housing for indigent families

## Examinations
12 / 2002  Osteopathic – COMLEX Part 3, Passed
08 / 2001  Osteopathic – COMLEX Part 2, Passed
06 / 1998  Osteopathic – COMLEX Part 1, Passed

## State Licenses
Kansas, Full, Expiration: 10 / 2004
Missouri, Full, Expiration: 01 / 2004

## Other Awards/Accomplishments
Bright Flight Scholarship-undergraduate, USAFA scholarship, Dean's Honor Roll

## Hobbies & Interests
Golf, personal fitness, skiing, mountain biking, personal finance, research

OhioHealth/Hall
0137



*ADAM HALL, DO*

7532 State Line RD
Prairie Village, KS 66208
Phone: (913) 381-3602
Fax:   (913) 381-3602
Email: aphall9900@hotmail.com

*Adam Hall*

**OBJECTIVE:**     *To gain valuable clinical experience that will enhance my practice of medicine.*
*To become a competent and compassionate anesthesiologist*

**QUALIFICATIONS:**   *I am focused, determined to succeed despite any obstacles, hard working, and*
*eager. I believe that I would be a valuable asset to whomever employs me.*

**EDUCATION**
   1996-2000     *Doctor of Osteopathic Medicine, Des Moines University-Osteopathic Medical*
            *Center, Des Moines, IA*
   1995-1996     *Creighton University, Omaha, NE*
   1992-1995     *B.A. Chemistry, University of Missouri-Columbia, Columbia, MO*

*816-476-5000      Vera Kramer - LM*

**EMPLOYMENT**
   01/03-Current   *Family Medicine Resident, Medical Center of Independence, Independence, MO*
            *Manage patient care responsibilities and coordinate the multi-specialty*
            *approach for the best care of the patients.*

   2001-2002     *Anesthesia Resident, Riverside County Regional Medical Center, Riverside, CA*
            *Provide anesthesia for multiple surgical services in an in-patient tertiary*
            *Hospital setting.*

   2000-2001     *Rotating Intern, Peninsula Hospital, Far Rockaway, Queens, NY*
            *Learned key diagnostic and clinical criteria necessary to care for-patients in*
            *multiple hospital settings—I.e.—ICU, PCU, CCU, ER, OB/GYN, Surgery,*
            *Cardiology, Family Medicine, etc,.*

**REFERENCES**     *Dr. Alfred Ma: 909-486-4572, Anesthesia Chairman*
*Dr. Keith Smith: 909-486-4572, Anesthesia Program Director*
*Dr. Peggy Bannerman: 909-486-4572, Anesthesia Attending*

OhioHealth/Hall
0138

STATE MEDICAL BOARD
OF OHIO

2005 NOV 17  A 11: 00

**REPORT AND RECOMMENDATION**
**IN THE MATTER OF ADAM P. HALL, D.O.**

The Matter of Adam P. Hall, D.O., was heard by Sharon W. Murphy, Esq., Hearing Examiner for the State Medical Board of Ohio, on August 24, 2005.

## INTRODUCTION

I.   Basis for Hearing

    A.   By letter dated April 13, 2005, the State Medical Board of Ohio [Board] notified Adam P. Hall, D.O., that it had proposed to deny his application for licensure or to take disciplinary action against his certificate to practice osteopathic medicine and surgery in Ohio. The Board based its proposed action on allegations that Dr. Hall had provided false information in his application for licensure and had failed to demonstrate the good moral character necessary for licensure in Ohio.

        The Board further alleged that Dr. Hall's conduct constitutes "'[m]aking a false, fraudulent, deceptive, or misleading statement in the solicitation of or advertising for patients; in relation to the practice of medicine and surgery, osteopathic medicine and surgery, podiatry, or a limited branch of medicine; or in securing or attempting to secure any certificate to practice or certificate of registration issued by the board,' as that clause is used in Section 4731.22(B)(5), Ohio Revised Code." Moreover, the Board alleged that Dr. Hall had failed to furnish satisfactory proof of good moral character as required by Sections 4731.29 and 4731.08, Ohio Revised Code.

        Accordingly, the Board advised Dr. Hall of his right to request a hearing in this matter. (State's Exhibit 1A)

    B.   On April 25, 2005, the Board received a written hearing request submitted by Dr. Hall. (State's Exhibit 1B)

II.   Appearances

    A.   On behalf of the State of Ohio: Jim Petro, Attorney General, by Tara L. Berrien, Assistant Attorney General.

    B.   On behalf of the Respondent: Kevin P. Byers, Esq.



EXHIBIT
3

OhioHealth/Hall
0080

Report and Recommendation
In the Matter of Adam P. Hall, D.O.
Page 2

## EVIDENCE EXAMINED

I.   Testimony Heard

Adam P. Hall, D.O.

II.   Exhibits Examined

A.   Presented by the State

1.   State's Exhibits 1A through 1O: Procedural exhibits.

2.   State's Exhibit 2: Certified copies of documents regarding Dr. Hall maintained by the Medical Center of Independence, Independence, Missouri.

3.   State's Exhibit 3: Affidavit of G.M. Johnston, D.O., pertaining to Dr. Hall.

4.   State's Exhibit 5: Certified copies of documents regarding Dr. Hall maintained by the Board.

B.   Presented by the Respondent

Respondent's Exhibits A through C: Letters written in support of Dr. Hall by attending physicians associated with the Anesthesiology Department at Doctor's West Hospital, Columbus, Ohio.

## PROFFERED MATERIALS

At hearing, Counsel for the State moved to admit State's Exhibit 4, a transcript of a deposition of Dr. Hall taken by the Board.  Counsel for the Respondent objected, as the transcript had not been used for impeachment or for any other purpose.  The Hearing Examiner sustained the objection, but agreed to proffer the transcript on behalf of the State. (See Hearing Transcript at 33)

## SUMMARY OF THE EVIDENCE

All exhibits and transcripts of testimony, even if not specifically mentioned, were thoroughly reviewed and considered by the Hearing Examiner prior to preparing this Report and Recommendation.

1.   In June 2000, Adam P. Hall, D.O., received a degree in osteopathic medicine from the Des Moines University Osteopathic Medical College in Des Moines, Iowa.  In June 2001, Dr. Hall completed a rotating internship at Peninsula Hospital in Far Rockaway, New York.

OhioHealth/Hall
0081

Report and Recommendation
In the Matter of Adam P. Hall, D.O.
Page 3

In August 2002, he completed fourteen months of a residency program in anesthesiology at the Riverside County Regional Medical Center in Riverside, California. (Hearing Transcript [Tr.] at 7-8; State's Exhibit [St. Ex.] 2 at 37, 40, 44; St. Ex. 5 at 6, 26)

In a September 2002 letter addressed only to "Dear Sir or Madam," Dr. Hall advised that he was applying for an open family practice residency position "to begin immediately." Dr. Hall further advised that he had been forced to leave his anesthesiology residency program because, "to progress to a PGY3 status, one must be licensed in California." Dr. Hall stated that he had not passed Step 3 of the COMLEX, which was a requirement for his licensure in California. Therefore, he could not obtain a license and he was terminated from his residency program. (St. Ex. 2 at 42)

From January 1 to June 9, 2003, Dr. Hall was a resident in the University of Health Sciences Family Medicine Residency Program at the Medical Center of Independence [MCI] in Independence, Missouri. (St. Ex. 2 at 5a; St. Ex. 5 at 6)

Dr. Hall reported that, from June 2003 through June 2004, he had served as an emergency department physician at three hospitals in Missouri. (St. Ex. 5 at 6-9) Nevertheless, Dr. Hall also testified that, in February 2004, he had entered the anesthesiology residency program at Doctor's Hospital West in Columbus, Ohio. (Tr. at 8)

Dr. Hall is currently licensed to practice osteopathic medicine and surgery in Missouri. He also holds a license to practice in Kansas, but that license is not current. Dr. Hall testified that he is not licensed in Ohio but has been permitted to participate in the residency program because he has submitted an application for licensure that is currently pending. (Tr. at 9; St. Ex. 5 at 4)

2. On or about June 2, 2003, G.M. Johnston, D.O., then Acting Director of Medical Education at MCI, received a report that a resident had not covered the night shift while on duty at MCI on May 30, 2003. The following day, Dr. Johnston discovered that Dr. Hall had been scheduled to be the resident on call on the night of May 30, 2003. Nevertheless, the house officer advised Dr. Johnson that he had not seen Dr. Hall at any time that night. Moreover, emergency department staff reported that they had paged Dr. Hall several times with the resident beeper, but Dr. Hall had not answered any of the pages. (St. Ex. 2 at 2; St. Ex. 3)

On or about June 4, 2003, Dr. Hall met with the Associate Program Director of the Family Medicine Residency Program and Chair of the Department of Medicine, and the Acting Family Practice Program Director of MCI. After the meeting, it was decided that Dr. Hall should be terminated from the residency program due to "grievous dereliction of duty and subsequent imminent risk to quality patient care." Dr. Hall was advised of this decision in a letter dated June 4, 2003, which Dr. Hall signed in acknowledgment of receipt. (St. Ex. 2 at 2, 11; St. Ex. 3)

Report and Recommendation
In the Matter of Adam P. Hall, D.O.
Page 4

Dr. Hall appealed his dismissal.  In a June 4, 2003, letter to "Dr. Johnston or Chief
Executive Officer," Dr. Hall wrote, in part, as follows:

> I am appealing because there was no dereliction of duty based on alleged
> failure to respond to a call.  While on-call Friday, May 30, 2003, I kept my
> pager on and with me at all times while scheduled and followed all other
> applicable on-call procedures.  I did not receive any page when scheduled on
> May 30th.  I believe that the alleged failure to respond to the call was due to
> communication failures over which I had no control.  Moreover, the alleged
> failure to respond was an isolated, and not a repeat, occurrence.  To my
> knowledge, I have no reprimands in my file.  I do not think I should be
> punished, especially with so severe of punishment as dismissal which will
> adversely impact, if not ruin, my career, where the failure to respond was
> through no fault of my own.

(St. Ex. 2 at 9)

On or about June 5, 2003, Dr. Johnston met with Dr. Hall.  In an affidavit, Dr. Johnston
provided details regarding Dr. Hall's report of the events of May 30, 2003, as follows:

> He was on duty from 7:00 p.m. to 7:00 a.m.  He had both the house beeper
> and his own beeper, and because he received no pages, the house beeper must
> not have been working.  He had been in the library in the Medical
> Professional Building, and while there, he did not hear any pages on the
> overhead or the intercom system.  He said that in the library he used a
> computer and read several journals.  During our conversation, I asked Dr. Hall
> three times if he had used the computer while he was on duty and to each
> question he answered yes.  However, before this meeting, I was informed by
> the library staff that the computers had remained inactive, without any entry
> of usage, during the time in question.

(St. Ex. 3)

On or about June 6, 2003, Dr. Johnston met with Dr. Hall, at which time Dr. Hall offered a
second version of the events of May 30, 2003.  In the affidavit, Dr. Johnston provided
details regarding Dr. Hall's second report of the events of May 30, 2003, as follows:

> He took cold medicine and slept the entire night at his house.  When he
> awoke, he did not call the hospital or the house officer.  He stated that he
> [had] lied about being on duty.  He stated that he did not report to work that
> shift nor had he been in the library.  He admitted to using very poor judgment
> and being dishonest.

(St. Ex. 3)

OhioHealth/Hall
0083

Report and Recommendation
In the Matter of Adam P. Hall, D.O.
Page 5

On June 9, 2003, Dr. Hall met with a residency program committee to present a statement concerning the events of May 30, 2003. After Dr. Hall's statement, Dr. Johnston reported to the committee what Dr. Hall had conveyed to him in the above-mentioned meetings of June 5 and 6, 2003. After further consideration, the residency program committee decided to uphold the termination. (St. Ex. 2 at 4-5, 17-20; St. Ex. 3)

3.  On January 29, 2004, Dr. Hall submitted an "Application for Certificate – Medicine or Osteopathic Medicine" to the Board. (St. Ex. 5 at 3) In the application, Dr. Hall answered "Yes" to the following question:

Have you ever resigned from, withdrawn from, or have you ever been warned by, censured by, disciplined by, been put on probation by, been requested to withdraw from, dismissed from, been refused renewal of a contract by, or expelled from, a medical school, clinical clerkship, externship, preceptorship, residency, or graduate medical education program?

(St. Ex. 5 at 11)

4.  At hearing, Dr. Hall testified that he had had used very poor judgment in deciding to remain at home on May 30, 2003, rather than to advise someone that he had been feeling ill. Dr. Hall testified that he now understands the importance of communication when you are part of a team. He added that, after the first mistake in failing to get coverage before he left the hospital, he had only made things worse by trying to conceal his conduct. (Tr. at 26-32)

Dr. Hall further testified that he had written the June 4, 2003, letter to "Dr. Johnston or Chief Executive Officer for" in an attempt to "minimize damage." Dr. Hall explained:

I had just been terminated and I was trying to write a letter to reverse the termination and to try and recover my job, or get the termination changed to a resignation. So I wrote a letter that stated that I had been available, which was not true * * * To clarify a little bit, there were -- this letter is not where the false statement began. The false statement would be later. This was basically stating that I had been available and I had a pager. I did have my home pager and was at home at the time, which never went off. But that was not sufficient; they wanted me to have a hospital pager.

(Tr. at 14-16)

Dr. Hall further acknowledged that he had met with Dr. Johnston on June 5, 2003, and had told Dr. Johnston that he had spent the night of May 30, 2005, in the library with a house pager and a personal pager. Dr. Hall also acknowledged that those stories had been false, and that he had purposely told this lie to Dr. Johnston in an attempt to avoid termination from the residency program. (Tr. at 16-18)

OhioHealth/Hall
0084

Report and Recommendation
In the Matter of Adam P. Hall, D.O.
Page 6

Nevertheless, Dr. Hall testified that he had met with Dr. Johnston again on June 6, 2003. Regarding that meeting, Dr. Hall testified that, at that time, he admitted that he had been at home that evening and that he had made false statements in an attempt to minimize the damage. He had made false statements previously. Dr. Hall added that he had spoken also with the residency program committee and admitted that he had lied repeatedly to Dr. Johnston. Dr. Hall testified that he had decided to stop lying because "things were getting out of control" and he did not want it to get worse. He stated the lying was not in his character and he had recognized that all of the negative consequences had been brought about by his own actions. (Tr. at 18-21) Finally, Dr. Hall stated that he had realized:

> All that I have had done so far is ruined my own reputation and ruined my own credibility. And the best thing I could do at that point was to just tell the truth and see where it would lead, because I had already been terminated in the action and the road I was going down was just going to lead to a worse outcome.

(Tr. at 21)

Dr. Hall concluded that he has learned some valuable lessons as a result of the events at MCI. He stated as follows:

> I have learned that honesty is the best policy. And I am definitely very remorseful for what I have done, and in reflection, I wish I had never done it. It was youthful and stupid and something that I would never do again. And it's definitely taught me to be honest and open with people and to accept, be it bitter, be it sweet; whatever happens, you have to live with the truth, so I have applied that to my life and I have made sure that everybody I have worked with since has known about my past indiscretions.

(Tr. at 25)

5.  Dr. Hall testified that, at the time of hearing, he had been participating in the residency at Doctor's Hospital West for eighteen months. Dr. Hall further testified that, when he applied for a position in that program, he had fully advised the residency program directors of the events that had occurred at MCI. (Tr. at 22-24)

6.  Dr. Hall submitted enthusiastic letters of recommendation written by his attending physicians at Doctor's Hospital West/Ohio Health. Authors of these letters include: Anthony D. Zucco, D.O., Program Director of the Department of Anesthesia; Bhaskar K.V. Reddy, M.D., MBA, Division Chair, Department of Anesthesiology; and Jon Furbee, D.O., Senior Attending Anesthesiologist. (Respondent's Exhibits A through C)

Dr. Zucco noted that, over the past eighteen months, Dr. Hall had proven that "he has the potential to be a good anesthesiologist. Good from the standpoint of being a skilled physician, a caring physician, a hardworking physician, and a physician who is more

Report and Recommendation
In the Matter of Adam P. Hall, D.O.
Page 7

mature and sure about himself than the one he was two year ago." (Resp. Ex. A)
Dr. Reddy wrote that Dr. Hall "has a full understanding of the ethical, moral, and legal
duties as applicable to medical practice." (Resp. Ex. B)  Finally, Dr. Furbee wrote that
Dr. Hall "is a valuable asset to the medical community, and I am happy to give him my
wholehearted endorsement." (Resp. Ex. C)

## FINDINGS OF FACT

1. On January 29, 2004, Dr. Hall submitted to the Board an "Application for Certificate–
   Medicine or Osteopathic Medicine."  Dr. Hall's application for licensure is currently
   pending.

2. From January 1 to June 9, 2003, Dr. Hall was a resident at the University of Health Sciences
   Family Medicine Residency Program at the Medical Center of Independence [MCI] in
   Independence, Missouri.  On the night of May 30, 2003, Dr. Hall was scheduled to be the
   resident on call.  Nevertheless, Dr. Hall went home, took cold medicine, and slept through
   the night.  Although the emergency department staff paged him several times, Dr. Hall did
   not respond to the pages.

   On June 3, 2003, G. M. Johnston, D.O., then Acting Director of Medical Education,
   discovered that the hospital staff had not seen Dr. Hall at any time during the night of
   May 30, 2003, and that Dr. Hall had not responded to the pages by the emergency
   department staff.  On June 4, 2003, Dr. Hall met with the Family Medicine Department
   Chair and the Acting Family Practice Program Director at MCI.  After the meeting, a
   determination was made to terminate Dr. Hall from the residency program for "grievous
   dereliction of duty and subsequent imminent risk to quality patient care."

   Shortly thereafter, upon questioning by Dr. Johnston, Dr. Hall falsely reported that he had
   been on duty that night, that he had had both the hospital beeper and his personal beeper,
   that he had received no pages, and that the hospital beeper must not have been working
   properly.  Dr. Hall further reported that that he had been in the hospital library, that he had
   not heard any pages, and that he had used a computer and read several journals while in the
   library.  During the conversation, Dr. Johnston asked Dr. Hall three times if Dr. Hall had
   used the computer while he was on duty and each time Dr. Hall answered yes.  However,
   before this meeting, Dr. Johnston had been informed by the library staff that the computers
   had remained inactive, without any entry of usage, during the time in question.

   On June 6, 2003, Dr. Johnston again met with Dr. Hall, at which time Dr. Hall offered a
   second accounting of the events of the night of May 30, 2003.  Dr. Hall's statement
   included the following:  Dr. Hall had taken cold medicine and had slept the entire night at
   his home, he had lied about being on duty, and he had not reported to work that shift nor
   had he been in the library.  Further, Dr. Hall admitted that he had used very poor judgment
   and had been dishonest.

OhioHealth/Hall
0086

Report and Recommendation
In the Matter of Adam P. Hall, D.O.
Page 8

On June 9, 2003, the residency program committee decided to uphold Dr. Hall's termination from the residency program.

## CONCLUSIONS OF LAW

1.  The conduct of Adam P. Hall, D.O., as set forth in Findings of Fact 2, constitutes "[m]aking a false, fraudulent, deceptive, or misleading statement in the solicitation of or advertising for patients; in relation to the practice of medicine and surgery, osteopathic medicine and surgery, podiatric medicine and surgery, or a limited branch of medicine; or in securing or attempting to secure any certificate to practice or certificate of registration issued by the board," as that clause is used in Section 4731.22(B)(5), Ohio Revised Code.

2.  The conduct of Dr. Hall, as set forth in Findings of Fact 2, is not sufficient to demonstrate a current failure to furnish satisfactory proof of good moral character as required by Sections 4731.29 and 4731.08, Ohio Revised Code.

\*      \*      \*      \*      \*

Dr. Hall issued a series of deceitful and self-serving misstatements during the course of his practice.  Such conduct would justify permanent denial of his certificate to practice in this state.  Nevertheless, Dr. Hall admitted his misconduct and deceit within a short time of their occurrence.  Moreover, Dr. Hall was forthcoming in his application for licensure in Ohio.  Therefore, the evidence suggests that Dr. Hall has learned from his mistakes and will be more cautious and forthcoming in the future.

## PROPOSED ORDER

It is hereby ORDERED that:

A.  **GRANTING OF CERTIFICATE:** The application of Adam P. Hall, D.O., for a certificate to practice osteopathic medicine and surgery in the State of Ohio is GRANTED, provided that he otherwise meets all statutory and regulatory requirements.  If so, the certificate shall be issued on the effective date of this Order.

B.  **SUSPENSION OF CERTIFICATE:**  Immediately upon issuance of Dr. Hall's certificate to practice osteopathic medicine and surgery in the State of Ohio, that certificate shall be SUSPENDED for thirty days.  The thirty days of suspension shall include the day that the certificate is issued.

Report and Recommendation
In the Matter of Adam P. Hall, D.O.
Page 9

C. **PROBATIONARY CONDITIONS**: Upon reinstatement, Dr. Hall's certificate shall be subject to the following PROBATIONARY terms, conditions, and limitations for a period of at least two years:

1. **Obey the Law**: Dr. Hall shall obey all federal, state, and local laws, and all rules governing the practice of osteopathic medicine and surgery in the state of Ohio.

2. **Quarterly Declarations**: Dr. Hall shall submit quarterly declarations under penalty of Board disciplinary action and/or criminal prosecution, stating whether there has been compliance with all the conditions of this Order. The first quarterly declaration must be received in the Board's offices on the first day of the third month following the month in which this Order becomes effective, provided that if the effective date is on or after the 16th day of the month, the first quarterly declaration must be received in the Board's offices on the first day of the fourth month following. Subsequent quarterly declarations must be received in the Board's offices on or before the first day of every third month.

3. **Appearances**: Dr. Hall shall appear in person for quarterly interviews before the Board or its designated representative during the third month following the effective date of this Order. Subsequent personal appearances must occur every three months thereafter, and/or as otherwise requested by the Board. If an appearance is missed or is rescheduled for any reason, ensuing appearances shall be scheduled based on the appearance date as originally scheduled.

4. **Course on Personal/Professional Ethics**: Before the end of the first year of probation, or as otherwise approved by the Board, Dr. Hall shall provide acceptable documentation of successful completion of a course or courses dealing with personal and professional ethics. The exact number of hours and the specific content of the course or courses shall be subject to the prior approval of the Board or its designee. Any courses taken in compliance with this provision shall be in addition to the Continuing Medical Education requirements for relicensure for the Continuing Medical Education acquisition period(s) in which they are completed.

5. **Absence from Ohio**: Dr. Hall shall obtain permission from the Board for departures or absences from Ohio. Such periods of absence shall not reduce the probationary term, unless otherwise determined by motion of the Board for absences of three months or longer, or by the Secretary or the Supervising Member of the Board for absences of less than three months, in instances where the Board can be assured that probationary monitoring is otherwise being performed.

6. **Violation of Probation; Discretionary Sanction Imposed**: If Dr. Hall violates probation in any respect, the Board, after giving him notice and the opportunity to be heard, may institute whatever disciplinary action it deems appropriate, up to and including the permanent revocation of his certificate.

Report and Recommendation
In the Matter of Adam P. Hall, D.O.
Page 10

D. **TERMINATION OF PROBATION**: Upon successful completion of probation, as evidenced by a written release from the Board, Dr. Hall's certificate will be fully restored.

E. **REQUIRED REPORTING BY LICENSEE TO EMPLOYERS AND HOSPITALS**: Within thirty days of the effective date of this Order, Dr. Hall shall provide a copy of this Order to all employers or entities with which he is under contract to provide health care services or is receiving training; and the Chief of Staff at each hospital where he has privileges or appointments. Further, Dr. Hall shall provide a copy of this Order to all employers or entities with which he contracts to provide health care services, or applies for or receives training, and the Chief of Staff at each hospital where he applies for or obtains privileges or appointments.

F. **REQUIRED REPORTING BY LICENSEE TO OTHER STATE LICENSING AUTHORITIES**: Within thirty days of the effective date of this Order, Dr. Hall shall provide a copy of this Order by certified mail, return receipt requested, to the proper licensing authority of any state or jurisdiction in which he currently holds any professional license. Dr. Hall shall also provide a copy of this Order by certified mail, return receipt requested, at time of application to the proper licensing authority of any state in which he applies for any professional license or reinstatement or restoration of any professional license. Further, Dr. Hall shall provide this Board with a copy of the return receipt as proof of notification within thirty days of receiving that return receipt.

**EFFECTIVE DATE OF ORDER:** This Order shall become effective thirty days after mailing of notification of approval by the Board.

Sharon W. Murphy, Esq.
Hearing Examiner

OhioHealth/Hall
0089

<u>BEFORE THE STATE MEDICAL BOARD OF OHIO</u>

IN THE MATTER OF          *

                                *

ADAM P. HALL, D.O.          *

<u>ENTRY OF ORDER</u>

This matter came on for consideration before the State Medical Board of Ohio on December 14, 2005.

Upon the Report and Recommendation of Sharon W. Murphy, State Medical Board Attorney Hearing Examiner, designated in this Matter pursuant to R.C. 4731.23, a true copy of which Report and Recommendation is attached hereto and incorporated herein, and upon the approval and confirmation by vote of the Board on the above date, the following Order is hereby entered on the Journal of the State Medical Board of Ohio for the above date.

It is hereby ORDERED that:

A.    **GRANTING OF CERTIFICATE**: The application of Adam P. Hall, D.O., for a certificate to practice osteopathic medicine and surgery in the State of Ohio is GRANTED, provided that he otherwise meets all statutory and regulatory requirements.  If so, the certificate shall be issued on the effective date of this Order.

B.    **SUSPENSION OF CERTIFICATE**:  Immediately upon issuance of Dr. Hall's certificate to practice osteopathic medicine and surgery in the State of Ohio, that certificate shall be SUSPENDED for thirty days.  The thirty days of suspension shall include the day that the certificate is issued.

C.    **PROBATIONARY CONDITIONS**: Upon reinstatement, Dr. Hall's certificate shall be subject to the following PROBATIONARY terms, conditions, and limitations for a period of at least two years:



EXHIBIT

4

In the matter of Adam P. Hall, D.O.
Page 2

1. **Obey the Law**: Dr. Hall shall obey all federal, state, and local laws, and all rules governing the practice of osteopathic medicine and surgery in the state of Ohio.

2. **Quarterly Declarations**: Dr. Hall shall submit quarterly declarations under penalty of Board disciplinary action and/or criminal prosecution, stating whether there has been compliance with all the conditions of this Order. The first quarterly declaration must be received in the Board's offices on the first day of the third month following the month in which this Order becomes effective, provided that if the effective date is on or after the 16th day of the month, the first quarterly declaration must be received in the Board's offices on the first day of the fourth month following. Subsequent quarterly declarations must be received in the Board's offices on or before the first day of every third month.

3. **Appearances**: Dr. Hall shall appear in person for quarterly interviews before the Board or its designated representative during the third month following the effective date of this Order. Subsequent personal appearances must occur every three months thereafter, and/or as otherwise requested by the Board. If an appearance is missed or is rescheduled for any reason, ensuing appearances shall be scheduled based on the appearance date as originally scheduled.

4. **Course on Personal/Professional Ethics**: Before the end of the first year of probation, or as otherwise approved by the Board, Dr. Hall shall provide acceptable documentation of successful completion of a course or courses dealing with personal and professional ethics. The exact number of hours and the specific content of the course or courses shall be subject to the prior approval of the Board or its designee. Any courses taken in compliance with this provision shall be in addition to the Continuing Medical Education requirements for relicensure for the Continuing Medical Education acquisition period(s) in which they are completed.

5. **Absence from Ohio**: Dr. Hall shall obtain permission from the Board for departures or absences from Ohio. Such periods of absence shall not reduce the probationary term, unless otherwise determined by motion of the Board for absences of three months or longer, or by the Secretary or the Supervising Member of the Board for absences of less than three months, in instances where the Board can be assured that probationary monitoring is otherwise being performed.

6. **Violation of Probation; Discretionary Sanction Imposed**: If Dr. Hall violates probation in any respect, the Board, after giving him notice and the opportunity to be heard, may institute whatever disciplinary action it deems appropriate, up to and including the permanent revocation of his certificate.

In the matter of Adam P. Hall, D.O.
Page 3

D.   **TERMINATION OF PROBATION**: Upon successful completion of probation, as evidenced by a written release from the Board, Dr. Hall's certificate will be fully restored.

E.   **REQUIRED REPORTING BY LICENSEE TO EMPLOYERS AND HOSPITALS**: Within thirty days of the effective date of this Order, Dr. Hall shall provide a copy of this Order to all employers or entities with which he is under contract to provide health care services or is receiving training; and the Chief of Staff at each hospital where he has privileges or appointments.  Further, Dr. Hall shall provide a copy of this Order to all employers or entities with which he contracts to provide health care services, or applies for or receives training, and the Chief of Staff at each hospital where he applies for or obtains privileges or appointments.

F.   **REQUIRED REPORTING BY LICENSEE TO OTHER STATE LICENSING AUTHORITIES**: Within thirty days of the effective date of this Order, Dr. Hall shall provide a copy of this Order by certified mail, return receipt requested, to the proper licensing authority of any state or jurisdiction in which he currently holds any professional license.  Dr. Hall shall also provide a copy of this Order by certified mail, return receipt requested, at time of application to the proper licensing authority of any state in which he applies for any professional license or reinstatement or restoration of any professional license.  Further, Dr. Hall shall provide this Board with a copy of the return receipt as proof of notification within thirty days of receiving that return receipt.

**EFFECTIVE DATE OF ORDER:** This Order shall become effective thirty days after mailing of notification of approval by the Board.


Lance A. Talmage, M.D.
Secretary

(SEAL)

December 14, 2005
Date

OhioHealth/Hall
0043

March 01, 2006

Adam Hall, DO
110 W. Henderson Rd
Columbus OH 43214

Dr. Kirk Hilliard
Medical Education Dept.
Doctor's Hospital
Columbus, OH



Dear Dr. Hilliard;

I am writing this letter in the hopes not only that an injustice be rectified but also to appeal the decision not to renew my contract.

In my humble opinion, I believe the decision not to renew my contract was predicated on a clerical error made by the Ohio State Medical Board. The transcribed error claimed that I had made fraudulent statements to the Ohio State Medical Board upon my application for permanent licensure (see page 3). My attorney addressed this error with the State Board at the December 2005 meeting. It is clearly visible in the December meeting minutes that the State of Ohio recognized its error and states that I did not lie on my application and that the official record should be corrected to read that I was being brought before the board for my lapse in judgment and dishonesty at MCI, the family practice program in Missouri. Unfortunately, the Ohio State Board made a clerical error and posted the erroneous document online in December. As you can see, the attached documentation (see page 4, entry nunc pro tunc, 02/08/06) shows the State of Ohio has since acknowledged its error and corrected that mistake; however, irreparable damage to me has been done because the resultant action was my dismissal from the Doctors Hospital anesthesia program. Additionally, this error portrayed me as an unscrupulous individual with no moral character because by believing this false statement that I lied to the board compounded with the fact that I had admitted to lying at another program it made it seem that I was a pathological liar.

I am a person of good moral character who made a mistake for which I am heartily sorry, but which taught me a life-lesson I will never repeat. I compounded the error of poor judgment with the error of dishonesty at MCI; I was dropped from their program. I paid the price, but Dr. Zucco believed that I was redeemable. With stipulations, I was given a chance to prove myself. I did not and have not failed his judgment. I have been honest with you and everyone at Doctors Hospital, and I have letters of recommendations from Dr. Furbee, Dr. Reddy and Dr. Zucco that attest to my honesty and integrity. Also, the State of Ohio issued me a permanent license because after an exhaustive investigation they found that I am an honest and moral individual who made a mistake. I stress that now I hold a full Ohio license. The whole licensing issue with the State Board of Ohio was premised on events in Missouri which I fully disclosed to the Ohio

OhioHealth/Hall
0032

Board, two anesthesia program directors and senior members of the Doctor's Hospital anesthesia staff. Additionally, Dr. Zucco informed medical education about my difficulties with licensure in Ohio as well as apprising them of what had happened at the Medical Center of Independence.

In conclusion, my termination from the anesthesia residency was a direct result of a human error and is without due process. I offer the analogy that this treatment of me is like a patient who is diagnosed with a benign cyst but is erroneously told that he has terminal cancer. It is not reasonable or fair to continue treating a patent with a remedy that is the result of a misdiagnosis or because of any other error, including administrative record-keeping. I appeal to your sense of fairness and justice to advocate my reinstatement or sign a certificate of completion as I have done 37 months of postgraduate anesthesia training. I have been and will continue to be an asset to the program and the hospital if reinstated or I will be a valuable asset to the medical community if allowed to move forward with a certificate of completion.

Respectfully,

Adam Hall, DO

OhioHealth/Hall
0033

PAGE 3

Nov 17, 2005

STATE MEDICAL BOARD
OF OHIO
2005 NOV 17 A 11: 00

**REPORT AND RECOMMENDATION
IN THE MATTER OF ADAM P. HALL, D.O.**

The Matter of Adam P. Hall, D.O., was heard by Sharon W. Murphy, Esq., Hearing Examiner for
the State Medical Board of Ohio, on August 24, 2005.

**INTRODUCTION**

I.   Basis for Hearing

A.   By letter dated April 13, 2005, the State Medical Board of Ohio [Board] notified
Adam P. Hall, D.O., that it had proposed to deny his application for licensure or to
take disciplinary action against his certificate to practice osteopathic medicine and
surgery in Ohio. The Board based its proposed action on allegations that Dr. Hall had
provided false information in his application for licensure and had failed to
demonstrate the good moral character necessary for licensure in Ohio.

*False
Statement*

The Board further alleged that Dr. Hall's conduct constitutes "'[m]aking a false,
fraudulent, deceptive, or misleading statement in the solicitation of or advertising for
patients; in relation to the practice of medicine and surgery, osteopathic medicine and
surgery, podiatry, or a limited branch of medicine; or in securing or attempting to
secure any certificate to practice or certificate of registration issued by the board,' as
that clause is used in Section 4731.22(B)(5), Ohio Revised Code." Moreover, the
Board alleged that Dr. Hall had failed to furnish satisfactory proof of good moral
character as required by Sections 4731.29 and 4731.08, Ohio Revised Code.

Accordingly, the Board advised Dr. Hall of his right to request a hearing in this
matter. (State's Exhibit 1A)

B.   On April 25, 2005, the Board received a written hearing request submitted by
Dr. Hall. (State's Exhibit 1B)

II.  Appearances

A.   On behalf of the State of Ohio: Jim Petro, Attorney General, by Tara L. Berrien,
Assistant Attorney General.

B.   On behalf of the Respondent: Kevin P. Byers, Esq.

OhioHealth/Hall
0034

*PAGE 4*

## BEFORE THE STATE MEDICAL BOARD

IN THE MATTER OF                          :

                                          :

ADAM P. HALL, D.O.                        :

*Feb 8, 2006*

### ENTRY NUNC PRO TUNC

*Nov 17, 2005*

On November 17, 2005, Hearing Examiner Sharon W. Murphy issued a Report and
Recommendation in the matter of Adam P. Hall, D.O. That Report and Recommendation stated
in Paragraph I.A. that the Board based its proposed action on an allegation that Dr. Hall had
provided false information in his application for licensure in the state of Ohio.

Upon further review, it has been determined that the Notice of Opportunity for Hearing issued by
the Board on April 13, 2005, did not allege that Dr. Hall had provided false information to the
State Medical Board in his application for licensure in the state of Ohio. *April 13, 2005*

WHEREFORE, it is hereby ORDERED that Paragraph I.A. of the Report and Recommendation
in the matter of Adam P. Hall, D.O., be and hereby is CORRECTED to read as follows:

> By letter dated April 13, 2005, the State Medical Board of Ohio [Board] notified  *The reason*
> Adam P. Hall, D.O., that it had proposed to deny his application for licensure or  *for action*
> to take disciplinary action against his certificate to practice osteopathic medicine  *against ohio*
> and surgery in Ohio. The Board based its proposed action on an allegation that  *licensure*
> Dr. Hall had provided false information to his Missouri residency director
> concerning an incident that occurred on or about May 30, 2003, and had failed to
> demonstrate the good moral character necessary for licensure in Ohio.

> The Board further alleged that Dr. Hall's conduct constitutes "'[m]aking a false,
> fraudulent, deceptive, or misleading statement in the solicitation of for advertising
> for patients; in relation to the practice of medicine and surgery, osteopathic
> medicine and surgery, podiatry, or a limited branch of medicine; or in securing or
> attempting to secure any certificate to practice or certificate of registration issued
> by the board,' as that clause is used in Section 4731.22(B)(5), Ohio Revised
> Code." Moreover, the Board alleged that Dr. Hall had failed to furnish
> satisfactory proof of good moral character as required by Sections 4731.29 and
> 4731.08, Ohio Revised Code.

OhioHealth/Hall
0035

5100 West Broad Street
Columbus, OH 43228

 **Doctors Hospital**
OhioHealth

**RESIDENT CONTRACT**



EXHIBIT

6

Institution No.        **118542**
Resident's AOA No.   **074687**
Year of Training    **PGY-2, R-1**
City & State   **Columbus, Ohio**

*This Contract,* is executed between **Doctors OhioHealth Corporation d/b/a Doctors Hospital** (hereafter called the Institution) and B **Adam Patrick Hall, D.O.** (hereafter called the Resident).

# WITNESSETH:

**WHEREAS,** the Institution has been approved by the American Osteopathic Association (hereafter called the "AOA") for a training program of residents and has, as a condition for the continued maintenance of such approval, agreed to abide by the residency standards, rules and regulations, of the AOA, and

**WHEREAS,** the Resident has made application to the Institution for appointment to serve as a Resident in an AOA-approved residency, and said application has been accepted by the Institution's governing board,

**NOW, THEREFORE,** in consideration of the above and of their mutual promises contained herein, the Institution and the Resident agree as follows:

**A.     THE INSTITUTION AGREES:**
1.      To appoint the Resident into its program for **Twelve (12)** consecutive months, not to exceed twelve (12) months, beginning **February 2**, **2004**, and ending on **February 1** , **2005**.
2.      To provide training for the Resident in the field of **Anesthesiology** by providing an educational program in accordance with AOA standards.
3.      To define the duties of the Resident.
4.      To clearly delineate policies and procedures for evaluation of resident performance, including provisions for promotion, demotion, retention, and dismissal.  Such policies shall also include requirements concerning work hour limits in clinical activity and a moonlighting policy and process for monitoring.  A copy of the Institution's Resident Work Hours and Supervision Policies is attached and incorporated herein by reference.
5.      To provide for the payment to the Resident a stipend of **$ 42,229/ year**.
6.      To furnish the Resident with a written statement listing all benefits that will be provided by the Institution to the Resident including, but not limited to, health insurance and professional liability insurance.
7.      To furnish the Resident with a written copy of the Institution's education program which will serve as a guide for residency training.
8.      To present or cause to be presented to the Resident a certificate of residency upon satisfactory completion of the Institution's residency educational program.

**B.     THE RESIDENT AGREES:**
1.      To serve as a Resident in the field of **Anesthesiology** during the entire period specified in paragraph A.1. of this contract.
2.      To perform all duties assigned by the Institution to him/her to the best of his/her ability, to maintain standards of professional competence as determined by the Institution, and to conduct himself/herself in a professional manner at all times.
3.      To observe all rules and regulations of the Institution pertaining to residents.

OhioHealth/Hall
0920

4.  To engage during the term of the residency only in such activities of a professional nature as are approved by the Institution and the AOA.  Such activities shall include compliance with institutional and AOA work hour policies to include all policies regarding moonlighting.

5.  To refrain during the entire term of the residency from engaging or participating in any nonprofessional activities which would interfere with the Resident's effective performance of this contract.

**C.   THE PARTIES FURTHER AGREE:**

1.  That the Resident and the Institution are the only parties to this agreement.  **The AOA is not a party to this agreement.**

2.  That this contract may be terminated at any time by a Written Release by Mutual Consent.  In the event of such termination, the Institution shall determine the amount of credit, if any, toward satisfying AOA residency education requirements to be awarded the Resident.

3.  That if the Resident by action or inaction commits or allows to occur any action or course of action, which the Institution reasonably believes involved moral turpitude or is contrary to the interests of patient care or the general welfare of the Institution, the Institution may terminate the Resident's service without prior notice, and the Resident will not be issued another AOA Resident Contract for a program approved by the AOA for a period of one year from the date of termination, unless sooner exonerated.

4.  That if the Resident fails to pursue satisfactorily the Institution's educational and clinical program, the Program Director / Director of Medical Education shall provide the Resident with written notice that the Resident is on probationary status.  Thereafter, if the identified deficiencies are not corrected, the Institution may terminate its relationship with the Resident at any time.

5.  That if the Institution loses its approval for resident training during the period of this contract, on the effective date of loss of such approval, the Resident shall have the option to be released from this contract and shall not be prohibited from immediately entering another Institution approved by the AOA for residency training.  Also, effective on the date of loss of approval, the Institution shall terminate the residency training program, at which time the Resident shall be granted credit for that portion of the residency completed and released therefrom.

6.  That if the Resident unilaterally terminates this contract in order to participate in a program which does not have AOA approval, the Resident, as a result, may be denied access to the AOA training approval process thereafter.

7.  That the institution and the Resident shall immediately notify the Council on Postdoctoral Training of the AOA in writing in the event of a breach or unilateral termination of this contract, by either party or of the termination of this agreement by written release by mutual consent.  In the event of mutual release, it shall be the duty of the Institution to send a signed copy of the release to the Council on Postdoctoral Training of the AOA.

8.  That this contract incorporates by reference "Residency Training Requirements of the American Osteopathic Association" to the extent that the "Residency Training Requirements of the American Osteopathic Association" relate to the obligations of the parties hereto and do not conflict with the terms of this contract.

9.  If the Resident changes specialty areas, the Resident may be allowed to start another AOA-approved program without regard to the one-year limitation in paragraph C.3. above.

**IN WITNESS WHEREOF**, this agreement has been executed by the parties hereto, to be effective as of the date of execution by the institution.

Resident: _____

Date: _____ 2-3-04 _____

Institution:

By: __Kirk C. Williard D.O.__

Date: __2/3/04__

(This proviso to be filled in only in the case of a Written Release by Mutual Consent.)
The parties hereby mutually consent to the release of their contractual obligations, as of the _____ day of _____, 20____.

OhioHealth/Hall
0921

_____

(Resident)

_____

(Institution)

_____

(Witness)

NOTE:  All signed contracts are to be kept in the trainee's File.  DO NOT SEND A COPY TO THE AOA.

A contract audit will be conducted annually in October by the AOA

# DOCTORS HOSPITAL
# COLUMBUS, OHIO

## RESIDENT HOSPITAL CONTRACT ADDENDUM

This is an Addendum made as of **April, 1999**, to the **2004-2005** Resident Contract (the "Agreement") by and between "Resident" and Doctors OhioHealth Corporation d/b/a Doctors Hospital "Institution" (this "Addendum"). To the extent of any inconsistencies between the terms of this Addendum and the terms of the Agreement, the terms of this Addendum shall supersede the inconsistent terms of the Agreement. The parties to the Agreement hereby agree as follows:

I.    The Section B of the Agreement is hereby modified by adding the following to subsections B.3., B.4., B.5., B.6., B.7.:

B.3.    It is specifically understood and agreed by the parties to the attached residency agreement the Resident is familiar with the provisions of the American Osteopathic Association rules and regulations pertaining to Residency Training Requirements of the American Osteopathic Association.

The Resident understands, during the residency, the Resident is obligated to participate in conferences at bedside, in the operating room, in the delivery room, and in the laboratories, and to attend staff meetings, teaching rounds, departmental conferences, seminars, lectures, and clinical pathological conferences, and such other educational exercises as a part of the overall teaching program of the hospital designed to meet the standards for accreditation by the American Osteopathic Association.

The Resident further agrees to be bound by the Residency Training Requirements of the American Osteopathic Association and amendments thereto, as published by the American Osteopathic Association which publication is made a part hereof to the same extent and as fully as if rewritten herein.

B.4.    Section B of the Agreement is hereby modified by deleting subsections B.4. and replacing it with the following:

To engage during the entire term of the residency in such activities of a professional nature as are approved by the Institution.

OhioHealth/Hall
0922

B.5.   This contract is predicated upon the Resident successfully passing a pre-employment drug screen, valid certificate of training, or verification of licensure, education, and training.

While training as a Resident at the Institution, the Resident will be provided professional liability insurance coverage through a commercial or self-insurance program maintained by the Institution.  Such professional liability insurance coverage for the Resident will cover the Resident while acting within the scope of duties and responsibilities under the training program.  Responsibilities include, without limitation, participation in patient care at the Institution.

Such professional liability insurance coverage does not cover the Resident if he/she is acting outside the scope of duties and responsibilities under the training program without limitation, or while participating in patient care activities off the premises of the Institution in Columbus, Ohio unless such activity is specifically authorized by the Chief Operating Officer of the Institution.  Such professional liability insurance shall not cover the Resident for any wrongful intentional acts of omissions committed by the Resident such as assaults, batteries, liable, slander or other intentional acts during his/her training period at the Institution.

In consideration of such coverage, the Resident agrees to provide the Institution's Risk Manager or General Counsel with prompt notice of any claim or potential claim of professional liability, and to cooperate with the Institution's Risk Management Department, General Counsel's office and trial counsel in the investigation and defense of any claim made against the Resident or the Institution due to the Resident's delivery of care.

In the event a claim or suit is made or filed against the Institution or against the Resident arising out of any acts or omissions of the Resident while participating in the training program, the Resident agrees he/she shall cooperate with the Institution and its attorneys in the defense of such claim or suit, including without limitation; cooperating in the investigation of such claim, attendance at depositions, and/or trial and maintaining confidentiality of all communications with the Institution and its attorneys. Failure or refusal of the Resident to cooperate with the Institution and its attorneys, including failure to attend any trial of any claim, if necessary, will result in the Resident not being protected under professional liability through the

OhioHealth/Hall
0923

Institution's commercial or self-insurance program. The Institution or its insurer agrees to assume all reasonable expenses incurred by the Resident in cooperation with the Institution and its attorneys, including travel to Columbus, Ohio or elsewhere to attend depositions or trial.

The Institution or its insurer shall select attorneys to defend the hospital and the Resident in any claim or suit and shall pay all attorney fees and expenses incurred. Should the Resident desire to engage in an attorney or his/her own, which is not agreed upon by the Institution, the Resident shall be responsible for the payment of any attorney fees and expenses incurred as a result of the Resident's selection of private legal counsel.

B.6.   Resident warrants to be a doctor of osteopathic medicine and agrees throughout the term of the contract to obtain a valid license to practice medicine in the State of Ohio within the second post graduate year and provide proof thereof. Resident agrees to provide Institution with immediate notice of any action taken or contemplated which may affect Resident's license to practice medicine.

B.7.   The Resident shall not submit nor accept fees or any other forms of compensation from patients or hospital department or employee for service.

II.   Section C of the Agreement is hereby amended by deleting subsections C.3. in its entirety and replacing it with the following new subsection C.3.:

C.3.   That if the Resident by action or inaction commits or allows to occur any action or course of action, which the Institution reasonably believes involved moral turpitude or is contrary to the interests of patient care or the general welfare of the Institution or its employees the Institution may terminate the Resident's service without prior notice, and the Resident will not be issued another AOA residency contract for a program approved by the AOA for a period of one year from the date of termination, unless sooner exonerated.

III.   Section C of the Agreement is hereby amended by deleting the last sentence of subsection C.4. and replacing it with the following new sentence.

C.4.   Thereafter, if the identified deficiencies are not corrected, the Institution may terminate its relationship with the Resident without further notice.

OhioHealth/Hall
0924

IV.   Except to the extent set forth in this Addendum, the Agreement
       remains as written without change.

**RESIDENT**                                           **INSTITUTION**

By: _____                            By: _Kirk C. Hilliard D.O._

Date: _____2.3.4_____                              Date: ___2/3/04_____

OhioHealth/Hall
0925

# DOCTORS HOSPITAL
# COLUMBUS, OHIO

## RESIDENT HOSPITAL CONTRACT

### ADDENDUM A

This is an Addendum made as of February 2, 2004 to the 2004-2005 Resident Contract (the "Agreement") by and between "Resident" and Doctors OhioHealth Corporation d/b/a/ Doctors Hospital "Institution" (this "Addendum"). To the extent of any inconsistencies between the terms of this Addendum and the terms of the Agreement, the terms of this Addendum shall supersede the inconsistent terms of the Agreement. The parties to the Agreement hereby agree as follows:

1.  The Resident will be placed on probationary status for the first 90 days (February 2, 2004 through May 2, 2004) of the residency training period to assess the resident's knowledge base and skills level as related to the resident training program in Anesthesiology.

2.  A quarterly evaluation will be completed at the end of the 90 day probationary period. If the program director assesses the resident's knowledge base and skill level to be consistent with the resident's PGY-2, R-1 training level, the resident will continue in the program at this training level.

3.  If the program director assesses the resident's knowledge base and skill level to be superior to the resident's PGY-2, R-1 training level, the program director will make the appropriate changes to the resident's training level status in the program.

RESIDENT

By: _____

Date: ____2·3·4____

INSTITUTION

By: _____

Date: ____2/3/04____

# DOCTORS HOSPITAL
# COLUMBUS, OHIO

### RESIDENT HOSPITAL CONTRACT

### ADDENDUM B

This is an addendum made as of November 23, 2004 to the 2004-2005 Resident Contract ("the Agreement") by and between"Resident" and Doctors Hospital OhioHealth Corporation. To the extent of any inconsistencies between the terms of this Addendum and the terms of the Agreement, the terms of this Addendum shall supersede the inconsistent terms of the Agreement. The parties to the Agreement hereby agree as follows:

1. The resident will be placed on academic review for (6) six months (November 23, 2004 – April 23, 2005) of the current residency training contract to assess the resident's behavioral, interpersonal, professional competencies, and skills level as related to the resident training program level in Anesthesiology. Therefore, the Medical Education Department will extend the resident's contract as a PGY II, R-1 until April 23, 2005.

2. The resident will attend counseling sessions as appointed by the program director and the Medical Education Department to address the behavioral changes necessary to meet the competencies of professionalism, interpersonal skills, and communications. Specific behaviors that will not be tolerated are as follows: personal communications with friends, family, and/or employees during work hours; inappropriate interactions with staff, and inattention to monitoring patients during anesthesia.

3. During this period, the resident will be restricted from moonlighting within or outside Doctors Hospital. However, the resident will be required to attend all departmental meetings, lectures, and journal clubs.

4. A monthly and quarterly evaluation and review will be completed during the entire academic review time frame. If the program director and department's resident evaluation committee assess the resident's competencies and skill level to be consistent with the beginning level PGY3-R2 at the end of the (6) six month academic review, the resident will advance to that level. If, however, the program director and department's resident evaluation committee decides that the resident has not met the above expectations, it will be recommended that the resident be released from his contract as an Anesthesia Resident with Doctors Hospital.

OhioHealth/Hall
0927

RESIDENT SIGNATURE

Adam Hall, DO

DATE   11·23·4

INSITITUTION SIGNATURE

Kirk L. Hilliard, DO
VP Medical Education

DATE   11/23/04

OhioHealth/Hall
0928

Doctors Hospital
OhioHealth

PAGE 1

## APPLICATION FOR INTERNSHIP/RESIDENCY TRAINING
Deadline for submission is **October 31st**

Indicate the program you are applying to:  ☐ Internship    ☐ Combination (PGYI & II)    ☒ Residency

Specialty: _Anesthesiology_

AOA# 074687

Name: Adam Patrick Hall                    Social Security # 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

Address: 7532 State Line Rd                 Academic Year:

City, State, Zip  Prairie Village, KS 66208

Home Phone: 913-381-3602            Cell Phone  OR  Pager  913-961-5347

E-mail:  APHALL9900@HOTMAIL.COM

### EMERGENCY CONTACT

Name: _Diane Hall_                          Phone: _913-381-3602_

Relation: _Spouse_

## APPLICATION INSTRUCTIONS
*Only complete applications will be considered for review.*

**REQUIRED MATERIALS**
1. Completed application.
2. Curriculum Vitae
3. Personal Statement (indicating why you are interested in Doctors Hospital)
4. National Board Scores (parts I, II & III if applicable)
5. Official medical school transcript
6. Dean's letter and / or DME letter
7. Three letters of recommendation

**OPTIONAL MATERIALS**
Personal photo (within past 6 months)
Rotation evaluations (limit 3 please)

> EXHIBIT
> 9

There is a $10 processing fe   for internship applications. This fee is applied toward the administrative cost of managing your application materials. Your application will only be considered or processed if this fee is included with your application.

### PLEASE DO NOT WRITE BELOW THIS LINE

☐ Application received    ☐ Confirmation letter
☐ Interview scheduled    Date _____  Time _____  Location _____

Notes: _____

_____

**MATERIALS RECEIVED**
☐ Curr Vitae    ☐ Dean/DME    ☐ Pers Stmt    ☐ Transcript

|  | Part 1 | Part 2 | Part 3 |
|---|---|---|---|
| NBOME |  |  |  |
| Letters | ____ | ____ | ____ |
| Evals | ____ | ____ | ____ |

Please return application materials to the:
**Intern Coordinator OR Residency Coordinator**
Doctors Hospital
Department of Medical Education
1087 Dennison Avenue
Columbus, Ohio 43201
Phone: 800-432-3309    Fax: (614) 297-1183

AE APPLICATION DH MDE (7/17/2003)

OhioHealth/Hall
0133

 **Doctors Hospital**
OhioHealth

PAGE 2

## APPLICATION FOR INTERNSHIP/RESIDENCY TRAINING
### Education Background

### INTERNSHIP

Dates: 06/00 to 06/01     Track: Rolling

Institution: Peninsula Hospital     DME: Dr. Gerald Teplitz

Address: 51-15 Beach Channel Drive

City, State, Zip: Far Rockaway, NY

### MEDICAL SCHOOL

Dates: 08/96 to 06/2000

Institution: Des Moines University     Dean: Terry Branstad

Address: 3200 Grand Ave

City, State, Zip: Des Moines, IA 50312

### UNDERGRADUATE

Dates: 08/92 to 12/96     Major: Chemistry

Institution: University of Missouri Columbia     Minor: Math

Address: University of Missouri Columbia

City, State, Zip: Columbia, MO 65211

### OTHER EDUCATION

Dates: 06/91 to 02/92     Major: N/A

Institution: US Air Force Academy     Minor:

Address:

City, State, Zip: Colorado Springs, Co 80840

ME APPLICATION DH MDE (7/17/2003)



**Doctors Hospital**
OhioHealth

## APPLICATION FOR INTERNSHIP/RESIDENCY TRAINING

MARK THE APPROPRIATE BOX WITH AN X

Do you have a military obligation following your internship?

☐ Yes  ☒ No      Branch: _____

Do you have a military obligation following your residency?

☐ Yes  ☒ No      Branch: _____

Do you have a public health obligation following your training?

☐ Yes  ☒ No

Do you have a State of Ohio medical license?

☐ Yes  ☒ No      License #: _____

Are you licensed to practice in another state?

☒ Yes  ☐ No      Location: _Missouri, Kansas_____

Have you ever engaged in private practice?

☐ Yes  ☒ No      Location: _____

Has your license been suspended?

☐ Yes  ☒ No

Please explain conditions below:

I certify the information supplied is true, to the best of my knowledge, and in signing this application

I waive the right under the federal disclosure law to see my recommendations and interview evaluations.

Signature: _____      Date: _12.09.03_____

September 30, 2004
Quarterly Date

# Doctors Hospital OhioHealth

## RESIDENT QUARTERLY EVALUATION

**Department:** Anesthesiology

**Evaluation of Resident:** Adam Hall D.O.

**Period of Training:** PGY2   R1          **Quarter:** ~~First~~ *Third*

*Please write the number in the right-hand column that you think most nearly fits the Resident's usual behavior or characteristics, using the following scale:*

0 = Unable to evaluate          3 = Average
1 = Definitely below average    4 = Above average
2 = Somewhat below average      5 = Superior

**EXHIBIT**
8

### CHARACTERISTICS:

1. Shows good clinical judgement, reaches valid decisions, takes appropriate action.   2

2. Has thorough up-to-date knowledge of program, appropriate to stage in career.   3

3. Makes thorough examination of each patient as may be required for accurate diagnosis and treatment.   2

4. Keeps full and accurate records, legibly written.   3

5. Maintains genuine concern for patients during their illness and after discharge.   2

6. Communicates well in every day work and relationships.   2

7. Is available when needed and carries fair share of the load.   3

8. Is considerate of others - patients, co-workers, all hospital personnel.   2

9. Is serious about learning - from books and journals, from conferences, and from own mistakes.   3

10. Shows professional behavior, is high-principled, of unquestionable integrity.   ~~3~~ (2) 90%

11. Teaching abilities.   3

12. Technical skills.   3

Should Resident continue in program?   (Yes)  ✓ ?   No _____

**COMMENTS REQUIRED:** SEE BACK PAGE FOR EXPLANATION.

OhioHealth/Hall
1030

*THIS EVALUATION MUST BE DISCUSSED WITH THE RESIDENT AND SIGNED BY THE RESIDENT IN THE PROGRAM DIRECTOR'S PRESENCE.*

RESIDENT'S SIGNATURE: _____   Date: 11-10-4

PROGRAM DIR'S SIGNATURE: _____   Date: 11-8-04

DME'S SIGNATURE: _____   Date: 11/15/04

It has been brought to my attention that on several occasions Adam has conducted himself in an "inappropriate" manner. It is unanimously agreed that for his time in training, Adam has not reached his level of expectation. It is felt that, at times, his preoperative evaluations are not as thorough as intended. It is also felt that he lacks vigilance in the operating room. For example, engaging in conversations with other operating room personnel or conversing over the phone rather than having all senses focused on monitoring the patient. Others have complained that his behavior has been "inappropriate" at times.

On the other hand, Adam has definitely progressed in knowledge and skill as compared to when he first started nine months ago. However, it is felt that his progression is not as rapid as the other residents.

(Cont.)

OhioHealth/Hall
1031

ADAM HALL EVALUATION CONTINUED ②

11-9-04

Therefore, THE ANESTHESIA ATTENDINGS ARE UNWILLING, AT THIS POINT, TO SEND ADAM ON OUT-ROTATIONS.

It is my firm BELIEF, AND THAT OF THE OTHER ATTENDINGS, THAT ADAM SHOULD CONTINUE TRAINING AS A CA-1 RESIDENT ON A SIX-MONTH PROBATIONARY PERIOD. If AFTER SIX MONTHS ADAM'S PERFORMANCE HAS IMPROVED, He will be RELEASED FROM PROBATIO + ALLOWED TO DO OUT-ROTATIONS AS A CA-2 RESIDENT. If, however, His PERFORMANCE REMAINS UNSATISFACTORY AFTER SIX MORE MONTHS OF SUPERVISED TRAINING, IT IS OUR OPINION THAT He SHOULD BE RELEASED FROM THE PROGRAM. DURING THIS PROBATIONARY PERIOD ADAM WILL NOT BE ALLOWED TO MOONLIGHT EITHER IN OR OUT OF HOUSE.

OhioHealth/Hall
1032

ADAM HALL EVALUATION CONTINUED  (3)

ADAM WILL ALSO BE REQUIRED TO ATTEND ALL DEPARTMENTAL MEETINGS AND LECTURES AS USUAL.

IF BECAUSE OF THE INCREASED IN-HOUSE STAY RESULTING FROM "PROBATION", ADAM IS NOT ABLE TO COMPLETE HIS CA-2 OUT-OF-HOUSE ROTATIONS ON TIME, IT IS RECOMMEND THAT HIS THIRD YEAR ANESTHESIA TRAINING BE EXTENDED TO ACCOMODATE OUT ROTATIONS, OR HIS CA-3 YEAR BE TAILORED TO ALLOW HIM TO GRADUATE ON TIME.

IN ENDING, I SINCERELY BELIEVE ADAM HAS IT WITHIN HIMSELF TO MAKE THE NECESSARY ADJUSTMENTS TO GRADUATE.

Tony Turco
Program Director.

OhioHealth/Hall
1033

<u>December 31, 2004</u>
Quarterly Date

# Doctors Hospital OhioHealth

## RESIDENT QUARTERLY EVALUATION

**EXHIBIT**
**9**

| | |
|---|---|
| **Department:** | Anesthesiology |
| **Evaluation of Resident:** | Adam Hall D.O. |
| **Period of Training:** | PGY - 2   R - 1 |

**Quarter:** Second

*Please write the number in the right-hand column that you think most nearly fits the Resident's usual behavior or characteristics, using the following scale:*

0 = Unable to evaluate  3 = Average
1 = Definitely below average  4 = Above average
2= Somewhat below average  5 = Superior

### CHARACTERISTICS:

1. Shows good clinical judgement, reaches valid decisions, takes appropriate action.  2

2. Has thorough up-to-date <u>knowledge of program</u>, appropriate to stage in career.  3

3. Makes thorough examination of each patient as may be required for accurate diagnosis and treatment.  2

4. Keeps full and accurate records, legibly written.  3

5. Maintains genuine concern for patients during their illness and after discharge.  3

6. Communicates well in every day work and relationships.  3

7. Is available when needed and carries fair share of the load.  3

8. Is considerate of others - patients, co-workers, all hospital personnel.  3

9. Is serious about learning - from books and journals, from conferences, and from own mistakes.  3

10. Shows professional behavior, is high-principled, of unquestionable integrity.  3

11. Teaching abilities.  3

12. Technical skills.  3

Should Resident continue in program?  Yes ☑  ~~No ☐~~  *in probationary status*

**COMMENTS REQUIRED:**
Dr. Hall has improved somewhat since his last evaluation. However, it is the department's opinion that he continue on probation until otherwise reviewed.

**THIS EVALUATION MUST BE DISCUSSED WITH THE RESIDENT AND SIGNED BY THE RESIDENT IN THE PROGRAM DIRECTOR'S PRESENCE.**

RESIDENT'S SIGNATURE: _____  Date: 1-7-5

PROGRAM DIR'S SIGNATURE: _____  Date: 1-7-05

DME'S SIGNATURE: _____  Date: 01/12/05

OhioHealth/Hall
1034

01/27/2006 FRI 1:33 FAX 6145441751 OH Medical Education @002/009

5100 West Broad Street
Columbus, OH 43228



✷ **Doctors Hospital**
OhioHealth

**EXHIBIT**

10

**RESIDENT CONTRACT**

Institution No. ___118542___
Resident's AOA No. ___074687___
Year of Training __PGY-3, R-2__
City & State __Columbus, Ohio__

*This Contract,* is executed between <u>Doctors OhioHealth Corporation d/b/a Doctors Hospital</u> (hereafter called the Institution) and <u>Adam Patrick Hall, D.O.</u> (hereafter called the Resident).

# WITNESSETH:

WHEREAS, the Institution has been approved by the American Osteopathic Association (hereafter called the "AOA") for a training program of residents and has, as a condition for the continued maintenance of such approval, agreed to abide by the residency standards, rules and regulations, of the AOA, and

WHEREAS, the Resident has made application to the Institution for appointment to serve as a Resident in an AOA-approved residency, and said application has been accepted by the Institution's governing board,

NOW, THEREFORE, in consideration of the above and of their mutual promises contained herein, the Institution and the Resident agree as follows:

**A.    THE INSTITUTION AGREES:**
1. To appoint the Resident into its program for <u>twelve (12)</u> consecutive months, not to exceed twelve (12) months, beginning <u>February 2, 2005</u>, and ending on <u>February 1, 2006</u>.
2. To provide training for the Resident in the field of <u>Anesthesia</u> by providing an educational program in accordance with AOA standards.
3. To define the duties of the Resident.
4. To clearly delineate policies and procedures for evaluation of resident performance, including provisions for promotion, demotion, retention, and dismissal. Such defined procedures shall allow for due process. Such policies shall also include requirements concerning work hour limits in clinical activity and a moonlighting policy and process for monitoring. A copy of the Institution's Resident Work Hours and Supervision Policies is attached and incorporated herein by reference.
5. To provide for the payment to the Resident a stipend of <u>$ 43,353/ year.</u>
6. To furnish the Resident with a written statement listing all benefits that will be provided by the Institution to the Resident including, but not limited to, health insurance and professional liability insurance.
7. To furnish the Resident with a written copy of the Institution's education program which will serve as a guide for residency training.
8. To present or cause to be presented to the Resident a certificate of residency upon satisfactory completion of the Institution's residency educational program.

**B.    THE RESIDENT AGREES:**
1. To serve as a Resident in the field of <u>Anesthesia</u> during the entire period specified in paragraph A.1. of this contract.
2. To perform all duties assigned by the Institution to him/her to the best of his/her ability, to maintain standards of professional competence as determined by the Institution, and to conduct himself/herself in a professional manner at all times.
3. To observe all rules and regulations of the Institution pertaining to residents.
4. To engage during the term of the residency only in such activities of a professional nature as are approved by the Institution and the AOA. Such activities shall include compliance with institutional and AOA work hour policies to include all policies regarding moonlighting.
5. To refrain during the entire term of the residency from engaging or participating in any nonprofessional activities which would interfere with the Resident's effective performance of this contract.

**C.**     **THE PARTIES FURTHER AGREE:**

1. That the Resident and the Institution are the only parties to this agreement. The AOA is not a party to this agreement.

2. That this contract may be terminated at any time by a Written Release by Mutual Consent. In the event of such termination, the Institution shall determine the amount of credit, if any, toward satisfying AOA residency education requirements to be awarded the Resident.

3. That if the Resident by action or inaction commits or allows to occur any action or course of action, which the Institution reasonably believes involved moral turpitude or is contrary to the interests of patient care or the general welfare of the Institution, the Institution may terminate the Resident's service without prior notice, and the Resident will not be issued another AOA Resident Contract for a program approved by the AOA for a period of one year from the date of termination, unless sooner exonerated.

4. That if the Resident fails to pursue satisfactorily the Institution's educational and clinical program, the Program Director / Director of Medical Education shall provide the Resident with written notice that the Resident is on probationary status. Thereafter, if the identified deficiencies are not corrected, the Institution may terminate its relationship with the Resident at any time.

5. That if the Institution loses its approval for resident training during the period of this contract, on the effective date of loss of such approval, the Resident shall have the option to be released from this contract and shall not be prohibited from immediately entering another Institution approved by the AOA for residency training. Also, effective on the date of loss of approval, the Institution shall terminate the residency training program, at which time the Resident shall be granted credit for that portion of the residency completed and released therefrom.

6. That if the Resident unilaterally terminates this contract in order to participate in a program which does not have AOA approval, the Resident, as a result, may be denied access to the AOA training approval process thereafter.

7. That the institution and the Resident shall immediately notify the Council on Postdoctoral Training of the AOA in writing in the event of a breach or unilateral termination of this contract, by either party or of the termination of this agreement by written release by mutual consent. In the event of mutual release, it shall be the duty of the Institution to send a signed copy of the release to the Council on Postdoctoral Training of the AOA.

8. That this contract incorporates by reference "Residency Training Requirements of the American Osteopathic Association" to the extent that the Residency Training Requirements of the American Osteopathic Association relate to the obligations of the parties hereto and do not conflict with the terms of this contract.

9. If the Resident changes specialty areas, the Resident may be allowed to start another AOA-approved program without regard to the one-year limitation in paragraph C.3. above.

**IN WITNESS WHEREOF**, this agreement has been executed by the parties hereto, to be effective as of the date of execution by the institution.

Resident: _____     Institution:

Date: _____ 1-26-5 _____     By: _____ Kirk C. Killiard D.O. _____

               Date: _____ 1-26-05 _____

(This proviso to be filled in only in the case of a Written Release by Mutual Consent.)
The parties hereby mutually consent to the release of their contractual obligations, as of the __02__ day of ____01____, 20_06_.

_____
(Resident)

_____
(Institution)

    NOTE: All signed contracts are to be kept in the trainee's File. **DO NOT SEND A COPY TO THE AOA.**

        A contract audit will be conducted annually in October by the AOA

_____
(Witness)

# DOCTORS HOSPITAL
## COLUMBUS, OHIO

### RESIDENT HOSPITAL CONTRACT ADDENDUM

This is an Addendum made as of **April, 1999**, to the **2005-2006** Resident Contract (the "Agreement") by and between "Resident" and Doctors OhioHealth Corporation d/b/a Doctors Hospital "Institution" (this "Addendum"). To the extent of any inconsistencies between the terms of this Addendum and the terms of the Agreement, the terms of this Addendum shall supersede the inconsistent terms of the Agreement. The parties to the Agreement hereby agree as follows:

I.     The Section B of the Agreement is hereby modified by adding the following to subsections B.3., B.4., B.5., B.6., B.7.:

B.3.    It is specifically understood and agreed by the parties to the attached residency agreement the Resident is familiar with the provisions of the American Osteopathic Association rules and regulations pertaining to Residency Training Requirements of the American Osteopathic Association.

The Resident understands, during the residency, the Resident is obligated to participate in conferences at bedside, in the operating room, in the delivery room, and in the laboratories, and to attend staff meetings, teaching rounds, departmental conferences, seminars, lectures, and clinical pathological conferences, and such other educational exercises as a part of the overall teaching program of the hospital designed to meet the standards for accreditation by the American Osteopathic Association.

The Resident further agrees to be bound by the Residency Training Requirements of the American Osteopathic Association and amendments thereto, as published by the American Osteopathic Association which publication is made a part hereof to the same extent and as fully as if rewritten herein.

B.4.    Section B of the Agreement is hereby modified by deleting subsections B.4. and replacing it with the following:

To engage during the entire term of the residency in such activities of a professional nature as are approved by the Institution.

OhioHealth/Hall
0987

01/27/2006 FRI 1:33   FAX 6145441751 DH Medical Education                    @009/009

B.5.   This contract is predicated upon the Resident successfully passing a pre-employment drug screen, valid certificate of training, or verification of licensure, education, and training.

While training as a Resident at the Institution, the Resident will be provided professional liability insurance coverage through a commercial or self-insurance program maintained by the Institution. Such professional liability insurance coverage for the Resident will cover the Resident while acting within the scope of duties and responsibilities under the training program. Responsibilities include, without limitation, participation in patient care at the Institution.

Such professional liability insurance coverage does not cover the Resident if he/she is acting outside the scope of duties and responsibilities under the training program without limitation, or while participating in patient care activities off the premises of the Institution in Columbus, Ohio unless such activity is specifically authorized by the Chief Operating Officer of the Institution. Such professional liability insurance shall not cover the Resident for any wrongful intentional acts of omissions committed by the Resident such as assaults, batteries, liable, slander or other intentional acts during his/her training period at the Institution.

In consideration of such coverage, the Resident agrees to provide the Institution's Risk Manager or General Counsel with prompt notice of any claim or potential claim of professional liability, and to cooperate with the Institution's Risk Management Department, General Counsel's office and trial counsel in the investigation and defense of any claim made against the Resident or the Institution due to the Resident's delivery of care.

In the event a claim or suit is made or filed against the Institution or against the Resident arising out of any acts or omissions of the Resident while participating in the training program, the Resident agrees he/she shall cooperate with the Institution and its attorneys in the defense of such claim or suit, including without limitation; cooperating in the investigation of such claim, attendance at depositions, and/or trial and maintaining confidentiality of all communications with the Institution and its attorneys. Failure or refusal of the Resident to cooperate with the Institution and its attorneys, including failure to attend any trial of any claim, if necessary, will result in the Resident not being protected under professional liability through the

OhioHealth/Hall
0988

Institution's commercial or self-insurance program. The Institution or its insurer agrees to assume all reasonable expenses incurred by the Resident in cooperation with the Institution and its attorneys, including travel to Columbus, Ohio or elsewhere to attend depositions or trial.

The Institution or its insurer shall select attorneys to defend the hospital and the Resident in any claim or suit and shall pay all attorney fees and expenses incurred. Should the Resident desire to engage in an attorney or his/her own, which is not agreed upon by the Institution, the Resident shall be responsible for the payment of any attorney fees and expenses incurred as a result of the Resident's selection of private legal counsel.

B.6.   Resident warrants to be a doctor of osteopathic medicine and agrees throughout the term of the contract to obtain a valid license to practice medicine in the State of Ohio within the second post graduate year and provide proof thereof. Resident agrees to provide Institution with immediate notice of any action taken or contemplated which may affect Resident's license to practice medicine.

B.7.   The Resident shall not submit nor accept fees or any other forms of compensation from patients or hospital department or employee for service.

II.   Section C of the Agreement is hereby amended by deleting subsections C.3. in its entirety and replacing it with the following new subsection C.3.:

C.3.   That if the Resident by action or inaction commits or allows to occur any action or course of action, which the Institution reasonably believes involved moral turpitude or is contrary to the interests of patient care or the general welfare of the Institution or its employees the Institution may terminate the Resident's service without prior notice, and the Resident will not be issued another AOA residency contract for a program approved by the AOA for a period of one year from the date of termination, unless sooner exonerated.

III.   Section C of the Agreement is hereby amended by deleting the last sentence of subsection C.4. and replacing it with the following new sentence.

C.4.   Thereafter, if the identified deficiencies are not corrected, the Institution may terminate its relationship with the Resident without further notice.

OhioHealth/Hall
0989

01/27/2006 FRI 1:34  FAX 6145441751 DH Medical Education                          ☒007/009

IV.   Except to the extent set forth in this Addendum, the Agreement
       remains as written without change.

**RESIDENT**                                           **INSTITUTION**

By: _____                By: _____

Date: _____1-26-5_____                  Date: _____1-26-05_____

OhioHealth/Hall
0990

# DOCTORS HOSPITAL
# COLUMBUS, OHIO

## RESIDENT HOSPITAL CONTRACT

### ADDENDUM B

This is an addendum made as of November 23, 2004 to the 2004-2005 Resident Contract ("the Agreement") by and between "Resident" and Doctors Hospital OhioHealth Corporation. To the extent of any inconsistencies between the terms of this Addendum and the terms of the Agreement, the terms of this Addendum shall supersede the inconsistent terms of the Agreement. The parties to the Agreement hereby agree as follows:

1.  The resident will be placed on academic review for (6) six months (November 23, 2004 – April 23, 2005) of the current residency training contract to assess the resident's behavioral, interpersonal, professional competencies, and skills level as related to the resident training program level in Anesthesiology. Therefore, the Medical Education Department will extend the resident's contract as a PGY II, R-1 until April 23, 2005.

2.  The resident will attend counseling sessions as appointed by the program director and the Medical Education Department to address the behavioral changes necessary to meet the competencies of professionalism, interpersonal skills, and communications. Specific behaviors that will not be tolerated are as follows: personal communications with friends, family, and/or employees during work hours; inappropriate interactions with staff, and inattention to monitoring patients during anesthesia.

3.  During this period, the resident will be restricted from moonlighting within or outside Doctors Hospital. However, the resident will be required to attend all departmental meetings, lectures, and journal clubs.

4.  A monthly and quarterly evaluation and review will be completed during the entire academic review time frame. If the program director and department's resident evaluation committee assess the resident's competencies and skill level to be consistent with the beginning level PGY3-R2 at the end of the (6) six month academic review, the resident will advance to that level. If, however, the program director and department's resident evaluation committee decides that the resident has not met the above expectations, it will be recommended that the resident be released from his contract as an Anesthesia Resident with Doctors Hospital.

OhioHealth/Hall
0991

RESIDENT SIGNATURE                    INSITITUTION SIGNATURE

Adam Hall, DO                         Kirk L. Hilliard, DO
                                      VP Medical Education

DATE ___1-26-5___                     DATE ___1-26-05___

OhioHealth/Hall
0992

## Doctors Hospital
**OhioHealth**

## EVALUATION OF
### RESIDENT PERFORMANCE

Return to Dept of Medical Education

Stacey Caster
5109 West Broad St.
Suite 205
Columbus, OH  43228

| NAME | Adam Hall | SERVICE | Anesthesia | DATES | 1/1 - 3/31/05 |
|---|---|---|---|---|---|

Please indicate the level of competency in consideration to level of training.  A rating of **1** must be accompanied by an action plan or recommendation for remediation.  A rating of **4** must be accompanied by supporting observations.

| **COMPETENCY RANGE**<br>*Circle one rating* | Unsatisfactory/<br>Needs Attention | Competent/<br>Meets<br>expectations | Skilled | Exceeds<br>expectations | Does<br>Not<br>Apply |
|---|---|---|---|---|---|
| **Patient Care:** compassionate, appropriate and effective for the promotion of health, prevention & treatment of illness, and end of life | | | | | |
| 1. Gathered accurate, essential information from all sources:interviews, physical examinations, records, procedures | 1 | (2) | 3 | 4 | X |
| Comments: | | | | | |
| 2. Made informed recommendations about preventive, diagnostic, and therapeutic interventions based on clinical judgment, evidence, and patient preference. | 1 | (2) | 3 | 4 | X |
| Comments: | | | | | |
| 3. Performed competently the diagnostic and therapeutic procedures considered essential to the practice of medicine | 1 | (2) | 3 | 4 | X |
| Comments: | | | | | |
| **Medical Knowledge:** demonstrate knowledge of established and evolving biomedical, clinical, and social sciences | | | | | |
| 1. Applied open-minded, analytical approach to acquiring new knowledge | 1 | (2) | 3 | 4 | X |
| Comments: | | | | | |
| 2. Developed applicable knowledge of basic and clinical sciences | 1 | (2) | 3 | 4 | X |
| Comments: | | | | | |
| 3. Applied knowledge to clinical problem-solving, decision-making, and critical thinking | 1 | (2) | 3 | 4 | X |
| Comments: | | | | | |
| **Practice-Based Learning:** use scientific evidence and methods to investigate, evaluate, and improve patient care practices | | | | | |
| 1. Implemented strategies to enhance knowledge, skills, attitudes and processes of care | 1 | (2) | 3 | 4 | X |
| Comments: | | | | | |
| 2. Developed and maintained willingness to learn from errors and improve system or processes of care. | 1 | (2) | 3 | 4 | X |
| Comments: | | | | | |
| 3. Used information technology or other available methodologies to access and manage information, support patient care decisions, and enhance both patient and physician education. | 1 | 2 | (3) | 4 | X |
| Comments: | | | | | |
| **Interpersonal & Communication Skills:** demonstrate interpersonal & communication skills to establish professional relationships | | | | | |
| 1. Provided effective and professional consultation to other physicians and health care professionals | 1 | 2 | (3) | 4 | X |
| Comments: | | | | | |
| 2. Used effective listening, questioning and narrative skills to communicate with patients and families. | 1 | (2) | 3 | 4 | X |
| Comments: | | | | | |

## PLEASE CONTINUE EVALUATION ON REVERSE SIDE



EXHIBIT

OhioHealth/Hall
0664